## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-6 (TJK)** |
| | : | |
| **DOUGLAS AUSTIN JENSEN,** | : | |
| | : | |
| **Defendant.** | : | |

### MOTION FOR EMERGENCY STAY AND
### FOR REVIEW OF RELEASE ORDER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves this Court to, first, stay Defendant's release pending trial, and second, review the decision by the Magistrate Judge from the Southern District of Iowa to deny the government's motion for pre-trial detention. In support thereof, the government states the following:

## I.  BACKGROUND

### A.  Procedural Posture

On January 8, 2021, Defendant was arrested in his home state of Iowa on an arrest warrant issued from the United States District Court for the District of Columbia by Magistrate Judge G. Michael Harvey in connection with a Criminal Complaint arising out of the riot at the United States Capitol building on January 6, 2021.

On January 11, 2021, a federal grand jury sitting in the District of Columbia returned a six-count Indictment charging Defendant with Obstructing a Law Enforcement Officer During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Assaulting, Resisting, or Impeding a Federal Law Enforcement Officer, in violation of 18 U.S.C. § 111(a)(1); Entering and Remaining, and

Disorderly and Disruptive Conduct inside a Capitol Building, in violation of 18 U.S.C. §§ 1752(a)(1)-(2); and Violent Entry and Disorderly Conduct, and Parading, Demonstrating and Picketing in a Capitol Building, in violation of 40 U.S.C. §§ 5104(e)(2)(A)-(G). (Docket Entry 3).

Defendant appeared for Rule 5 proceedings in the Southern District of Iowa on January 12, 2021, in case Number 4:21-mj-11-HCA. The United States made a motion to detain the defendant without bond pending trial. The defendant is subject to detention pursuant to 18 U.S.C. § 3142(f)(1)(E), which provides for detention in cases where Defendant committed a crime while in possession of a deadly weapon—Defendant was in possession of a knife when he committed the charged crimes.  Chief Magistrate Judge Helen C. Adams ordered Defendant's temporary detention pending an identity and detention hearing. Id. (Docket Entry 10).  Defendant waived the identity hearing, but a detention hearing was held on January 19, 2021. Id. (Docket Entries 14-16).  On January 21, 2021, Magistrate Judge Adams ordered Defendant released pending trial and established release conditions. Id. (Docket Entries 17-18). Magistrate Judge Adams stayed her ruling until January 27, 2021, to allow the United States an opportunity to appeal to this Court pursuant to 18 U.S.C. § 3145(a).

### B.    Statement of Facts

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public. During the joint

session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice

President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there. Among those persons was Douglas Austin Jensen, who traveled from his home in Des Moines, Iowa, to participate.

Defendant's participation in the Capitol riot was reported to the Federal Bureau of Investigation ("FBI") by numerous sources after The Guardian, a British news media outlet, published video showing Defendant chasing a police officer during the riot. That video, which was published on January 7, 2021, quickly went "viral" on multiple social media sites, and numerous individuals who knew Defendant personally called FBI to report that Defendant was the person in the video.

On January 8, 2021, Defendant walked into the Des Moines Police Department and said that he wanted to talk to someone because he thought he was in trouble. Defendant was interviewed by a Detective and an FBI Special Agent, who identified themselves as such to Defendant before the interview began.  Prior to conducting the interview, Defendant was informed that the interview was being conducted voluntarily at his request, and that he was free to leave at any time.  Defendant was also informed that the interview was being recorded.  Defendant explained that he was a firm believer in "QAnon" or "Q," and was a proponent of President Trump's exercise of the "Insurrection Act" to declare martial law and prevent the "fraudulent" election of Joseph R. Biden from being certified by Congress.  Defendant said that, in his opinion, the first person to be arrested pursuant to the "Insurrection Act" would be Vice President Mike Pence.

Defendant stated that he traveled to Washington, D.C. to attend President Trump's rally because he had seen "Q" publish that "The Storm has arrived," and both "Q" and President Trump had called "all Patriots" to Washington, D.C. for the rally.  Defendant stated that he believed that it was "Showtime" – which he clarified to mean that he believed President Trump would order that Vice President Mike Pence and the rest of the "corrupt government" were going to be arrested, and he wanted to be there to see it. Defendant described himself as a "true believer."

