**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-6 (TJK)** |
| | : | |
| **DOUGLAS AUSTIN JENSEN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION TO REVOKE DETENTION ORDER**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to defendant Douglas Jensen's motion to revoke detention order, dated June 7, 2021. Dkt. 21.

Douglas Jensen wanted to be the "poster boy" for the events that unfolded at the Capitol on January 6. And, in his words, "it really worked out." The harrowing footage of Jensen spearheading the menacing pursuit of Officer Goodman up two flights of stairs remains one of the most infamous videos from January 6. A self-proclaimed "digital soldier" and "religious" adherent of QAnon, Jensen traveled to Washington D.C. because he was "all about a revolution," and was "trying to fire up this nation." While he claims now to have been there only to "observe" the arrest of lawmakers, including former Vice President Mike Pence, his actions that day tell a different story. From scaling the outer walls of the Capitol, to climbing through broken windows, and ultimately threatening the life of a United States Capitol Police officer, Jensen's actions evinced an intent to disrupt the legitimate and most sacred function of the United States Congress – and a willingness to resort to violence to do so. This intent, coupled with defendant's actions on January 6, 2021, indicate by clear and convincing evidence, that releasing defendant would pose a danger to the public.

1

For the reasons discussed below, the government opposes the defendant's motion to revoke the Court's February 23, 2021 detention order. The government will not restate the arguments and facts proffered in its Motion for Emergency Stay and For Review of Release Order (hereinafter, the "Emergency Motion"), but incorporates those facts and arguments herein by reference. *See* Dkt. 5. There is a basis to hold the defendant under 18 U.S.C. § 3142(f)(1)(E). *See* Dkt. 21, ¶ 3 n.1 (conceding that a knife constitutes a "dangerous weapon" for purposes of § 3142(f)(1)(E)).

## **BACKGROUND**

This section summarizes the procedural history of this case following the government's filing of its Emergency Motion on January 22, 2021.

On February 10, 2021, a federal grand jury returned a seven-count superseding indictment charging Jensen with five felonies and two misdemeanors. *See* Dkt. 12. Specifically, the grand jury charged Jensen with civil disorder, in violation of 18 U.S.C. § 231(a)(3); obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2; assaulting, resisting, or impeding federal law enforcement officers, in violation of 18 U.S.C. § 111(a)(1); unlawfully entering and remaining in a restricted building while carrying a deadly and dangerous weapon, that is, a knife, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); disorderly and disruptive conduct in a restricted building while carrying a deadly and dangerous weapon, that is, a knife, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, and picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

An arraignment and detention hearing were held before this Court on February 23, 2021. Though defendant conceded detention, the Court nevertheless made several factual findings in support of its conclusion that no conditions or combination of conditions of release could

reasonably assure the safety of any person and the community.  *See* Dkt. 15.  In particular, the Court described the "gravely serious" nature and circumstances of defendant's offense, including the fact that defendant "allegedly travelled halfway across the country . . . attended a rally in support of former President Trump, joined rioters by climbing through a broken window to enter the Capitol while armed with a knife, led a mob chasing Capitol Police Officer Eugene Goodman up a flight of stairs in a menacing fashion, threatened to take the officer's baton, and refused to obey the officer's lawful orders to stop and leave."  *Id.* at 3.  The Court also expressed concern with the fact that Jensen's actions on January 6 were "motivated by conspiracy theories that, in Mr. Jensen's words, led him to be 'all about a revolution' against the lawful government of the United States."  *Id.* at 4.  Because the Court had "no basis to conclude that Mr. Jensen's interest in 'revolution' against the United States government and his willingness to use force to accomplish that goal" had come to an end, the Court found that Jensen must be detained pending trial because the government had proven by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any person and the community if defendant were released.  *Id.* at 2-4.

