IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA CR No. 1:21-cr-00006-TJK-1

v. Washington, D.C.
Tuesday, July 13, 2021
DOUGLAS AUSTIN JENSEN, 10:00 a.m.

Defendant.

- - - - - - - - - - - - - - - - x

TRANSCRIPT OF BOND HEARING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES VIA VIDEOCONFERENCE:

For the United States: Hava A. L. Mirell, Esq.
U.S. ATTORNEY'S OFFICE
312 N. Spring Street
Suite 1200
Los Angeles, CA 90012
(213) 894-0717

For the Defendant: Christopher M. Davis, Esq.
DAVIS & DAVIS
1350 Connecticut Avenue, NW
Suite 202
Washington, DC 20036
(202) 234-7300

Court Reporter: Timothy R. Miller, RPR, CRR, NJ-CCR
Official Court Reporter
U.S. Courthouse, Room 6722
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3111

Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

THE DEPUTY CLERK: We are on the record in criminal matter 21-6, United States of America v. Douglas Austin Jensen.

Present for the Government is Hava Mirell; present for the defendant is Christopher Davis; present from Pretrial Services is Shay Holman; present from the United States Probation Office in the Southern District of Iowa is Branden Brown; also present is the defendant, Mr. Jensen.

THE COURT: All right. Good morning to everyone, and especially those of you not in the Eastern time zone who have had to get up a little bit earlier today.

We are here for a ruling on the -- Mr. Jensen's detention -- or motion to -- for release -- his bond motion.

Let me go through a few, first, of -- the procedural path that got us to this point.

On January -- back in January -- on January 21, a magistrate judge in the Southern District of Iowa ordered Mr. Jensen released pending trial. She stayed his release to allow the Government to appeal her ruling which it did. And the next day, the Government filed, and this Court granted, emergency motions to stay Mr. Jensen's release pending review and to transport him to the District of Columbia.

About a month later on February 23rd, Mr. Jensen

appeared before me for the first time for arraignment and a detention hearing. And at that hearing, defense counsel explained that, Discussions were ongoing -- quote, Discussions are ongoing. We're in the process of receiving discovery, and until we complete that process we're going to agree to detention and reserve our right to bring it back if we deem it's appropriate, closed quote. I then proceeded to consider the BRA factors and I detained Mr. Jensen. And I did so without the benefit of briefing from defense counsel or any argument from the parties. And I'll note that at the time, the Government did not suggest that proceeding -- that in proceeding that way, Mr. Jensen was waiving his right to litigate his detention, nor did the Government otherwise object to or further comment on proceeding that way.

In the intervening time, Mr. Jensen was indicted on a second superseding indictment and the parties began to exchange discovery. And on June 7th, he filed a motion for bond, specifically noting the fact that he had previously consented to detention and reserved the right to contest those issues at a later time.

So I think I first need to address this procedural issue of reconsidering -- or the procedural posture that we're in here.

Although the Federal Rules -- quote, Although the Federal Rules do not specifically provide for motions for

reconsideration in criminal cases, the Supreme Court has recognized, in dicta, the utility of such motions, closed quote. That's United States v. Ferguson, F. 74 [sic] F. Supp. 2d 111 at 113, a D.D.C. case from 2008. When considering a motion for reconsideration of an interlocutory order in a criminal case, judges in this District have applied the, quote, As justice requires, closed quote, standard from Rule 54(b) of the Federal Rules of Civil Procedure. And see, for example, United States v. Bloch, 794 F. Supp. 2d 15 at 19, a D.D.C. case from 2011; United States v. Sunia, 643 F. Supp. 2d at -- 51 at 61, a D.D.C. case from 2009. And as a pretrial detention order is, obviously, an interlocutory order, judges in this District have applied the as-justice-requires standard to review detention orders. And see, for example, United States v. Worrell. It -- that is 2021 WL 2366934 at 9; and United States v. Hong Vo, 978 F. Supp. 2d 41 at 48, a D.D.C. case from 2013.

So, Asking what -- quote, Asking what justice requires amounts to determining, within the court's discretion, whether reconsideration is necessary under the relevant circumstances. That's Hong Vo, 978 F. Supp. 2d at 48. Those circumstances include when a court has, quote, Patently misunderstood the parties, made a decision beyond the adversarial issues presented, or made an error in

failing to consider controlling decisions or data, or where a controlling or significant change in the law has occurred. That's Arias v. DynCorp, 856 F. Supp. 2d 46 at 52, a D.D.C. case from 2012. For justice to require reconsideration, logically, it must be the case that some sort of injustice will result if reconsideration is refused. That is, the movant must demonstrate that some harm would flow from a denial of reconsideration, closed quote. That's Cobell v. Norton, 355 F. Supp. 2d 531 at 540, a D.D.C. case from 2005.