Defendant stated that he was disappointed that President Trump did not make such an announcement at the rally, but that he had heard President Trump encourage everyone to march on the Capitol and he believed that something was going to happen there. Defendant stated that, while walking to the Capitol, he heard other "Patriots" talking about how they were going to "Storm the Capitol."  Defendant admitted that he agreed to participate because it was "Showtime" and he wanted to be a part of it.  Defendant stated that he wanted to participate in "Storming the Capitol" because "I was trying to fire up this nation," and "I'm all about a revolution."

During the course of the interview Defendant admitted that he was the person seen in the video published on The Guardian. Defendant admitted that he entered the Capitol by climbing a wall, and running with a crowd of others to a location with multiple windows.  Defendant stated that he entered the Capitol by climbing through a window after someone else used "tools" to break it.  Defendant stated that, once inside the Capitol building, he pushed his way to the front because he was wearing a shirt with a large "Q" on it with their motto "Where We Go One, We Go All," and he "wanted Q to get the credit" for what they were about to do.  When asked to clarify, Defendant stated, "I wanted to stop this crap with Mike Pence."

Defendant specifically admitted chasing a Capitol Police officer, and that he had refused to obey the officer's lawful orders to stop and leave the Capitol. Defendant further admitted to

yelling "I'll take it" when the officer raised a baton to threaten Defendant to move back. Defendant further admitted to yelling "Why are you defending these m*****f*****s, why aren't you arresting them" and "I'm only here to make you do your jobs and arrest these people" during his altercations with the officer.  Defendant admitted that when he said "them" and "these people" he was referring to "the corrupt government," including Vice President Mike Pence.

During the interview, Defendant provided agents his cell phone and gave written consent for them to search it.  Defendant admitted that he had deleted his social media accounts from his phone after January 6, 2021, so as not to be in possession of incriminating material. Law enforcement is in the process of searching the phone, which contains more than 100GB of data. When the interview concluded, Defendant was allowed to leave the Des Moines Police Station. FBI Special Agents and undersigned counsel then secured a criminal complaint and warrant for Defendant's arrest.

### C.     Order for Release

On January 21, 2021, two days after a detention hearing the Southern District of Iowa, the magistrate judge issued an Order of Release for the defendant with certain conditions. The magistrate judge stayed the implementation of that order until January 27, 2021, to give the United States an opportunity appeal.

## III.     **ARGUMENT**

### A.  This Court Has the Authority to Stay and Review the Release Order

Title 18, U.S.C. § 3145(a) states:

**(a) Review of a release order –** If a person is ordered released by a magistrate, …

> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

6

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised. In short, the Court may proceed as best enables it to resolve the question posed:  whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . .

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182,  3195-3196.[1]

---

[1] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News

**B.  The Bail Reform Act Factors All Weigh in Favor of Detention**

The United States is seeking detention pending trial pursuant to 18 U.S.C. § 3142(f)(1)(E), which provides for the possibility of detention where the defendant possessed a dangerous weapon during the course of the charged offenses. Consequently, the government requests review of the magistrate judge's decision to release the defendant and seeks a further stay of the order from this Court.

As the Court is aware, there are four factors under Section 3142(g) that the Court should analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. Each of these factors weighs in favor of pretrial detention in this case.

### 1.       The Nature and Circumstances of the Offenses Favor Detention

The nature and circumstances of the charged offenses weigh heavily in favor of detention. Defendant traveled from Des Moines, Iowa to the District of Columbia to attend President Trump's rally on January 6, 2021. After the rally, Defendant and thousands of others marched to the U.S. Capitol building and, eventually, forced their way inside. Defendant entered the Capitol through a broken window after another rioter threw a piece of wood through it and another rioter used a plastic shield to break the glass out of the frame.[2]

---

3182, 3486-3487. (Emphasis added.)

[2] The following photographs are "screenshots" of a video that was uploaded to YouTube on January 6, 2021. *See https://www.youtube.com/watch?v=aUjtmt_9GcY* (last visited January 19, 2021).