On April 9, 2021, a federal grand jury returned a second superseding indictment charging Jensen with aggravated assault rather than simple assault because Jensen's assault involved "an intent to commit another felony."  *See* Dkt. 17.  Whereas simple assault is punishable by up to one year of imprisonment, aggravated assault is punishable by up to eight years' imprisonment.  *See* 18 U.S.C. § 111(a)(1).

Defendant filed the instant motion to revoke this Court's detention order on June 7, 2021. A bond hearing is scheduled for June 24, 2021.

## ARGUMENT

### I.    Applicable Authority.

Because defendant was ordered detained by the court having original jurisdiction over the offense, he is not entitled to review of his detention order under 18 U.S.C. § 3145(b).  *See* 18 U.S.C. § 3145(b) ("If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order.").  Accordingly, defendant's motion must be construed as either a motion to reopen a detention determination under § 3142(f), or a motion for reconsideration.

Section 3142(f) of the Bail Reform Act provides that, at any time prior to trial, a detention determination "may be reopened" if new information "that was not known to the movant at the time of the hearing" surfaces that has a "material bearing on the issue [of] whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f).  Thus, even if the movant asserts new information, that information must have a "material bearing" on the § 3142(g) factors that the Court must consider when deciding whether or not a defendant should be detained pending trial.  *See United States v. Leake*, No. 19-CR-194, 2020 WL 1905150, at *2 (D.D.C. Apr. 17, 2020).  Those § 3142(g) factors include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *See* 18 U.S.C. § 3142(g).  The § 3142(g) factors do not include consideration of the need for a defendant to "get his affairs in order" before entering a

plea or the impact that pretrial detention has on a convicted defendant's security level designation at the time of sentencing.  *See* Dkt. 21 ¶ 16.

In addition, though not expressly authorized by the Federal Rules of Criminal Procedure, a defendant may seek reconsideration of a detention order.  *United States v. Worrell*, No. 21-CR-292, 2021 WL 2366934, at *9 (D.D.C. June 9, 2021).  "For interlocutory pretrial-detention orders, courts in this district apply the 'as justice requires' standard ordinarily applied to motions under [Federal Rule of Civil Procedure] 54(b)."  *Id.* (citing *United States v. Hong Vo*, 978 F. Supp. 2d 41, 47 (D.D.C. 2013)).  Thus, "[r]econsideration may be warranted under this standard when, within the court's discretion, the court has 'patently misunderstood the parties, made a decision beyond the adversarial issues presented, or made an error in failing to consider controlling decisions or data, or where a controlling or significant change in the law has occurred.'"  *Id.* at *10 (quoting *Hong Vo*, 978 F. Supp. 2d at 48).  The corollary of that narrow standard of review is that a motion for reconsideration "should not be used as a vehicle for relitigating issues on which the court already ruled because the party disagrees."  *Id.*  Put differently, a motion for reconsideration "cannot be used as 'an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier."  *Estate of Gaither ex rel. Gaither v. Dist. of Columbia*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (quoting *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 14 (D.D.C. 2010)).

Here, defendant seeks "to have his detention without bond status reviewed" and for the Court to permanently release defendant "pending resolution of this case."  Dkt. 21, at 1, 9. Construing this language as a request to reopen the detention hearing under § 3142(f), Jensen must present the Court with new information that was unknown to him at the time of the February 23, 2021 detention hearing, and that has a material bearing on the § 3142(g) factors.  Alternatively, if

Jensen can demonstrate that the Court, in its February 23 detention order, patently misunderstood the parties, made a decision beyond the adversarial issues presented, or made an error in failing to consider controlling law, then the Court may, in its discretion and as justice requires, reconsider its detention order.  As discussed further below, Jensen has failed to establish his eligibility for relief under either standard.