So in this case, I'm being asked to reconsider a detention decision that was made without the benefit of adversarial presentation. Mr. Jensen previously consented to detention, explicitly reserving the right to contest detention later. The Government did not suggest that in doing so, Mr. Jensen had waived his right to challenge his detention, and the Government did not otherwise raise an issue with detention -- with Jensen reserving such a right. Now, with the benefit of some discovery and more time, Mr. Jensen has chosen to contest his detention. At this point, declining to reconsider Mr. Jensen's detention would effectively deprive him of an opportunity to litigate his release pending trial because -- at least at this point. And I do find that just -- injustice would result if I declined to give him that opportunity, especially because, as I -- as I'll explain in a moment, after considering the

parties' presentations, I think his release with very strict conditions that amount to home incarceration is appropriate. I find that this is consistent with the law of reconsideration that warns that, quote, Where litigants have once battled for the court's decision, they should neither be required, nor with good reason permitted, to battle for it again, closed quote. That's Lemmons v. Georgetown University Hospital, 241 F.R.D. 15 at 22, a D.D.C. case from 2007. That is not the situation here. The parties did not battle for a decision before, and so the considerations that weigh against reconsideration in almost all circumstances are not present here. I do find that reconsideration is proper under these circumstances and, as I mentioned, I will grant Mr. Jensen's motion, albeit with conditions that are stricter than were ordered in the District of Iowa.

So moving on to the substance of the detention decision before me, then.

Quote, In our society, liberty is the norm and detention prior to trial or without trial is the carefully limited exception. That's United States v. Salerno, 481 U.S. 739 at 755 from 1987 -- a Supreme Court case from 1987. Under the Bail Reform Act, or BRA, Congress -- quote, Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are most -- that are the most serious compared

with other federal offenses. That's United States v. Singleton, 182 F.3d 7 at 13, a D.C. Circuit case from 1999 quoting Salerno at 747. Thus, a detention hearing must be held at the government's request only in a case that involves a charged offense failing -- falling in -- into one of five enumerated categories or if the defendant poses a serious risk of flight or of attempt -- trying to obstruct justice or threaten, injure, or intimidate a witness or juror.

The BRA requires that a judicial officer, quote, Shall order, closed quote, the detention of the defendant before trial if, after a hearing held under 18 United States Code 3142(f), and upon consideration of the available information concerning the factors enumerated in Section 3142(g), the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. In common parlance, the relevant inquiry is whether the defendant is a flight risk or a danger to the community. That's United States v. Vasquez-Benitez, 919 F.3d 546 at 550, a D.C. Circuit case from 2019. The BRA requires that detention be supported by clear and convincing evidence when the justification is the safety of the community. And even if the detention -- the defendant does not pose a flight risk, danger to the

community alone is sufficient to warrant pretrial detention. In assessing whether pretrial detention or release is warranted, then, the judicial officer must take into account the available information concerning these four factors: the -- first, the nature and circumstances of the offense charged, including whether the offense is a crime of violence; two, the weight of the evidence against the person; three, the history and characteristics of the person, including the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and, four, the nature and circumstance [sic] of the danger to any person or the community that would be posed by the person's release. That's 18 United States Code 3142(g). And at the detention hearing, both the government and the defendant may offer evidence or proceed by proffer. That's United States v. Smith, 79 F.3d 1208 at 1210, a D.C. Circuit case from 1996.

Here, the Government is seeking detention pending trial pursuant to 18 United States Code 3142(f)(1)(E) which provides for the possibility of detention where the defendant possessed a dangerous weapon during the course of a charged felony.

So let me walk through the factors that I have to consider.

The first statutory factor requires me to consider, quote, The nature and circumstances of the offense charged. Again, that's 18 United States Code 3142(g)(1). And considered as a whole, as I'll explain further, I do conclude that the nature and circumstances of the offense weigh in favor of detaining Mr. Jensen.

Chief Judge Howell has set forth a number of considerations, which I find helpful, to differentiate the severity of the conduct of the many defendants connected to January 6th for purposes of detention. She laid those out in United States v. Chrestman. That's 2021 WL 765662 at Page 7. Her opinion is dated February 26, 2021. Those considerations include whether a defendant, one, has been charged with felony or misdemeanor offenses; two, engaged in prior planning before arriving at the Capitol; three, carried or used a dangerous weapon during the riot; four, coordinated with other participants before, during, or after the riot; or, five, assumed -- five, assumed either a formal or a de facto leadership role in the assault by encouraging others' misconduct; and, six, the nature of the defendant's words and movements during the riot, including whether the defendant damaged federal property, threatened or confronted federal officials or law enforcement, or otherwise promoted

or celebrated efforts to disrupt the certification of the electoral count during the riot.

Examining these considerations, Mr. Jensen's conduct falls somewhere in the middle of the spectrum of the conduct that January 6th defendants are charged with.

On the first, Mr. Jensen is charged with seven offenses, including several felonies. The offenses include obstruction of law enforcement during a civil disorder, in violation of 18 United States Code Section 231(a)(3); assaulting, resisting, or impeding a federal law enforcement officer, in violation of 18 United States Code Section 111(a)(1); entering and remaining and disorderly and disruptive conduct in a restricted building with a deadly and [sic] dangerous weapon, in violation of 18 United States Code Sections 1752(a)(1)-(2) and (b)(1)(A); and disorderly conduct, parading, demonstrating, and picketing in a Capitol building, in violation of 40 United States Code Sections 5104(e)(2)(D) and (G); and obstruction of an official proceeding, in violation of 18 United States Code 1512(c)(2).