8

 

 

Once inside the Capitol, Defendant pushed his way to the front of the pack, and engaged in a confrontation with Capitol Police Officer Eugene Goodman.[3] Officer Goodman repeatedly ordered Defendant and the other rioters to back up and leave the Capitol building. Defendant refused and, indeed, kept advancing toward Officer Goodman in a menacing manner – even as Officer Goodman retreated to recover a baton that had been dropped onto the floor. The video shows that Defendant was primary aggressor, and other members of the mob followed his lead in pursuing Officer Goodman into the Capitol building.

---

[3] The following photographs are "screenshots" of a video that was uploaded to YouTube on January 7, 2021. *See https://www.youtube.com/watch?v=_cA2l0n5gPE* (last visited January 20, 2021).



When Officer Goodman recovered the baton, raised it, and ordered Defendant to "get back," Defendant responded "I'll take it," indicating that he would physically take the baton from Officer Goodman if Officer Goodman tried to use it on Defendant. Officer Goodman, who was facing the mob on his own, then retreated up the stairs and radioed twice for backup to direct other officers to the mob's location. Defendant, followed by the mob, chased Officer Goodman up the stairs.



When Officer Goodman reached the second floor, he positioned himself so that he was between Defendant and the Senate floor – which had not yet been evacuated. During this altercation, Defendant was yelling that Officer Goodman should be arresting members of the

"corrupt government" and that Defendant was there to make sure that he did so. Realizing that he could not prevent the mob from storming the Senate floor by himself, Officer Goodman baited Defendant into continuing to follow him – luring Defendant and the mob away from the Senators that Defendant wanted to "arrest." Officer Goodman's ruse worked, and Defendant continued to pursue Officer Goodman. At one point, Defendant reached into his pocket where we now know he had a knife.[4]



Immediately thereafter, several additional Capitol Police officers joined Officer Goodman and attempted to quell the mob, and Defendant removed his hands from his pockets. Officers

---

[4] Defendant admitted to law enforcement that he brought the knife with him, into the Capitol and surrendered it to law enforcement. Defendant's possession of a dangerous weapon also raises the maximum penalty for 18 U.S.C. § 1752(a)(1) and (2) to ten years imprisonment, because the Capitol riot resulted in significant bodily injury. 18 U.S.C. § 1752(b)(1).

reported that they were too far outnumbered to attempt to arrest the rioters, so instead they used their training to try and de-escalate the situation by talking with individuals in an attempt to calm them down. Notwithstanding these efforts, offers were met. Rather, they were met with shouting and aggression. On the video, rioters can be heard shouting "this is our house," "this is our America," and "we're here for the corrupt government". Defendant admitted during the voluntary interview that he aggressively shouted "why aren't you defending these m*****f*****s, you should be arresting them!"

 



Capitol Police Officer Keith Robichow reported that, during this altercation, one of the rioters slammed a fire extinguisher on the ground causing it to rupture. Officer Robichow described that it sounded

12

like an "explosion," and – given both the sound and the white powder in the air – both the rioters and the officers were momentarily shocked and everyone took a step back. Officer Robichow described that Defendant was the only one who seemed unfazed by the "explosion" and continued to advance toward the police officers.  Officer Robichow stated that Defendant was the most aggressive of the rioters – because he was constantly encouraging the other rioters to move forward, and seemed intent on starting a fight with officers. Officer Robichow stated, however, that the scariest thing about Defendant was that he kept calmly approaching officers even when everyone else was momentarily fazed by the "explosion."  This event was captured in multiple photographs, including a photograph which shows Officer Robichow standing between Defendant and the rest of the police line trying to defuse the situation.



Officer Robichow stated that he and the rest of the officers were eventually able to de-escalate the tension between the rioters and the officers, and the rioters all left the atrium where this confrontation occurred. Many of the rioters, upon retracing their steps out of the atrium, found their way onto the Senate floor – which had been evacuated while this confrontation took place.  It is not clear where else Defendant went inside the Capitol building after this confrontation was de-escalated.

## 2.    <u>The Weight of the Evidence Favors Detention</u>

The weight of the evidence against Defendant weighs strongly in favor of detention. Defendant's involvement in the events of January 6, 20201, was memorialized in press photographs and surveillance video from the Capitol building itself. Defendant also published

photographs of himself inside the capitol – and self-identified – on his Twitter account.