## II.     Jensen Is Not Entitled to Relief Under Section 3142(f).

Defendant's motion asserts no new facts that were unknown to him at the time of the February 23 detention hearing.  Instead, defendant's motion "respectfully disagrees" with the Court's analysis of the evidence proffered by the government in its Emergency Motion.  Dkt. 21 ¶ 10.  A defendant's disagreement with the Court's analysis is not a basis to reopen a detention hearing under § 3142(f).  Because defendant has failed to assert any new information that has a material bearing on this Court's assessment of his danger to the community, this Court should deny defendant's request to reopen the detention hearing.

Even if this Court were to consider defendant's alleged disavowal of QAnon as information that was not known at the time of the February 23 detention hearing, this fact does not have a material bearing on defendant's dangerousness.  The concern with respect to QAnon is less that Jensen actually believed its conspiracy theories, but rather that he was willing to engage in violent, harassing, and life-threatening conduct in order to promote his beliefs and undermine one of the most legitimate and sacrosanct functions of Congress.  That, coupled with Jensen's inability (or refusal) to exercise his independent judgment and conform his behavior to the law, render defendant an unacceptable danger to the community.

The fact that defendant attributes his actions on January 6 to his "victimization" by QAnon does little to assuage the government's concern that he will not act in the same or similar ways in

the future.  Defendant cannot hermetically seal himself from the world and all of its negative and potentially corrupting influences.  If, at age 41, Jensen does not have good enough judgment to know not to violently break into the Capitol and menacingly chase a law enforcement officer under any circumstances, then he cannot be trusted to abide by any release conditions that this Court could impose.

Finally, it's important to consider that not only was defendant willing to harm a law enforcement officer for QAnon, but he was also willing to sacrifice his family, friends, job, and health for an unknown entity with whom he had only ever interacted via social media.  For example, in order to attend the rally on January 6, defendant had to drive 16 hours, without stopping, after working a full-day construction shift, in order to make it to D.C. in time for Trump's speech.  Then, without having slept in over a day, Jensen walked nearly two miles from the rally to the U.S. Capitol, where he engaged in close to five hours of vigorous and life-threatening physical activity, including scaling the outer walls of the Capitol, jumping through shattered windows, and chasing an officer up a flight of stairs.  Jensen also risked his job by attending the rally, since his employer had informed him that he would be required to quarantine for two weeks upon his return from D.C.  The individual who traveled with Jensen to D.C. on January 5 described him as follows: "The conspiracy theory shit's going to his head.  And I mean anybody that knows Doug will tell you conspiracy theories go into his head."  When the interviewing agent asked if Jensen had "really bought in," the individual replied, "Uh, ya, believe you me.  He bought into a lot more than just Trump and the whole political aspect.  Some of the shit that he's researching is like, seriously dude?  For real?  Do you realize how you sound and what you look like right now telling me about some of this crazy weird shit?"  Jensen's wife also described how all of his "researching, and learning, and stuff he didn't know" changed Jensen.  In sum, even if Jensen

could physically, mentally, and emotionally distance himself from QAnon, that does not change the fact that he has, and will continue, to take any risk and break any law in order to pursue and promote his beliefs.

**III.    Jensen Has Not Alleged Any Facts that Merit Reconsideration of the Detention Order.**

Jensen is not entitled to reconsideration of the detention order based on his disagreement with the Court's analysis of the now-infamous video of defendant pursuing Officer Goodman.  It is well-established that a motion for reconsideration "cannot be used as 'an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier."  *Estate of Gaither*, 771 F. Supp. 2d at 10 (internal quotation marks omitted).  Here, Jensen has already had an opportunity to present his theories and arguments regarding his conduct on January 6.  Instead of doing so, however, Jensen conceded detention at the February 23 hearing.  Dkt. 21 ¶ 6.  Therefore, the Court should decline to exercise its discretion to reconsider its detention order, especially where defendant's new theories and arguments center on evidence that was available to him well before the February 23 detention hearing.

But even if this Court were to exercise its discretion to reconsider the February 23 order, the facts of this case overwhelmingly favor detention.  New evidence shows that Jensen began leading and inciting the mob before ever stepping foot inside the Capitol building.  For example, video recovered from defendant's cell phone shows that he was at the front of a line of protesters who clashed with uniformed law enforcement officers outside the Capitol building.