The 1512(c)(2) offense is one for which the maximum term of imprisonment is 20 years. So it is plainly a very serious offense, at least from that perspective. But in addition to the maximum sentence that Congress has established, it is the broader circumstances of the alleged

conduct that underscore the seriousness of the charges against Mr. Jensen. The grand jury has charged that Mr. Jensen acted to stop, delay, or hinder Congress's certification of the Electoral College vote, in violation of 18 United States Code 1512(c)(2); and, two, to obstruct or interfere with law enforcement officers engaged in their official duties to protect the Capitol and its occupants while that was happening, in violation of 18 United States Code Section 231(a)(3). In other words, Mr. Jensen stands charged with interfering with the nation's peaceful transfer of power, which is quite a grave matter to say the very least.

So this consideration weighs in favor of detention.

On the second, fourth, and fifth considerations outlined by Chief Judge Howell in Chrestman, there are no allegations or evidence that Mr. Jensen engaged in any sort of meaningful planning -- prior planning for January 6th or that he coordinated with other participants really before, during, or even after the riot. I find all of that quite significant in weighing against detention as to this factor and more broadly weighing against detention. In fact, the evidence the Government brings to my attention here in some ways cuts against the idea that Mr. Jensen planned much of anything that day. The Government -- one of the

Government's exhibits was a series of videos in which Mr. Jensen states, while at the Capitol building, that, in fact, he was at the White House. It's hard to imagine that Mr. Jensen planned or coordinated the events of January 6th when he had no basic understanding of where he even was that day. And as to the fifth factor about leadership, Mr. Jensen apparently was one of the first to enter the Capitol and did intentionally position himself, the evidence shows, toward the front of the crowd wearing a QAnon conspiracy theory T-shirt because he, quote, Wanted Q to get the credit, closed quote. That's ECF No. 5 at 5. But this is a thin reed on which to argue that Mr. Jensen was a meaningful leader in the events of that day, and it alone does not say much about the threaten -- threat he might pose going forward or whether pretrial detention is appropriate.

As to -- considerations three and six are a mixed bag but waiver slight -- weigh slightly in favor of detention.

As for consideration six, Mr. Jensen's words and deeds during the riot, the key video and evidence proffered by the Government show him scaling some of the outside walls of the Capitol, celebrating storming it, although he does refer to it as the White House, and entering through an already -- a window that was already broken. He proceeded up a flight of stairs with other rioters behind him, moving

deeper into the Capitol building and ignoring Officer Eugene Goodman's instructions to stop as Officer Goodman retreated. Officer Goodman, at one point, raised his baton at Mr. Jensen. And in response, Mr. Jensen did not stop, but at the same time he did not raise his arms or physically confront Officer Goodman either. The parties disagree about words spoken by Mr. Jensen to Officer Goodman. The defense claims that he said, I -- I'll take it for my country, indicating a willingness to be beaten. That's ECF 21 at 5. The Government instead argues that Mr. Jensen said, I'll take it. I'll take it. ECF No. 24 at 13. To the extent that the Government argues that Mr. Jensen was threatening to take Officer Goodman's baton, I looked at the video very closely and it doesn't appear to me that Mr. Jensen made any effort to do that or even to use his arms or his hands to confront Officer Goodman or even, frankly, to defend himself. So there really is no reason I can see to believe that that is what Mr. Jensen meant. In any event, after being at the top of the stairway, after being redirected away from the Senate chamber by Officer Goodman, in a nearby atrium, Mr. Jensen was then confronted by a group of officers, who he had and other rioters continued to shout at, with Mr. Jensen asking why they were not arresting corrupt members of the government instead of protecting them. One officer who was threatened -- who was present

characterized Mr. Jensen as encouraging other rioters to advance, although it is unclear how. I've watched that video very closely and it never captures Mr. Jensen addressing other rioters or appearing to intentionally egg them on except insofar as they might have been egged on simply by Mr. Jensen continuing to advance into the building and verbally sparring with the officers. In fact, the video in the atrium, though, captures another rioter yelling at police officers far more loudly and aggressively than Mr. Jensen, and the Government has never asked for that defendant to be detained which I know because that defendant -- that case happens to be assigned to me.

In any event, after another rioter -- not Mr. Jensen -- slammed a -- apparently, slammed a fire extinguisher against the ground causing it to rupture and many who were there in the atrium were stunned, according to the Government, Mr. Jensen was unfazed and kept, quote, Calmly approaching, closed quote, officers. But the situation was eventually deescalated and there's no evidence that Mr. Jensen proceeded any further, for example, into the chamber of either the House or the Senate.

So broadly speaking, in summary, there is no evidence before me that Mr. Jensen toppled any barricades, broke any windows, or damaged any federal property, nor is there any evidence that he fought with or raised his hands

against anyone, including any law enforcement officer. That said, he clearly disobeyed Officer Goodman and other officers, and he did position himself near the front of a mob as he ran up the stairs toward Officer Goodman and ultimately into this atrium. That may be some leadership, but only in the narrowest sense. I would also characterize Mr. Jensen's actions and words as confronting law enforcement in the sense, again, that he failed to obey their commands and in the sense that he continued to proceed. He did also celebrate what -- that happened -- what was happening that day, no doubt, as some of the other evidence depicts, but on the other hand he did not confront officers with a weapon, he did not fight with any officers, or as far as I can tell he did not utter any threats to harm them.

In any event, none of my comments about Mr. Jensen's individual conduct, considered on its own somewhat separately from the entirety of the day's events and viewed six months later, should not [sic] be taken to minimize how serious the conduct was, nor should it be taken in any way to diminish the bravery and quick thinking of Officer Goodman that he showed as he confronted the mob and did his duty that day to protect the Capitol and its occupants.