Moreover, given the sheer number of photographs and videos taken at the Capitol on January 6, 2021 – as well as internal surveillance footage – the United States anticipates that its evidence against Defendant will increase as agents are able to acquire and review that additional footage.

### 3.     Defendant's History and Characteristics Favor Detention

Defendant's History and Characteristics also weigh in favor of detention. Defendant is a self-described adherent of "QAnon"—a conspiracy that thrives on spreading misinformation and encouraging violence.  Defendant's eagerness to travel more than 1,000 miles in hopes that he would hear President Trump declare martial law, and his willingness to take martial law into his own hands when no such pronouncement came, says more about Defendant's characteristics than any criminal history ever could.

Nevertheless,  Defendant has a number of convictions which demonstrate violence and/or dangerous behavior.

| Date | Jurisdiction | Charge(s) of Conviction | Sentence |
|---|---|---|---|
| 3/7/15 | Olmstead County, Minnesota | Domestic Assault<br>Disorderly Conduct | 3 days imprisonment<br>1 year probation |
| 2/17/07 | Polk County, Iowa | DUI | Deferred Judgement<br>1 year probation |
| 12/26/06 | Polk County, Iowa | Fifth Degree Theft | Deferred Judgment |

| | | | Community Service |
|---|---|---|---|
| 1/31/05 | Warren County, Iowa | Conspiracy to Deliver a Controlled Substance | Deferred Judgment 2 years' Probation |

Defendant's Pretrial Services Report in the Southern District of Iowa reports that he was fired from his job based on his actions on January 6, 2021. PS3 Form, Case No. 4:21-mj-11-HCA (Docket Entry 12, at 2) (1/15/21). Defendant admits to taking Hydrocodone and muscle relaxers for a back injury, and also reports being a daily marijuana user. Id. at 3. Defendant reports to drinking "monthly," and that when he drinks he drinks to intoxication. Defendant also reported having experimented with both cocaine and methamphetamine in the past.

**D.      The Danger to the Community Created by Defendant's Release Favors of Detention**

Defendant poses a substantial risk of danger to the community if he is released. A self-described "true believer" who is "all about a revolution" voluntarily chose to join a riot seeking to "arrest" lawmakers who were going to certify an election that he believed to have been stolen. In order to make good on his intent to "stop this crap with Mike Pence," Defendant led a large mob that chased a Capitol Police officer up two flights of stairs – menacing the officer all the way, and at one point reaching into a pocket where he held a pocket knife.  Defendant made it perfectly clear that the Capitol Police officers should be *arresting* Vice President Pence, Senators, and Congresspersons, not *protecting* them. Defendant believed that such arrests were mandatory, and he and the mob were present to make sure they happened.

Releasing Defendant from custody will only reinforce his belief that his cause is just. If nothing else, the events of January 6, 2021, have exposed the size and determination of right-wing fringe groups in the United States, and their willingness to place themselves and others in danger to further their political ideology. Anyone who would act as Defendant acted, for the reasons he identified in support of his actions, is a *per se* danger to the community. There is no reason believe

15

that Defendant is any less interested in "revolution" simply because the results of the election that he believes is fraudulent was certified and President Biden has been inaugurated. Allowing Defendant to be released pending trial, even under substantial release conditions, creates a substantial risk of danger to the community.

## **CONCLUSION**

This Court has the authority to stay the Magistrate Judge from the Southern District of Iowa's Order to release Defendant pending trial in this case. Moreover, this Court has the authority to overrule that decision and order that Defendant be detained and transferred to the District of Columbia pending trial. This case warrants such an exercise of the Court's authority. All four of the Bail Reform Act factors weigh heavily in favor of detention in this case, and there is no condition, or combination of conditions, that will ensure the safety of the community if Defendant is released.

Respectfully submitted,
MICHAEL R. SHERWIN
Acting United States Attorney
New York Bar No. 4444188


By:      _/s/  James B. Nelson_
         JAMES B. NELSON
         D.C. Bar No. 1613700
         Assistant United States Attorney
         Federal Major Crimes Section
         555 4th Street, N.W.
         Washington, D.C. 20530
         (202) 252-6986
         james.nelson@usdoj.gov