*Screenshot from Gov't Exh. A*

Once Jensen and the other rioters were able to overtake and advance past these officers, Jensen

began scaling the outer walls of the Capitol building staircase.



*Screenshot from USCP Surveillance Footage*

When Jensen reached the top of the staircase, he knelt atop the ledge, raised his arms triumphantly,

and shouted, "Storm the White House [sic], that's what we do." *See* Gov't Exh. B.



*Screenshot from USCP Surveillance Footage*



*Screenshot from Gov't Exh. B*

Jensen ultimately made his way up the staircase and to the Senate Wing door, where he was one

of the first ten rioters to climb through a shattered glass window and enter the Capitol building.



*Screenshot from USCP Surveillance Footage*

As is now familiar to this Court, once inside the Capitol, Jensen maneuvered his way to the front

of a mob and immediately began accosting Officer Goodman.  Despite Officer Goodman's

repeated orders to back up and leave the Capitol building, Jensen refused.  Instead, Jensen kept

advancing toward Officer Goodman in a stoic and menacing manner, even as Officer Goodman

began to retreat.



*Screenshots from Def. Exh. 1*

Whereas the rest of the mob walked up the two flights of stairs behind Officer Goodman, Jensen actively sprinted.  In fact, the other rioters did not even enter the camera's view until seconds after Officer Goodman and Jensen reached the second floor landing.





*Screenshots from Def. Exh. 1*

As Jensen chased Officer Goodman up the stairwell, he said "I'll take it, I'll take it," not, as defendant's motion suggests, "I will take it for my country." Dkt. 21 ¶ 11. Even if Jensen intended his statement to be non-threatening, to a lone law enforcement officer being chased by dozens of angry rioters – the same rioters who, moments prior, used weapons to break through reinforced glass windows of the United States Capitol – the words "I'll take it" connote a threat to inflict injury.

As discussed in the government's Emergency Motion, Jensen's threatening conduct did not end with his pursuit of Officer Goodman. *See* Dkt. 5, at 11-13. According to Officer Robishaw[1] – a U.S. Capitol Police officer who came to Officer Goodman's aid – Jensen was the most aggressive of the rioters because he was constantly encouraging other rioters to advance forward in the standoff with law enforcement in the Ohio Clock Corridor. Indeed, according to Officer Robishaw, Jensen was so intent on confronting law enforcement officers that he appeared to be unfazed by the loud explosion of a fire extinguisher behind him.



---

[1] The government's Emergency Motion mistakenly refers to Officer Robishaw as Officer Robichow.



Finally, Jensen took pride in his and the other rioters' assaults on law enforcement. Indeed, moments after the standoff had subsided, Jensen began taking trophy selfies with U.S. Capitol Police officers and with a stolen officer hat.



In sum, Jensen deliberately positioned himself at the front of the crowd and, by word and deed, encouraged others to assault, accost, harass, impede, intimidate, pursue, and threaten the law enforcement officers who were there to protect members of Congress and to safeguard the integrity of the electoral vote certification.

IV.     **The Bail Reform Act Factors All Weigh in Favor of Detention.**

Pursuant to the Bail Reform Act, 18 U.S.C. §§ 3141-3156, there are four factors that the Court must consider in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person and the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g)(1)-(4).

A.     **The nature and circumstances of the offenses favor detention.**

This Court has already characterized Jensen's offense conduct as "gravely serious."  *See* Dkt. 15, at 3.  The new evidence proffered by the government further bolsters that finding.