The Government also proffers that Mr. Jensen

carried a small pocketknife with him that day, which is the key fact that even makes him eligible for detention. The Government does argue at one point that Mr. Jensen reached for that pocket, but even so I don't think there's any persuasive evidence that Mr. Jensen ever really tried to take the knife out of his pocket or even that he threatened those present that he was about to do so. And the defense proffers that Mr. Jensen carried his -- that knife with him for protection and that he carried with -- it with him regularly, including to work and, the parties agree, even to his FBI interview that he eventually voluntarily subjected himself to. So in my view, the knife really does not move the needle that much in terms of the issue of detention.

Given all the above, I think all of these factors are a mixed bag and, no doubt, the conduct undertaken by Mr. Jensen that day was serious both in terms of how he acted and in terms of the potential effect on the republic that it could have had, but I do -- and I do find that the nature and circumstances of the offense weigh in favor of detention, but I think that they do so not overwhelmingly.

The second factor I have to consider is the weight of the evidence against the person. And the Government's evidence here is extremely strong, given that the -- it has proffered photos and video of the incident. So this factor, too, weighs in favor of detention.

But next, I have to consider the history and characteristics of the person, including the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record regarding -- record concerning appearance at court proceedings.

And I do find that this factor favors release. Prior to January 6th and his subsequent detention, Mr. Jensen appears to have lived a relatively stable life in Des Moines, Iowa. He resides with his wife of almost 20 years with whom he has 3 children. His wife has a job. She has been approved by Pretrial Services as an appropriate third-party custodian as someone who -- ensure that Mr. Jensen does comply with his conditions of release. He himself -- Mr. Jensen himself had stable employment before he was arrested. And I'll also note that the Government proffers that, to complete the picture, Mr. Jensen did admit to consuming marijuana on a daily basis and having previously experimented with cocaine and methamphetamine. And there is also evidence in record that -- evidence in the record that, at the time of his arrest, Mr. Jensen was receiving mental health treatment in the community.

Mr. Jensen also does have some prior contact with

the criminal justice system, but his criminal history is not too serious, nor does it demonstrate a pattern of violence. He has no felony convictions. Three of the four incidents I've been made aware of -- a driving while under the influence of alcohol, fifth degree theft, and a conspiracy to deliver a controlled substance -- all include [sic] more than 14 years ago and apparently resulted in deferred judgment with no term of imprisonment for Mr. Jensen. The last incident is more recent, a, quote, Domestic assault, disorderly conduct conviction from 2015. Mr. Jensen proffers, and there doesn't appear to be any reason to doubt, that the victim of the assault was not his wife. And Mr. Jensen served about three days of imprisonment and one year of probation for this misdemeanor. This isn't a clean record, but on the other hand most of it is in the past and, as I said, again, does not demonstrate a pattern of violence. Defense counsel represents that Mr. Jensen also did not violate the terms of his supervision at any point during these cases. And, further, aside from his criminal history, after the events of January 6th, Mr. Jensen contacted law enforcement on his own initiative and submitted to an FBI -- to an interview about his conduct. So -- and there's no suggestion that he lied about his conduct on January 6th to the FBI or destroyed evidence of that conduct.

The Government also proffers that Mr. Jensen's actions were motivated by conspiracy theories, including the QAnon conspiracy theory. And indeed, Mr. Jensen allegedly told law enforcement that he believed in preventing the election of now-President Biden from being certified and that he was present in the Capitol to participate in an event that he thought would result in the arrest of members of Congress and Vice President Pence. But at this point, defense counsel now represents that Mr. Jensen, quote, Feels deceived, closed quote, and, quote, Recognizes that he bought into a pack of lies, closed quote. That's ECF No. 21 at 7. He describes Mr. Jensen as having experienced a wake-up call. That's ECF No. 21 at 8. While I don't put too much weight on these representations, given how late they've come, and they are less persuasive given that they're through counsel, they do distinguish Mr. Jensen from many other detained January 6th rioters, and they do suggest that Mr. Jensen has come to understand that acting on conspiracy theories like QAnon can have terrible real-life consequences both for others and for him.

So in summary, again, this factor, the history and characteristics of Mr. Jensen, I do think favors release. Again, it's somewhat of a mixed bag, but on the whole I do think it favors release.

And the final factor I have to look at is the

nature and seriousness of the danger to any person or the community that would be posed by the person's release. That's, again, the last 3142(g) factor.

And then, as the Circuit found in the recent Munchel decision, to justify detention on the basis of dangerousness, I must find by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety or [sic] any other person and the community. As the Circuit held in that case, a defendant's detention based on dangerousness accords with due process only insofar as the District Court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety -- that's the Munchel case at 1280 -- or as the Supreme Court articulated in Salerno, to the extent that the defendant presents an identified and reasonable [sic] threat to an individual or the community, not necessarily dangerous -- danger, but some sort of threat.

Although this is a close case, I do believe that this factor weighs against detention and that this ultimate standard is not met when I have to consider all the factors at issue here.

And, again, I want to emphasize by -- before I continue that nothing what [sic] I'm about to say should be

understood as suggesting that I don't think Mr. Jensen's conduct that day was very serious; that I don't think what happened on January 6th was very serious; and that should give anyone any -- and for -- much of -- any -- as -- give anyone a hint about what sentence I might think might be appropriate if Mr. Jensen is either convicted at trial or pleads guilty to one of the charges that he is -- to one of the offenses that he is charged with. I think I've said many times in connection with these cases that I do consider what happened that day to be the equivalent of an attempt to steal one of the crown jewels of our country, the peaceful transfer of power.