In *United States v. Chrestman*, Chief Judge Howell set forth a number of considerations that several courts in this district have applied in assessing the comparative culpability of a given defendant in relation to fellow rioters.  No. 21-MJ-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021).  These considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses"; (2) "engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear"; (3) carried or used a dangerous weapon during the riot; (4) "coordinat[ed] with other participants before, during, or after the riot"; (5) "assumed either a formal or a de facto leadership role in the assault by encouraging others rioters' misconduct, for example, by urging rioters to advance on the Capitol or to confront law enforcement"; and (6) the nature of "the defendant's words and movement during the riot," including whether he "actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct."  *Id.*  Jensen's conduct on January 6 epitomizes nearly all of the

*Chrestman* factors.

In addition to leading a mob of rioters in a menacing pursuit of Officer Goodman, Jensen assumed a de facto leadership role when, after clashing with a row of uniformed police officers outside the Capitol building, he proceeded to scale a wall of the Capitol and shout "Storm the White House [sic], that's what we do" from atop the ledge.  Jensen actively and repeatedly threatened and confronted federal law enforcement agents throughout the Capitol grounds.  He celebrated other rioters' attempts to breach the restricted perimeter and disrupt the certification of the electoral vote, and he took trophy selfie photos to commemorate his standoff with law enforcement.

Jensen was armed with a dangerous weapon on January 6, namely, a pocket knife with a three-inch blade.  In a photograph from the standoff between Officer Goodman and Jensen, Jensen appears to be reaching toward his pocket, which we now know contained the below-pictured knife.



Jensen also engaged in at least some degree of planning, since, as he admitted to FBI agents during his voluntary interview, he deliberately wore his "Q" shirt to ensure that "Q got all the attention that day."  It is also clear from the defendant's statements leading up to his trip to D.C. that he came prepared to engage in violent, assaultive conduct.  For example, in text messages that

Jensen sent to a friend in December 2020, he wrote: "We are waiting on Q or Trump to tweet the words 'The STORM is here.'  All hell will break loose.  You'll see.  They started a fight they are not ready for. . . .  The corrupt politicians.  There will come a time when they won't be able to walk down a street.  You'll see. . . .  Nothing can stop what is coming."

Jensen's contemporaneous text messages on January 6 further show that he entered the Capitol building with the intention of causing mayhem and disrupting the democratic process.  For example, after receiving text messages from a friend stating "CNN pence banged the gavel" and "Joint sessions certified all electoral votes as is," Jensen replied "That's all about to change ;)" and sent the following photos:



Jensen then wrote, "We broke the fence down at the White House [sic]," and sent a video of himself touching the outer wall of the Capitol building.



*Screenshot from Gov't Exh. C*

In the video, Jensen says, "This is me touching the f***ing White House [sic]. This is why we're here. At the White House [sic]. So you know."

Finally, Jensen is charged with five felonies, and is facing up to twenty years' imprisonment if convicted. *See* 18 U.S.C. § 1512(c)(2).

Accordingly, based on these *Chrestman* factors, defendant falls squarely within the most serious category of rioters who stormed the Capitol on January 6.

Additionally, in *United States v. Munchel*, the D.C. Circuit made clear that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." 991 F.3d 1273, 1284 (D.C. Cir. 2021). As someone who actually assaulted a police officer and who was present as the rioters began smashing and climbing through the Senate Wing

door windows, Jensen is in a "different category" of dangerousness.  *Id.*  It is therefore clear that defendant fits comfortably within the category of Capitol rioters for whom detention is plainly warranted and appropriate.

### B.      The Weight of the Evidence Favors Detention

This Court has already characterized the weight of the evidence against Jensen as "overwhelming."  Dkt. 15, at 3.  After all, defendant's conduct on January 6 was extensively documented, making him one of the most well-known rioters present that day.

The case against Jensen has only grown stronger now that the government has had an opportunity to collect additional evidence from Jensen's cell phone.  This evidence includes hundreds of photos and videos taken by Jensen both inside and outside the Capitol, as well as extensive text messages between Jensen and his friends regarding QAnon, Jensen's intentions in traveling to Washington D.C., and his desire to stop the certification of the 2020 electoral vote. Moreover, the government has identified additional footage of Jensen confronting uniformed law enforcement officers outside the Capitol, which could potentially result in further charges against Jensen.  Therefore, the weight of the evidence continues to overwhelmingly favor detention.