But that said, detention requires a determination, as I said, that Mr. Jensen poses an articulable and prospective threat to the community that cannot be reasonably mitigated by conditions of release. And I don't think that standard is met here. I'll just quickly walk through why.

Again, there is no evidence that Mr. Jensen toppled barricades that day, broke anything, fought with anyone, whether that be law enforcement or other rioters. There is no evidence he planned or coordinated with others about the events of the day. Quite the opposite, in my view, given that he didn't even really know where he was. He wore no protective gear, suggested [sic] he anticipated a

physical conflict. He did possess a small knife, but he never took it out of his pocket, and it's a knife that is so commonly with him he brought it to his FBI interview that he showed up for voluntarily. And when confronted by, sort of, I would call it, defensive tactical force by Officer Goodman, a push keeping him away from the Senate, he declined to physically respond except insofar as he continued to advance into the Capitol.

Although Mr. Jensen told the FBI vaguely that he was, All about revolution, closed quote, there is no evidence that he has the capability to help plan another January 6-type event. He is not alleged to have lied to law enforcement about his conduct. And, further, his criminal history is not serious insofar as he has had -- he has no felony convictions, and it does not reflect any occasion where he violated his conditions of release and it does not reflect a pattern of violence.

The Government's argument ultimately turns on the video that depicts -- and it's a powerful video -- that depicts Mr. Jensen at the front of a crowd, proceeding deep into a Capitol -- into the Capitol up the stairs as Officer Goodman retreats, and disobeying Officer Goodman's instructions to stop. And, as I said, especially in the context of the larger mob and what was happening that day, Mr. Jensen's behavior is deeply concerning and quite

serious. And but for the heroic actions of Officer Goodman, the reality is we don't know where that entire mob would have ended up.

But I don't think this conduct alone provides sufficient reason to determine that Mr. Jensen poses an articulable threat moving forward that cannot be reasonably mitigated by very strict conditions of release. The Munchel decision is helpful here insofar it explains that, quote, Those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence, entered the Capitol after others cleared the way. That's Munchel at 1284. Mr. Jensen's conduct that day more closely fits into this second category of rioters, even if he did place himself at the front of that group moving up the stairs and even if his actions ultimately do meet the definition of assaulting, resisting, or impeding a federal law enforcement officer.

Finally, Mr. Jensen has suggested strict conditions, including GPS monitoring, a -- restrictions on his Internet access, and release to a third-party custodian that has been approved at least by Pretrial Services at this point, that I'll discuss in a moment that I have to weigh in making this decision and that, again, those conditions are

critical in why I think release is -- there -- is warranted here.

So for all of those reasons, I do find that there is a combination of conditions that will reasonably assure the safety of any other person and the community and I will grant the motion.

We will go through -- I believe we've provided the Pretrial Services representatives on here -- on the line here with the order I intend to sign laying out those conditions. We'll get to Ms. Jensen in a moment here. But the motion requests that I release Mr. Jensen to the conditions that were previously ordered in the Southern District of Iowa, but I am going to shore up those conditions and make them even tighter to some degree. The previous conditions were to release Mr. Jensen to home detention, but I am going to find here that home incarceration is appropriate. That condition restricts Mr. Jensen to his home at all times except for medical necessities, court appearances, and other activities specifically approved by me. He'll be monitored by location-monitoring technology to ensure his compliance. Some of the other conditions I impose, which we'll walk through momentarily, may require Mr. Jensen to leave his home for medical -- for drug testing or treatment, for other medical issues, and for mental health screenings. So I'll

approve Mr. Jensen, of course, to leave his home for any one of those purposes that my order reflects but for no other purposes than the order will reflect. And to the extent there are other things that pop up that the parties think I should release Mr. Jensen for, of course, you all know how to reach me if you think -- I'd encourage the parties to talk to each other about whether they can come to an agreement on those, but either way you can -- you know where to find me, Mr. Davis, if you want to pursue that. But as for now, I'm not going to order him to pursue employment or education; simply to be at home on home incarceration and to follow these other conditions.

As for the other conditions, I will order Mr. Jensen, again, released to the custody of his wife, April Jensen. She will be responsible for supervising him in accordance with the conditions of release, to make every effort to ensure that he appears at all scheduled court proceedings, and to notify the Court immediately if he violates any condition of his release. Mr. Jensen will have to surrender his passport to the Probation Office. He will have to not travel outside the Southern District of Iowa, except to the District of Columbia for court appearances if that becomes -- when, and if, that becomes warranted. He should [sic] avoid contact with anyone who participated in the riot at the U.S. Capitol on January 6th. He shall

undergo medical or psychiatric treatment as directed by the Probation Office. He shall refrain from possessing a firearm, ammunition, destructive device, or other dangerous weapon. He shall refrain from using any alcohol or narcotic drugs or any other controlled substances. He shall submit to drug testing and to participate in substance abuse treatment as advised by the Pretrial Services Office. As I mentioned earlier, he must submit to location-monitoring technology; to substance abuse and mental health screening as directed by Pretrial Services; and to take any medication that might be prescribed by any health care provider.