### C.      Jensen's History and Characteristics Favor Detention

Jensen's history and characteristics demonstrate that he presents an ongoing articulable threat to the community.  Though Jensen's criminal history is limited, his blatant disregard for the law and for the safety and security of others on January 6 is the most telling indicator of how defendant would act if released pending trial.  Not only did defendant have the audacity to scale the walls of the Capitol building, enter the U.S. Capitol during a joint session of Congress, disrupt the certification of the Electoral College vote, disobey a United States Capitol Police Officer's orders to stand back, and then chase the United States Capitol Police Officer up a flight of stairs,

but he did so with the goal of being captured on film and becoming the "poster boy" for the January 6 insurrection. "These are not the actions of a person who is shy about breaking the law." *United States v. Chansley*, No. 21-CR-3, 2021 WL 861079, at *13 (D.D.C. Mar. 8, 2021).

Defendant's daily drug use is a further example of his willingness to openly break the law and his inability to comply with conditions of release if this Court were to release him. Indeed, in reviewing defendant's cell phone, law enforcement identified several text messages between defendant and associates offering to buy and sell significant quantities of marijuana and unknown prescription pills.

### D.     The Danger to the Community Created by Defendant's Release Favors Detention

As the government argued in its Emergency Motion, anyone who would act as defendant acted, for the reasons he identified in support of his actions, is a *per se* danger to the community. That the reason defendant wanted to enter the U.S. Capitol on January 6 was because he believed, incorrectly, that lawmakers, including former Vice President Mike Pence, would be arrested for certifying an election that defendant believed to have been stolen makes defendant more, not less, dangerous. *See United States v. Sabol*, No. 21-CR-35, 2021 WL 1405945, at *15 (D.D.C. Apr. 14, 2021) ("That [the defendant] acted violently against law enforcement protecting the peaceful transition of power based on a belief that the 2020 Presidential Election was stolen is also very alarming . . . [and] indeed raises concerns about [his] character and the danger [he] may present to the community if he were released." (internal citation omitted)).

Even though the circumstances of January 6, 2021 were unique, and the day has passed, it cannot be said that the presence of the mob at the U.S. Capitol that day was necessary for defendant to cause danger to the community. *See id.* at *18; *see also Munchel*, 991 F.3d at 1284. In fact, even defendant insists that he acted independently of the mob. *See* Dkt. 21 ¶ 11 ("Jensen was on

20

his own and moved on his own, irrespective of others."). Defendant appears to have been motivated to act "not solely by the presence of the group or President Trump's encouragement," but also by his belief that he is a QAnon warrior in a fight against perceived tyranny and corruption. *See Sabol*, 2021 WL 1405945, at *18. There is no reason to believe that that fight is finished for Jensen and others like him, therefore making the threat of further violence present, concrete, and continuing. *Id.*

In sum, defendant has proven that he does not accept or respect the rule of law. His text messages with friends reflect a propensity, willingness, and eagerness to engage in lawless and violent behavior. Finally, Jensen has shown that he is unable to exercise independent judgment, and that he can be easily manipulated into committing horrific acts. Allowing defendant to be released pending trial, even under rigorous release conditions, creates an unacceptable risk of danger to the community.

<u>**CONCLUSION**</u>

This Court should deny Jensen's motion to revoke the detention order.

<div style="margin-left: 40%;">

Respectfully submitted,
CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793


By:      */s/ Hava Mirell*
HAVA ARIN LEVENSON MIRELL
CA Bar No. 311098
Assistant United States Attorney (Detailed)
312 N. Spring St., Suite 1100
Los Angeles, CA 90012
(213) 894-0717
Hava.Mirell@usdoj.gov

</div>