Further, Mr. Jensen shall not access or -- Internet -- or utilize Internet-capable devices, including a cell phone, and any access to the Internet by Mr. Jensen, directly or indirectly, is prohibited. All Internet-capable devices in Mr. Jensen's home, included [sic] them -- those belonging to his family members, must be password protected with passwords unknown to Mr. Jensen. And any computers or electronic communication and storage devices or media in Mr. Jensen's home shall be subject to a search if there is reasonable suspicion that Mr. Jensen has violated conditions of his supervision and that the computer or storage device contains evidence of that violation.

Let me address Ms. Jensen before we swear you in.

Ms. Jensen, you understand the responsibility that

you're undertaking here?

(Brief pause.)

You can -- you're muted right now, Ms. Jensen.

(Brief pause.)

MS. JENSEN: Sorry. Yes, I do.

THE COURT: All right. You understand that I'm going to -- I -- we'll have the -- Pretrial Services is going to explain these conditions again and, of course, they'll be available to explain them further if you need further explanation, but I just -- and I'm going to instruct your husband about this in a moment, but broadly speaking he is -- if he violates his conditions of release, he can be re-incarcerated or prosecuted for additional offenses, but the most obvious thing is -- the most obvious -- or the most typical -- or a typical outcome if someone violates their conditions of release in a material way is that they're just jailed again pending trial. Do you understand that, Ms. Jensen?

MS. JENSEN: Yes, sir.

THE COURT: All right. Katrina, why don't you swear in Ms. Jensen.

THE PRETRIAL SERVICES OFFICER: Your Honor -- oh, I'm sorry. Go ahead, Katrina.

THE COURT: Ms. --

THE DEPUTY CLERK: Your Honor, do you want me to

swear her in for additional questions or swear her to the -- to her --

THE COURT: To the --

THE DEPUTY CLERK: -- duties?

THE COURT: For her duties.

THE DEPUTY CLERK: Thank you.

Ms. Jensen, will you please raise your right hand.

Do you solemnly swear or affirm to well and truly discharge your responsibility as a third-party custodian and advise the Court if the defendant fails to follow the conditions of release?

MS. JENSEN: I do.

THE DEPUTY CLERK: Thank you.

MS. JENSEN: Thank you.

THE COURT: All right. Mr. --

THE PRETRIAL SERVICES OFFICER: Your Honor, this is Ms. Holman with Pretrial Services. If I could just recommend that the Court add one additional condition?

THE COURT: Please.

THE PRETRIAL SERVICES OFFICER: For the -- these cases, we've been adding the standard condition to stay away from Washington, D.C., except for court, meetings with attorney, or Pretrial.

THE COURT: That, I think, is eminently appropriate. I thank you for that. And we'll go ahead and

we will include that in the order that I do enter.

So Mr. Jensen, in addition to what I mentioned before, obviously, you may -- depending upon how we proceed in terms of proceeding remotely or not, you may have to come to Washington, D.C., at some point for court. The point is that, other than that, you do have a stay-away from Washington, D.C., which means you're not allowed to -- part of your conditions of release would be you would not allow -- be allowed to come here. Of course, that's even a little more specific. I'm actually ordering you to stay within the Southern District of Iowa except for court appearances, again, unless prior approval is obtained by the Probation Office. But this is, sort of, a double prohibition, if you will, a more specific prohibition to make sure you stay away from Washington, D.C. And if you end up -- if you were to violate that, it would be an additional violation of your conditions.

Mr. Jensen, just before you -- our probation officer walks through those -- these conditions with you, I want to make sure you understand, again, you're going to be required to appear, whether it be on -- whether it be remotely like we're doing today or perhaps at some point in person. And failure to appear as required, as you will be informed, is a separate criminal offense for which you could be sentenced to imprisonment. And in addition, if -- once

you're released, you will be under supervision, and that means there will be reporting requirements that will be explained to you and other conditions. The penalties for violating those conditions can be very severe. For example, if you would -- if, eventually, you are either convicted or plead guilty and a sentencing proceeding is scheduled, you could be -- or any other proceeding -- you can be subject to a fine or imprisonment for failure -- for failing to appear for a subsequent proceeding in this case. Do you understand that, sir -- Mr. Jensen?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And if you violate any of your conditions of release, your release could be revoked and you would be detained at that point very likely until the case is completely resolved. You could also be subject to a separate prosecution, depending upon the circumstances, for contempt of Court. Do you understand that, Mr. Jensen?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And the worst possible scenario perhaps, if you were convicted of an offense while on release, then in addition to the sentence imposed for that offense, you could be subject to -- sentenced up to 10 years' imprisonment. And any term of imprisonment for an offense committed while on release would be consecutive -- would be added to any sentence you would -- might receive

for any other offense. Do you understand that, Mr. Jensen?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Why don't I have, then, Pretrial Services -- why don't you go ahead and walk through with Mr. Jensen the conditions I just mentioned and that are reflected on that order.

THE PRETRIAL SERVICES OFFICER: I'm sorry, Your Honor. You said you wanted Pretrial to go through the conditions again?

THE COURT: Well, with Mr. Jensen just to make sure he understands them.

THE PRETRIAL SERVICES OFFICER: All right.

Mr. Jensen, you have been ordered -- you are -- have been -- you will be released by the Court. And you are to report as directed to the Southern District of Iowa. You are to surrender your passport, if you have one; not obtain a new passport or any other international travel documents; stay away from the District of Columbia as -- except for court, meetings with the attorney; and your travel is restricted to the Southern District of Iowa and to the District of Columbia for court, but you need to get prior approval from your assigned probation officer in the Southern District of Iowa. You are to get any medical or psychiatric assessments as directed by the Southern District of Iowa. Do not possess any firearms, destructive devices.

If you have any weapons in your home, you need to transfer them to a third party and provide Iowa with a notice. Do not drink alcohol; do not -- or do not use or unlawfully possess any narcotics or other controlled substance unless they're prescribed by a licensed doctor; submit to drug testing.

Your Honor, with that, I don't know if Iowa is testing. I believe Mr. Brown is on the line. Some jurisdictions still remain closed due to COVID, but if we could leave that to the discretion of Southern District of Iowa.

Participate in any in-patient or out-patient program as ordered by the supervising jurisdiction. You will be on home incarceration with location monitoring, and that will be at the discretion of the Southern District of Iowa. It could be what we refer to as radio frequency or GPS monitoring. There might be a cost associated with the location monitoring. That will be your responsibility to pay. Report as soon as possible any contact with law enforcement; permit the Probation Office in the Southern District of Iowa to visit your home at any time or any residence where you live; submit to substance abuse and mental health screening as directed by the Southern District of Iowa. You shall not take any medication -- I'm sorry, you shall take medication as prescribed by the physician,

psychiatrist, or health provider. You shall not take any medication not prescribed to you. Defendant shall not access or utilize Internet-capable devices, including a cell phone. All Internet-capable devices, including those of the family members residing with the defendant, shall be password protected and the defendant shall not have access to the devices or the password -- I'm sorry, to the password. All -- any access to the Internet, directly or indirectly, through devices belonging to others or in public spaces is prohibited. So that means you cannot go to a library or any such place and use any type of the Internet. And you must submit your computer, or computers, or other electronic communications or data storage devices, media to a search. You must warn any other people who use these computers or devices that they're subject to a search by the Southern District of Iowa.

Your Honor, in reference to incarceration, I just want to verify that Mr. Jensen does not work. If we could address that now with defense counsel so we won't have to re-approach the Court in that aspect.

THE COURT: There's no -- at this point -- correct. At this point, he is not authorized to work.

THE PRETRIAL SERVICES OFFICER: Okay.

THE COURT: As I've mentioned, if, at some point in the future, the parties want to approach me about that,

they may, but at this point he is not authorized -- work is not one of the authorized reasons for him to leave or else I wouldn't have made it home incarceration.

THE PRETRIAL SERVICES OFFICER: Okay. And I'm just going to put that on the order so it's perfectly clear, Your Honor, not authorized to work at this time.

THE COURT: All right. Very well.

All right. And is there anything -- Mr. -- as I recall, Mr. Davis, you had made the point that you wanted -- I don't know if I need to reflect this on the order one way or the other at all, but you had mentioned Ms. Jensen would come and actually pick him up from D.C. Is that correct?

MR. DAVIS: That's correct, Your Honor. And, you know, actually, I could resubmit an order, but I think that's probably a good idea. I'm -- as far as I can determine, Mr. Jensen is on a no-fly list. I haven't been able to confirm that other than by trying to book him a ticket and it doesn't work. So I assume he's on a no-fly list. So his wife is going to have to drive from Iowa. She'll leave today and pick him up tomorrow morning. I -- what I would suggest we do is put in the order that he be released from CTF on July 14th to his wife's custody and identify her by name and she'll present identification when she goes to pick him up, and I'll make certain this goes smoothly.

THE COURT: All right. We'll work with Pretrial Services to try to come up with language that is specific in that regard and that only releases him to her custody, as you -- as you've indicated.

MR. DAVIS: Thank you.

THE PRETRIAL SERVICES OFFICER: Your Honor, I don't know if that needs to be on the release order. It needs to be on the paperwork that the Court will submit to the marshals that we'll send to the D.C. Jail.

THE COURT: All right. We will work this out.

Ms. Mirell, I saw you --

I -- so I -- what -- wherever that language goes, I think we can work on that without taking up any more time in today's hearing.

Ms. Mirell, did -- were -- I saw your arm moving, maybe, toward unmuting yourself. Did you want to be heard on something?

MS. MIRELL: Yes, Your Honor. You addressed one of my concerns about having the defendant released directly into the custody of his wife --

THE COURT: Yes.

MS. MIRELL: -- however, is there a reporting date by which he must be outfitted with a location-monitoring bracelet in Iowa?

THE COURT: We can -- and actually, the -- well,

you raise a sub-issue that I did -- since we do have Mr. Brown -- Officer Brown here, Officer Brown, can I just ask this one question. Do you know the answer? I had assumed it would be a -- for lack of a better way to put it, a GPS monitoring system. We -- I can do it as, sort of, technology as directed by you. But if I did that, do you know what technology you would -- Iowa would be using at this point for this?

THE PROBATION OFFICER: Unfortunately, Your Honor, I'd have to staff that with our location monitoring team. Typically, what I've seen with the home incarceration cases, since they're primarily at home, we typically put those people on RS units.

THE COURT: What -- and RS is the, like -- the radio frequency?

THE PROBATION OFFICER: Correct.

THE COURT: All right. And that -- remind me. That would -- tells you if they leave the home. But if they left the home, it would not necessarily tell you where they would be once they leave a certain perimeter from the home; is that true?

THE PROBATION OFFICER: That's correct.

THE COURT: Yeah. I mean, I may -- this may be one where, I think -- and, maybe, Ms. Mirell, if this -- I'm not sure if this is what you're requesting, but I see you

nodding. My thought is, actually, I'm going to -- rather than leave it up to Iowa, I will probably require GPS in this particular case. It's, sort of, a belt-and-suspenders thing, but I think knowing -- there will be, maybe, in more cases than usual -- at least for the kind of medical visits that the order will reflect, Mr. Jensen may well be leaving his house a little more -- a little bit more than the average person who's subject to home incarceration. So I think probably GPS technology is appropriate here just so we know exactly where he is. And so I'll probably check that box.

And then, Officer Brown, how quickly do you think he can be fitted with that if he is released to Ms. Jensen on the -- let's say, tomorrow on the 14th?

THE PROBATION OFFICER: If he's released tomorrow, I imagine he probably wouldn't be back in -- what -- until the 15th. So we would put it on that day.

THE COURT: All right. I'm going to just say no later than the 16th and build in -- we'll put that that should be -- that he should be fitted with that by at least -- by the -- no later than the 16th just to build in a potential administrative delay of a day. Does that address your concern, Ms. Mirell?

MS. MIRELL: Yes, it does, Your Honor.

THE COURT: Okay. Anything further from you?

MS. MIRELL: Well, obviously, the ship has sailed, Your Honor, but just for purposes of the record, the Government would also rely on the recently issued opinion by the D.C. Circuit in Hale-Cusanelli of which this Court was most certainly aware, but that's just for purposes of the record.

But I also did want to inquire, as one more thought came to me, if Ms. Jensen is driving alone -- and we are now aware that it's a 16-hour drive straight -- if there will be a stop along the way or whether she will be bringing someone else to drive, just -- the Government still harbors concerns about the danger to community and making any stops longer than just a pickup in D.C.

THE COURT: Ms. Jensen, what can you tell us about your plans?

MS. JENSEN: Either my son will be coming with us or I have a -- one of my good friends will be riding with me.

THE COURT: All right.

MS. JENSEN: So --

THE COURT: So that means you plan on driving -- getting -- not stopping overnight, for example?

MS. JENSEN: Probably not.

THE COURT: All right. Well, if you bring another person, you won't have that ability. And, again, he's --

I'm going to order that the GPS monitoring start no later than the 16th. So you know, if you don't hook up with Officer Brown here and get that done by the 16th, then he will be in violation and we will, you know, at that point -- the outcomes at that point won't be good for your husband.

Mr. Davis, do you have anything else you want to raise?

MR. DAVIS: I have nothing else to raise, Your Honor.

THE COURT: All right. I believe we're already set in this case for a status. Am I correct in that?

MR. DAVIS: I believe we are towards the latter --

THE DEPUTY CLERK: July 27th.

THE COURT: July 27th? All right. And I believe we've even tolled speedy trial until that day; is that correct?

MR. DAVIS: We have.

THE COURT: All right.

THE PRETRIAL SERVICES OFFICER: What's the time on July 27th? So I can place it on the order.

MR. DAVIS: That will be 3:00 p.m.

THE PRETRIAL SERVICES OFFICER: All right. Thank you.

THE COURT: 3:00 p.m., although, obviously, by video.

All right. If there's nothing further from either party --

THE DEPUTY CLERK: Judge Kelly --

THE COURT: Yes?

THE DEPUTY CLERK: -- I need to swear Mr. Jensen to his conditions of release --

THE COURT: Oh, yes, you absolutely do. Please go ahead and do that.

THE DEPUTY CLERK: Mr. Jensen, will you please raise your right hand.

Do you solemnly swear or affirm that you will abide by the conditions of release as imposed by the Court?

THE DEFENDANT: I do.

THE DEPUTY CLERK: Thank you.

THE DEFENDANT: Thank you.

THE COURT: I should have checked with you, Ms. Harris. Anything further from you, Ms. Harris?

THE DEPUTY CLERK: That's all, Your Honor. Thank you.

THE COURT: All right. Very well.

THE PRETRIAL SERVICES OFFICER: Your Honor, if I could just speak to Mr. Brown once the proceeding is concluded just for some administrative questions?

THE COURT: We might be able to -- I don't honestly know.

Ms. Harris, do you know whether someone else has this line for a proceeding?

THE DEPUTY CLERK: I just need to take the public line off once we end.

THE COURT: Okay. All right.

THE PRETRIAL SERVICES OFFICER: It will be --

THE COURT: So --

THE PRETRIAL SERVICES OFFICER: -- quick. Two minutes, Your Honor.

THE COURT: All right. Very well.

With that, the parties are dismissed.

MR. DAVIS: Have a good day, Your Honor.

(Proceedings concluded at 11:10 a.m.)

* * * * * * * * * * * * *

**CERTIFICATE OF OFFICIAL COURT REPORTER**

**I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability, dated this 19th day of August 2021.**

**Please note: This hearing occurred during the COVID-19 pandemic and is, therefore, subject to the technological limitations of court reporting remotely.**

**/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
**Official Court Reporter**
**United States Courthouse**
**Room 6722**



**333 Constitution Avenue, NW**
**Washington, DC 20001**