IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            CR No. 1:21-cr-00006-TJK-1

v.                                  Washington, D.C.
                                    Tuesday, July 13, 2021
DOUGLAS AUSTIN JENSEN,              10:00 a.m.

            Defendant.

- - - - - - - - - - - - - - - - x

_____

                 TRANSCRIPT OF BOND HEARING
         HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
               UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Hava A. L. Mirell, Esq.
                          U.S. ATTORNEY'S OFFICE
                          312 N. Spring Street
                          Suite 1200
                          Los Angeles, CA 90012
                          (213) 894-0717


For the Defendant:        Christopher M. Davis, Esq.
                          DAVIS & DAVIS
                          1350 Connecticut Avenue, NW
                          Suite 202
                          Washington, DC 20036
                          (202) 234-7300


Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                     **P R O C E E D I N G S**

2             THE DEPUTY CLERK:  We are on the record in

3       criminal matter 21-6, United States of America v. Douglas

4       Austin Jensen.

5             Present for the Government is Hava Mirell; present

6       for the defendant is Christopher Davis; present from

7       Pretrial Services is Shay Holman; present from the United

8       States Probation Office in the Southern District of Iowa is

9       Branden Brown; also present is the defendant, Mr. Jensen.

10             THE COURT:  All right.  Good morning to everyone,

11      and especially those of you not in the Eastern time zone who

12      have had to get up a little bit earlier today.

13             We are here for a ruling on the -- Mr. Jensen's

14      detention -- or motion to -- for release -- his bond motion.

15             Let me go through a few, first, of -- the

16      procedural path that got us to this point.

17             On January -- back in January -- on January 21, a

18      magistrate judge in the Southern District of Iowa ordered

19      Mr. Jensen released pending trial.  She stayed his release

20      to allow the Government to appeal her ruling which it did.

21      And the next day, the Government filed, and this Court

22      granted, emergency motions to stay Mr. Jensen's release

23      pending review and to transport him to the District of

24      Columbia.

25             About a month later on February 23rd, Mr. Jensen

1    appeared before me for the first time for arraignment and a

2    detention hearing.  And at that hearing, defense counsel

3    explained that, Discussions were ongoing -- quote,

4    Discussions are ongoing.  We're in the process of receiving

5    discovery, and until we complete that process we're going to

6    agree to detention and reserve our right to bring it back if

7    we deem it's appropriate, closed quote.  I then proceeded to

8    consider the BRA factors and I detained Mr. Jensen.  And I

9    did so without the benefit of briefing from defense counsel

10   or any argument from the parties.  And I'll note that at the

11   time, the Government did not suggest that proceeding -- that

12   in proceeding that way, Mr. Jensen was waiving his right to

13   litigate his detention, nor did the Government otherwise

14   object to or further comment on proceeding that way.

15          In the intervening time, Mr. Jensen was indicted

16   on a second superseding indictment and the parties began to

17   exchange discovery.  And on June 7th, he filed a motion for

18   bond, specifically noting the fact that he had previously

19   consented to detention and reserved the right to contest

20   those issues at a later time.

21          So I think I first need to address this procedural

22   issue of reconsidering -- or the procedural posture that

23   we're in here.

24          Although the Federal Rules -- quote, Although the

25   Federal Rules do not specifically provide for motions for

1    reconsideration in criminal cases, the Supreme Court has

2    recognized, in dicta, the utility of such motions, closed

3    quote.  That's United States v. Ferguson, F. 74 [sic] F.

4    Supp. 2d 111 at 113, a D.D.C. case from 2008.  When

5    considering a motion for reconsideration of an interlocutory

6    order in a criminal case, judges in this District have

7    applied the, quote, As justice requires, closed quote,

8    standard from Rule 54(b) of the Federal Rules of Civil

9    Procedure.  And see, for example, United States v. Bloch,

10   794 F. Supp. 2d 15 at 19, a D.D.C. case from 2011; United

11   States v. Sunia, 643 F. Supp. 2d at -- 51 at 61, a D.D.C.

12   case from 2009.  And as a pretrial detention order is,

13   obviously, an interlocutory order, judges in this District

14   have applied the as-justice-requires standard to review

15   detention orders.  And see, for example, United States v.

16   Worrell.  It -- that is 2021 WL 2366934 at 9; and United

17   States v. Hong Vo, 978 F. Supp. 2d 41 at 48, a D.D.C. case

18   from 2013.

19           So, Asking what -- quote, Asking what justice

20   requires amounts to determining, within the court's

21   discretion, whether reconsideration is necessary under the

22   relevant circumstances.  That's Hong Vo, 978 F. Supp. 2d at

23   48.  Those circumstances include when a court has, quote,

24   Patently misunderstood the parties, made a decision beyond

25   the adversarial issues presented, or made an error in

1    failing to consider controlling decisions or data, or where

2    a controlling or significant change in the law has occurred.

3    That's Arias v. DynCorp, 856 F. Supp. 2d 46 at 52, a D.D.C.

4    case from 2012.  For justice to require reconsideration,

5    logically, it must be the case that some sort of injustice

6    will result if reconsideration is refused.  That is, the

7    movant must demonstrate that some harm would flow from a

8    denial of reconsideration, closed quote.  That's Cobell v.

9    Norton, 355 F. Supp. 2d 531 at 540, a D.D.C. case from 2005.

10          So in this case, I'm being asked to reconsider a

11    detention decision that was made without the benefit of

12    adversarial presentation.  Mr. Jensen previously consented

13    to detention, explicitly reserving the right to contest

14    detention later.  The Government did not suggest that in

15    doing so, Mr. Jensen had waived his right to challenge his

16    detention, and the Government did not otherwise raise an

17    issue with detention -- with Jensen reserving such a right.

18    Now, with the benefit of some discovery and more time,

19    Mr. Jensen has chosen to contest his detention.  At this

20    point, declining to reconsider Mr. Jensen's detention would

21    effectively deprive him of an opportunity to litigate his

22    release pending trial because -- at least at this point.

23    And I do find that just -- injustice would result if I

24    declined to give him that opportunity, especially because,

25    as I -- as I'll explain in a moment, after considering the

1    parties' presentations, I think his release with very strict

2    conditions that amount to home incarceration is appropriate.

3    I find that this is consistent with the law of

4    reconsideration that warns that, quote, Where litigants have

5    once battled for the court's decision, they should neither

6    be required, nor with good reason permitted, to battle for

7    it again, closed quote.  That's Lemmons v. Georgetown

8    University Hospital, 241 F.R.D. 15 at 22, a D.D.C. case from

9    2007.  That is not the situation here.  The parties did not

10   battle for a decision before, and so the considerations that

11   weigh against reconsideration in almost all circumstances

12   are not present here.  I do find that reconsideration is

13   proper under these circumstances and, as I mentioned, I will

14   grant Mr. Jensen's motion, albeit with conditions that are

15   stricter than were ordered in the District of Iowa.

16          So moving on to the substance of the detention

17   decision before me, then.

18          Quote, In our society, liberty is the norm and

19   detention prior to trial or without trial is the carefully

20   limited exception.  That's United States v. Salerno, 481

21   U.S. 739 at 755 from 1987 -- a Supreme Court case from 1987.

22   Under the Bail Reform Act, or BRA, Congress -- quote,

23   Congress limited pretrial detention of persons who are

24   presumed innocent to a subset of defendants charged with

25   crimes that are most -- that are the most serious compared

1    with other federal offenses.  That's United States v.

2    Singleton, 182 F.3d 7 at 13, a D.C. Circuit case from 1999

3    quoting Salerno at 747.  Thus, a detention hearing must be

4    held at the government's request only in a case that

5    involves a charged offense failing -- falling in -- into one

6    of five enumerated categories or if the defendant poses a

7    serious risk of flight or of attempt -- trying to obstruct

8    justice or threaten, injure, or intimidate a witness or

9    juror.

10          The BRA requires that a judicial officer, quote,

11   Shall order, closed quote, the detention of the defendant

12   before trial if, after a hearing held under 18 United States

13   Code 3142(f), and upon consideration of the available

14   information concerning the factors enumerated in Section

15   3142(g), the judicial officer finds that no condition or

16   combination of conditions will reasonably assure the

17   appearance of the person as required and the safety of any

18   other person and the community.  In common parlance, the

19   relevant inquiry is whether the defendant is a flight risk

20   or a danger to the community.  That's United States v.

21   Vasquez-Benitez, 919 F.3d 546 at 550, a D.C. Circuit case

22   from 2019.  The BRA requires that detention be supported by

23   clear and convincing evidence when the justification is the

24   safety of the community.  And even if the detention -- the

25   defendant does not pose a flight risk, danger to the

1    community alone is sufficient to warrant pretrial detention.

2    In assessing whether pretrial detention or release is

3    warranted, then, the judicial officer must take into account

4    the available information concerning these four factors: the

5    -- first, the nature and circumstances of the offense

6    charged, including whether the offense is a crime of

7    violence; two, the weight of the evidence against the

8    person; three, the history and characteristics of the

9    person, including the person's character, physical and

10   mental condition, family ties, employment, financial

11   resources, length of residence in the community, community

12   ties, past conduct, history relating to drug or alcohol

13   abuse, criminal history, and record concerning appearance at

14   court proceedings; and, four, the nature and circumstance

15   [sic] of the danger to any person or the community that

16   would be posed by the person's release.  That's 18 United

17   States Code 3142(g).  And at the detention hearing, both the

18   government and the defendant may offer evidence or proceed

19   by proffer.  That's United States v. Smith, 79 F.3d 1208 at

20   1210, a D.C. Circuit case from 1996.

21        Here, the Government is seeking detention pending

22   trial pursuant to 18 United States Code 3142(f)(1)(E) which

23   provides for the possibility of detention where the

24   defendant possessed a dangerous weapon during the course of

25   a charged felony.

1          So let me walk through the factors that I have to

2      consider.

3          The first statutory factor requires me to

4      consider, quote, The nature and circumstances of the offense

5      charged.  Again, that's 18 United States Code 3142(g)(1).

6      And considered as a whole, as I'll explain further, I do

7      conclude that the nature and circumstances of the offense

8      weigh in favor of detaining Mr. Jensen.

9          Chief Judge Howell has set forth a number of

10     considerations, which I find helpful, to differentiate the

11     severity of the conduct of the many defendants connected to

12     January 6th for purposes of detention.  She laid those out

13     in United States v. Chrestman.  That's 2021 WL 765662 at

14     Page 7.  Her opinion is dated February 26, 2021.  Those

15     considerations include whether a defendant, one, has been

16     charged with felony or misdemeanor offenses; two, engaged in

17     prior planning before arriving at the Capitol; three,

18     carried or used a dangerous weapon during the riot; four,

19     coordinated with other participants before, during, or after

20     the riot; or, five, assumed -- five, assumed either a formal

21     or a de facto leadership role in the assault by encouraging

22     others' misconduct; and, six, the nature of the defendant's

23     words and movements during the riot, including whether the

24     defendant damaged federal property, threatened or confronted

25     federal officials or law enforcement, or otherwise promoted

1    or celebrated efforts to disrupt the certification of the

2    electoral count during the riot.

3          Examining these considerations, Mr. Jensen's

4    conduct falls somewhere in the middle of the spectrum of the

5    conduct that January 6th defendants are charged with.

6          On the first, Mr. Jensen is charged with seven

7    offenses, including several felonies.  The offenses include

8    obstruction of law enforcement during a civil disorder, in

9    violation of 18 United States Code Section 231(a)(3);

10   assaulting, resisting, or impeding a federal law enforcement

11   officer, in violation of 18 United States Code Section

12   111(a)(1); entering and remaining and disorderly and

13   disruptive conduct in a restricted building with a deadly

14   and [sic] dangerous weapon, in violation of 18 United States

15   Code Sections 1752(a)(1)-(2) and (b)(1)(A); and disorderly

16   conduct, parading, demonstrating, and picketing in a Capitol

17   building, in violation of 40 United States Code Sections

18   5104(e)(2)(D) and (G); and obstruction of an official

19   proceeding, in violation of 18 United States Code

20   1512(c)(2).

21         The 1512(c)(2) offense is one for which the

22   maximum term of imprisonment is 20 years.  So it is plainly

23   a very serious offense, at least from that perspective.  But

24   in addition to the maximum sentence that Congress has

25   established, it is the broader circumstances of the alleged

1    conduct that underscore the seriousness of the charges

2    against Mr. Jensen.  The grand jury has charged that

3    Mr. Jensen acted to stop, delay, or hinder Congress's

4    certification of the Electoral College vote, in violation of

5    18 United States Code 1512(c)(2); and, two, to obstruct or

6    interfere with law enforcement officers engaged in their

7    official duties to protect the Capitol and its occupants

8    while that was happening, in violation of 18 United States

9    Code Section 231(a)(3).  In other words, Mr. Jensen stands

10   charged with interfering with the nation's peaceful transfer

11   of power, which is quite a grave matter to say the very

12   least.

13        So this consideration weighs in favor of

14   detention.

15        On the second, fourth, and fifth considerations

16   outlined by Chief Judge Howell in Chrestman, there are no

17   allegations or evidence that Mr. Jensen engaged in any sort

18   of meaningful planning -- prior planning for January 6th or

19   that he coordinated with other participants really before,

20   during, or even after the riot.  I find all of that quite

21   significant in weighing against detention as to this factor

22   and more broadly weighing against detention.  In fact, the

23   evidence the Government brings to my attention here in some

24   ways cuts against the idea that Mr. Jensen planned much of

25   anything that day.  The Government -- one of the

1    Government's exhibits was a series of videos in which

2    Mr. Jensen states, while at the Capitol building, that, in

3    fact, he was at the White House.  It's hard to imagine that

4    Mr. Jensen planned or coordinated the events of January 6th

5    when he had no basic understanding of where he even was that

6    day.  And as to the fifth factor about leadership,

7    Mr. Jensen apparently was one of the first to enter the

8    Capitol and did intentionally position himself, the evidence

9    shows, toward the front of the crowd wearing a QAnon

10    conspiracy theory T-shirt because he, quote, Wanted Q to get

11    the credit, closed quote.  That's ECF No. 5 at 5.  But this

12    is a thin reed on which to argue that Mr. Jensen was a

13    meaningful leader in the events of that day, and it alone

14    does not say much about the threaten -- threat he might pose

15    going forward or whether pretrial detention is appropriate.

16           As to -- considerations three and six are a mixed

17    bag but waiver slight -- weigh slightly in favor of

18    detention.

19           As for consideration six, Mr. Jensen's words and

20    deeds during the riot, the key video and evidence proffered

21    by the Government show him scaling some of the outside walls

22    of the Capitol, celebrating storming it, although he does

23    refer to it as the White House, and entering through an

24    already -- a window that was already broken.  He proceeded

25    up a flight of stairs with other rioters behind him, moving

1   deeper into the Capitol building and ignoring Officer Eugene

2   Goodman's instructions to stop as Officer Goodman retreated.

3   Officer Goodman, at one point, raised his baton at

4   Mr. Jensen.  And in response, Mr. Jensen did not stop, but

5   at the same time he did not raise his arms or physically

6   confront Officer Goodman either.  The parties disagree about

7   words spoken by Mr. Jensen to Officer Goodman.  The defense

8   claims that he said, I -- I'll take it for my country,

9   indicating a willingness to be beaten.  That's ECF 21 at 5.

10  The Government instead argues that Mr. Jensen said, I'll

11  take it.  I'll take it.  ECF No. 24 at 13.  To the extent

12  that the Government argues that Mr. Jensen was threatening

13  to take Officer Goodman's baton, I looked at the video very

14  closely and it doesn't appear to me that Mr. Jensen made any

15  effort to do that or even to use his arms or his hands to

16  confront Officer Goodman or even, frankly, to defend

17  himself.  So there really is no reason I can see to believe

18  that that is what Mr. Jensen meant.  In any event, after

19  being at the top of the stairway, after being redirected

20  away from the Senate chamber by Officer Goodman, in a nearby

21  atrium, Mr. Jensen was then confronted by a group of

22  officers, who he had and other rioters continued to shout

23  at, with Mr. Jensen asking why they were not arresting

24  corrupt members of the government instead of protecting

25  them.  One officer who was threatened -- who was present

1    characterized Mr. Jensen as encouraging other rioters to

2    advance, although it is unclear how.  I've watched that

3    video very closely and it never captures Mr. Jensen

4    addressing other rioters or appearing to intentionally egg

5    them on except insofar as they might have been egged on

6    simply by Mr. Jensen continuing to advance into the building

7    and verbally sparring with the officers.  In fact, the video

8    in the atrium, though, captures another rioter yelling at

9    police officers far more loudly and aggressively than

10   Mr. Jensen, and the Government has never asked for that

11   defendant to be detained which I know because that defendant

12   -- that case happens to be assigned to me.

13        In any event, after another rioter -- not

14   Mr. Jensen -- slammed a -- apparently, slammed a fire

15   extinguisher against the ground causing it to rupture and

16   many who were there in the atrium were stunned, according to

17   the Government, Mr. Jensen was unfazed and kept, quote,

18   Calmly approaching, closed quote, officers.  But the

19   situation was eventually deescalated and there's no evidence

20   that Mr. Jensen proceeded any further, for example, into the

21   chamber of either the House or the Senate.

22        So broadly speaking, in summary, there is no

23   evidence before me that Mr. Jensen toppled any barricades,

24   broke any windows, or damaged any federal property, nor is

25   there any evidence that he fought with or raised his hands

1      against anyone, including any law enforcement officer.  That

2      said, he clearly disobeyed Officer Goodman and other

3      officers, and he did position himself near the front of a

4      mob as he ran up the stairs toward Officer Goodman and

5      ultimately into this atrium.  That may be some leadership,

6      but only in the narrowest sense.  I would also characterize

7      Mr. Jensen's actions and words as confronting law

8      enforcement in the sense, again, that he failed to obey

9      their commands and in the sense that he continued to

10     proceed.  He did also celebrate what -- that happened --

11     what was happening that day, no doubt, as some of the other

12     evidence depicts, but on the other hand he did not confront

13     officers with a weapon, he did not fight with any officers,

14     or as far as I can tell he did not utter any threats to harm

15     them.

16             In any event, none of my comments about

17     Mr. Jensen's individual conduct, considered on its own

18     somewhat separately from the entirety of the day's events

19     and viewed six months later, should not [sic] be taken to

20     minimize how serious the conduct was, nor should it be taken

21     in any way to diminish the bravery and quick thinking of

22     Officer Goodman that he showed as he confronted the mob and

23     did his duty that day to protect the Capitol and its

24     occupants.

25             The Government also proffers that Mr. Jensen

1  carried a small pocketknife with him that day, which is the

2  key fact that even makes him eligible for detention.  The

3  Government does argue at one point that Mr. Jensen reached

4  for that pocket, but even so I don't think there's any

5  persuasive evidence that Mr. Jensen ever really tried to

6  take the knife out of his pocket or even that he threatened

7  those present that he was about to do so.  And the defense

8  proffers that Mr. Jensen carried his -- that knife with him

9  for protection and that he carried with -- it with him

10  regularly, including to work and, the parties agree, even to

11  his FBI interview that he eventually voluntarily subjected

12  himself to.  So in my view, the knife really does not move

13  the needle that much in terms of the issue of detention.

14         Given all the above, I think all of these factors

15  are a mixed bag and, no doubt, the conduct undertaken by

16  Mr. Jensen that day was serious both in terms of how he

17  acted and in terms of the potential effect on the republic

18  that it could have had, but I do -- and I do find that the

19  nature and circumstances of the offense weigh in favor of

20  detention, but I think that they do so not overwhelmingly.

21         The second factor I have to consider is the weight

22  of the evidence against the person.  And the Government's

23  evidence here is extremely strong, given that the -- it has

24  proffered photos and video of the incident.  So this factor,

25  too, weighs in favor of detention.

1          But next, I have to consider the history and

2     characteristics of the person, including the person's

3     character, physical and mental condition, family ties,

4     employment, financial resources, length of residence in the

5     community, community ties, past conduct, history relating to

6     drug or alcohol abuse, criminal history, and record

7     regarding -- record concerning appearance at court

8     proceedings.

9          And I do find that this factor favors release.

10    Prior to January 6th and his subsequent detention,

11    Mr. Jensen appears to have lived a relatively stable life in

12    Des Moines, Iowa.  He resides with his wife of almost 20

13    years with whom he has 3 children.  His wife has a job.  She

14    has been approved by Pretrial Services as an appropriate

15    third-party custodian as someone who -- ensure that

16    Mr. Jensen does comply with his conditions of release.  He

17    himself -- Mr. Jensen himself had stable employment before

18    he was arrested.  And I'll also note that the Government

19    proffers that, to complete the picture, Mr. Jensen did admit

20    to consuming marijuana on a daily basis and having

21    previously experimented with cocaine and methamphetamine.

22    And there is also evidence in record that -- evidence in the

23    record that, at the time of his arrest, Mr. Jensen was

24    receiving mental health treatment in the community.

25          Mr. Jensen also does have some prior contact with

1     the criminal justice system, but his criminal history is not

2     too serious, nor does it demonstrate a pattern of violence.

3     He has no felony convictions.  Three of the four incidents

4     I've been made aware of -- a driving while under the

5     influence of alcohol, fifth degree theft, and a conspiracy

6     to deliver a controlled substance -- all include [sic] more

7     than 14 years ago and apparently resulted in deferred

8     judgment with no term of imprisonment for Mr. Jensen.  The

9     last incident is more recent, a, quote, Domestic assault,

10    disorderly conduct conviction from 2015.  Mr. Jensen

11    proffers, and there doesn't appear to be any reason to

12    doubt, that the victim of the assault was not his wife.  And

13    Mr. Jensen served about three days of imprisonment and one

14    year of probation for this misdemeanor.  This isn't a clean

15    record, but on the other hand most of it is in the past and,

16    as I said, again, does not demonstrate a pattern of

17    violence.  Defense counsel represents that Mr. Jensen also

18    did not violate the terms of his supervision at any point

19    during these cases.  And, further, aside from his criminal

20    history, after the events of January 6th, Mr. Jensen

21    contacted law enforcement on his own initiative and

22    submitted to an FBI -- to an interview about his conduct.

23    So -- and there's no suggestion that he lied about his

24    conduct on January 6th to the FBI or destroyed evidence of

25    that conduct.

1          The Government also proffers that Mr. Jensen's

2    actions were motivated by conspiracy theories, including the

3    QAnon conspiracy theory.  And indeed, Mr. Jensen allegedly

4    told law enforcement that he believed in preventing the

5    election of now-President Biden from being certified and

6    that he was present in the Capitol to participate in an

7    event that he thought would result in the arrest of members

8    of Congress and Vice President Pence.  But at this point,

9    defense counsel now represents that Mr. Jensen, quote, Feels

10   deceived, closed quote, and, quote, Recognizes that he

11   bought into a pack of lies, closed quote.  That's ECF No. 21

12   at 7.  He describes Mr. Jensen as having experienced a

13   wake-up call.  That's ECF No. 21 at 8.  While I don't put

14   too much weight on these representations, given how late

15   they've come, and they are less persuasive given that

16   they're through counsel, they do distinguish Mr. Jensen from

17   many other detained January 6th rioters, and they do suggest

18   that Mr. Jensen has come to understand that acting on

19   conspiracy theories like QAnon can have terrible real-life

20   consequences both for others and for him.

21          So in summary, again, this factor, the history and

22   characteristics of Mr. Jensen, I do think favors release.

23   Again, it's somewhat of a mixed bag, but on the whole I do

24   think it favors release.

25          And the final factor I have to look at is the

1    nature and seriousness of the danger to any person or the

2    community that would be posed by the person's release.

3    That's, again, the last 3142(g) factor.

4          And then, as the Circuit found in the recent

5    Munchel decision, to justify detention on the basis of

6    dangerousness, I must find by clear and convincing evidence

7    that no condition or combination of conditions will

8    reasonably assure the safety or [sic] any other person and

9    the community.  As the Circuit held in that case, a

10   defendant's detention based on dangerousness accords with

11   due process only insofar as the District Court determines

12   that the defendant's history, characteristics, and alleged

13   criminal conduct make clear that he or she poses a concrete,

14   prospective threat to public safety -- that's the Munchel

15   case at 1280 -- or as the Supreme Court articulated in

16   Salerno, to the extent that the defendant presents an

17   identified and reasonable [sic] threat to an individual or

18   the community, not necessarily dangerous -- danger, but some

19   sort of threat.

20         Although this is a close case, I do believe that

21   this factor weighs against detention and that this ultimate

22   standard is not met when I have to consider all the factors

23   at issue here.

24         And, again, I want to emphasize by -- before I

25   continue that nothing what [sic] I'm about to say should be

1    understood as suggesting that I don't think Mr. Jensen's

2    conduct that day was very serious; that I don't think what

3    happened on January 6th was very serious; and that should

4    give anyone any -- and for -- much of -- any -- as -- give

5    anyone a hint about what sentence I might think might be

6    appropriate if Mr. Jensen is either convicted at trial or

7    pleads guilty to one of the charges that he is -- to one of

8    the offenses that he is charged with.  I think I've said

9    many times in connection with these cases that I do consider

10   what happened that day to be the equivalent of an attempt to

11   steal one of the crown jewels of our country, the peaceful

12   transfer of power.

13           But that said, detention requires a determination,

14   as I said, that Mr. Jensen poses an articulable and

15   prospective threat to the community that cannot be

16   reasonably mitigated by conditions of release.  And I don't

17   think that standard is met here.  I'll just quickly walk

18   through why.

19           Again, there is no evidence that Mr. Jensen

20   toppled barricades that day, broke anything, fought with

21   anyone, whether that be law enforcement or other rioters.

22   There is no evidence he planned or coordinated with others

23   about the events of the day.  Quite the opposite, in my

24   view, given that he didn't even really know where he was.

25   He wore no protective gear, suggested [sic] he anticipated a

1    physical conflict.  He did possess a small knife, but he

2    never took it out of his pocket, and it's a knife that is so

3    commonly with him he brought it to his FBI interview that he

4    showed up for voluntarily.  And when confronted by, sort of,

5    I would call it, defensive tactical force by Officer

6    Goodman, a push keeping him away from the Senate, he

7    declined to physically respond except insofar as he

8    continued to advance into the Capitol.

9          Although Mr. Jensen told the FBI vaguely that he

10   was, All about revolution, closed quote, there is no

11   evidence that he has the capability to help plan another

12   January 6-type event.  He is not alleged to have lied to law

13   enforcement about his conduct.  And, further, his criminal

14   history is not serious insofar as he has had -- he has no

15   felony convictions, and it does not reflect any occasion

16   where he violated his conditions of release and it does not

17   reflect a pattern of violence.

18         The Government's argument ultimately turns on the

19   video that depicts -- and it's a powerful video -- that

20   depicts Mr. Jensen at the front of a crowd, proceeding deep

21   into a Capitol -- into the Capitol up the stairs as Officer

22   Goodman retreats, and disobeying Officer Goodman's

23   instructions to stop.  And, as I said, especially in the

24   context of the larger mob and what was happening that day,

25   Mr. Jensen's behavior is deeply concerning and quite

1    serious.  And but for the heroic actions of Officer Goodman,

2    the reality is we don't know where that entire mob would

3    have ended up.

4          But I don't think this conduct alone provides

5    sufficient reason to determine that Mr. Jensen poses an

6    articulable threat moving forward that cannot be reasonably

7    mitigated by very strict conditions of release.  The Munchel

8    decision is helpful here insofar it explains that, quote,

9    Those who actually assaulted police officers and broke

10   through windows, doors, and barricades, and those who aided,

11   conspired with, planned, or coordinated such actions, are in

12   a different category of dangerousness than those who cheered

13   on the violence, entered the Capitol after others cleared

14   the way.  That's Munchel at 1284.  Mr. Jensen's conduct that

15   day more closely fits into this second category of rioters,

16   even if he did place himself at the front of that group

17   moving up the stairs and even if his actions ultimately do

18   meet the definition of assaulting, resisting, or impeding a

19   federal law enforcement officer.

20         Finally, Mr. Jensen has suggested strict

21   conditions, including GPS monitoring, a -- restrictions on

22   his Internet access, and release to a third-party custodian

23   that has been approved at least by Pretrial Services at this

24   point, that I'll discuss in a moment that I have to weigh in

25   making this decision and that, again, those conditions are

1    critical in why I think release is -- there -- is warranted

2    here.

3           So for all of those reasons, I do find that there

4    is a combination of conditions that will reasonably assure

5    the safety of any other person and the community and I will

6    grant the motion.

7           We will go through -- I believe we've provided the

8    Pretrial Services representatives on here -- on the line

9    here with the order I intend to sign laying out those

10   conditions.  We'll get to Ms. Jensen in a moment here.  But

11   the motion requests that I release Mr. Jensen to the

12   conditions that were previously ordered in the Southern

13   District of Iowa, but I am going to shore up those

14   conditions and make them even tighter to some degree.  The

15   previous conditions were to release Mr. Jensen to home

16   detention, but I am going to find here that home

17   incarceration is appropriate.  That condition restricts

18   Mr. Jensen to his home at all times except for medical

19   necessities, court appearances, and other activities

20   specifically approved by me.  He'll be monitored by

21   location-monitoring technology to ensure his compliance.

22   Some of the other conditions I impose, which we'll walk

23   through momentarily, may require Mr. Jensen to leave his

24   home for medical -- for drug testing or treatment, for other

25   medical issues, and for mental health screenings.  So I'll

1    approve Mr. Jensen, of course, to leave his home for any one

2    of those purposes that my order reflects but for no other

3    purposes than the order will reflect.  And to the extent

4    there are other things that pop up that the parties think I

5    should release Mr. Jensen for, of course, you all know how

6    to reach me if you think -- I'd encourage the parties to

7    talk to each other about whether they can come to an

8    agreement on those, but either way you can -- you know where

9    to find me, Mr. Davis, if you want to pursue that.  But as

10   for now, I'm not going to order him to pursue employment or

11   education; simply to be at home on home incarceration and to

12   follow these other conditions.

13          As for the other conditions, I will order

14   Mr. Jensen, again, released to the custody of his wife,

15   April Jensen.  She will be responsible for supervising him

16   in accordance with the conditions of release, to make every

17   effort to ensure that he appears at all scheduled court

18   proceedings, and to notify the Court immediately if he

19   violates any condition of his release.  Mr. Jensen will have

20   to surrender his passport to the Probation Office.  He will

21   have to not travel outside the Southern District of Iowa,

22   except to the District of Columbia for court appearances if

23   that becomes -- when, and if, that becomes warranted.  He

24   should [sic] avoid contact with anyone who participated in

25   the riot at the U.S. Capitol on January 6th.  He shall

 1    undergo medical or psychiatric treatment as directed by the

 2    Probation Office.  He shall refrain from possessing a

 3    firearm, ammunition, destructive device, or other dangerous

 4    weapon.  He shall refrain from using any alcohol or narcotic

 5    drugs or any other controlled substances.  He shall submit

 6    to drug testing and to participate in substance abuse

 7    treatment as advised by the Pretrial Services Office.  As I

 8    mentioned earlier, he must submit to location-monitoring

 9    technology; to substance abuse and mental health screening

10    as directed by Pretrial Services; and to take any medication

11    that might be prescribed by any health care provider.

12              Further, Mr. Jensen shall not access or --

13    Internet -- or utilize Internet-capable devices, including a

14    cell phone, and any access to the Internet by Mr. Jensen,

15    directly or indirectly, is prohibited.  All Internet-capable

16    devices in Mr. Jensen's home, included [sic] them -- those

17    belonging to his family members, must be password protected

18    with passwords unknown to Mr. Jensen.  And any computers or

19    electronic communication and storage devices or media in

20    Mr. Jensen's home shall be subject to a search if there is

21    reasonable suspicion that Mr. Jensen has violated conditions

22    of his supervision and that the computer or storage device

23    contains evidence of that violation.

24              Let me address Ms. Jensen before we swear you in.

25              Ms. Jensen, you understand the responsibility that

1    you're undertaking here?

2              (Brief pause.)

3              You can -- you're muted right now, Ms. Jensen.

4              (Brief pause.)

5              MS. JENSEN:  Sorry.  Yes, I do.

6              THE COURT:  All right.  You understand that I'm

7    going to -- I -- we'll have the -- Pretrial Services is

8    going to explain these conditions again and, of course,

9    they'll be available to explain them further if you need

10   further explanation, but I just -- and I'm going to instruct

11   your husband about this in a moment, but broadly speaking he

12   is -- if he violates his conditions of release, he can be

13   re-incarcerated or prosecuted for additional offenses, but

14   the most obvious thing is -- the most obvious -- or the most

15   typical -- or a typical outcome if someone violates their

16   conditions of release in a material way is that they're just

17   jailed again pending trial.  Do you understand that,

18   Ms. Jensen?

19             MS. JENSEN:  Yes, sir.

20             THE COURT:  All right.  Katrina, why don't you

21   swear in Ms. Jensen.

22             THE PRETRIAL SERVICES OFFICER:  Your Honor -- oh,

23   I'm sorry.  Go ahead, Katrina.

24             THE COURT:  Ms. --

25             THE DEPUTY CLERK:  Your Honor, do you want me to

1    swear her in for additional questions or swear her to the --

2    to her --

3              THE COURT:  To the --

4              THE DEPUTY CLERK:  -- duties?

5              THE COURT:  For her duties.

6              THE DEPUTY CLERK:  Thank you.

7              Ms. Jensen, will you please raise your right hand.

8              Do you solemnly swear or affirm to well and truly

9    discharge your responsibility as a third-party custodian and

10   advise the Court if the defendant fails to follow the

11   conditions of release?

12             MS. JENSEN:  I do.

13             THE DEPUTY CLERK:  Thank you.

14             MS. JENSEN:  Thank you.

15             THE COURT:  All right.  Mr. --

16             THE PRETRIAL SERVICES OFFICER:  Your Honor, this

17   is Ms. Holman with Pretrial Services.  If I could just

18   recommend that the Court add one additional condition?

19             THE COURT:  Please.

20             THE PRETRIAL SERVICES OFFICER:  For the -- these

21   cases, we've been adding the standard condition to stay away

22   from Washington, D.C., except for court, meetings with

23   attorney, or Pretrial.

24             THE COURT:  That, I think, is eminently

25   appropriate.  I thank you for that.  And we'll go ahead and

1    we will include that in the order that I do enter.

2           So Mr. Jensen, in addition to what I mentioned

3    before, obviously, you may -- depending upon how we proceed

4    in terms of proceeding remotely or not, you may have to come

5    to Washington, D.C., at some point for court.  The point is

6    that, other than that, you do have a stay-away from

7    Washington, D.C., which means you're not allowed to -- part

8    of your conditions of release would be you would not allow

9    -- be allowed to come here.  Of course, that's even a little

10   more specific.  I'm actually ordering you to stay within the

11   Southern District of Iowa except for court appearances,

12   again, unless prior approval is obtained by the Probation

13   Office.  But this is, sort of, a double prohibition, if you

14   will, a more specific prohibition to make sure you stay away

15   from Washington, D.C.  And if you end up -- if you were to

16   violate that, it would be an additional violation of your

17   conditions.

18          Mr. Jensen, just before you -- our probation

19   officer walks through those -- these conditions with you, I

20   want to make sure you understand, again, you're going to be

21   required to appear, whether it be on -- whether it be

22   remotely like we're doing today or perhaps at some point in

23   person.  And failure to appear as required, as you will be

24   informed, is a separate criminal offense for which you could

25   be sentenced to imprisonment.  And in addition, if -- once

1    you're released, you will be under supervision, and that

2    means there will be reporting requirements that will be

3    explained to you and other conditions.  The penalties for

4    violating those conditions can be very severe.  For example,

5    if you would -- if, eventually, you are either convicted or

6    plead guilty and a sentencing proceeding is scheduled, you

7    could be -- or any other proceeding -- you can be subject to

8    a fine or imprisonment for failure -- for failing to appear

9    for a subsequent proceeding in this case.  Do you understand

10   that, sir -- Mr. Jensen?

11            THE DEFENDANT:  Yes, Your Honor.

12            THE COURT:  And if you violate any of your

13   conditions of release, your release could be revoked and you

14   would be detained at that point very likely until the case

15   is completely resolved.  You could also be subject to a

16   separate prosecution, depending upon the circumstances, for

17   contempt of Court.  Do you understand that, Mr. Jensen?

18            THE DEFENDANT:  Yes, Your Honor.

19            THE COURT:  And the worst possible scenario

20   perhaps, if you were convicted of an offense while on

21   release, then in addition to the sentence imposed for that

22   offense, you could be subject to -- sentenced up to 10

23   years' imprisonment.  And any term of imprisonment for an

24   offense committed while on release would be consecutive --

25   would be added to any sentence you would -- might receive

1    for any other offense.  Do you understand that, Mr. Jensen?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  All right.  Why don't I have, then,

4    Pretrial Services -- why don't you go ahead and walk through

5    with Mr. Jensen the conditions I just mentioned and that are

6    reflected on that order.

7              THE PRETRIAL SERVICES OFFICER:  I'm sorry, Your

8    Honor.  You said you wanted Pretrial to go through the

9    conditions again?

10             THE COURT:  Well, with Mr. Jensen just to make

11   sure he understands them.

12             THE PRETRIAL SERVICES OFFICER:  All right.

13             Mr. Jensen, you have been ordered -- you are --

14   have been -- you will be released by the Court.  And you are

15   to report as directed to the Southern District of Iowa.  You

16   are to surrender your passport, if you have one; not obtain

17   a new passport or any other international travel documents;

18   stay away from the District of Columbia as -- except for

19   court, meetings with the attorney; and your travel is

20   restricted to the Southern District of Iowa and to the

21   District of Columbia for court, but you need to get prior

22   approval from your assigned probation officer in the

23   Southern District of Iowa.  You are to get any medical or

24   psychiatric assessments as directed by the Southern District

25   of Iowa.  Do not possess any firearms, destructive devices.

1    If you have any weapons in your home, you need to transfer

2    them to a third party and provide Iowa with a notice.  Do

3    not drink alcohol; do not -- or do not use or unlawfully

4    possess any narcotics or other controlled substance unless

5    they're prescribed by a licensed doctor; submit to drug

6    testing.

7           Your Honor, with that, I don't know if Iowa is

8    testing.  I believe Mr. Brown is on the line.  Some

9    jurisdictions still remain closed due to COVID, but if we

10   could leave that to the discretion of Southern District of

11   Iowa.

12          Participate in any in-patient or out-patient

13   program as ordered by the supervising jurisdiction.  You

14   will be on home incarceration with location monitoring, and

15   that will be at the discretion of the Southern District of

16   Iowa.  It could be what we refer to as radio frequency or

17   GPS monitoring.  There might be a cost associated with the

18   location monitoring.  That will be your responsibility to

19   pay.  Report as soon as possible any contact with law

20   enforcement; permit the Probation Office in the Southern

21   District of Iowa to visit your home at any time or any

22   residence where you live; submit to substance abuse and

23   mental health screening as directed by the Southern District

24   of Iowa.  You shall not take any medication -- I'm sorry,

25   you shall take medication as prescribed by the physician,

1     psychiatrist, or health provider.  You shall not take any

2     medication not prescribed to you.  Defendant shall not

3     access or utilize Internet-capable devices, including a cell

4     phone.  All Internet-capable devices, including those of the

5     family members residing with the defendant, shall be

6     password protected and the defendant shall not have access

7     to the devices or the password -- I'm sorry, to the

8     password.  All -- any access to the Internet, directly or

9     indirectly, through devices belonging to others or in public

10    spaces is prohibited.  So that means you cannot go to a

11    library or any such place and use any type of the Internet.

12    And you must submit your computer, or computers, or other

13    electronic communications or data storage devices, media to

14    a search.  You must warn any other people who use these

15    computers or devices that they're subject to a search by the

16    Southern District of Iowa.

17            Your Honor, in reference to incarceration, I just

18    want to verify that Mr. Jensen does not work.  If we could

19    address that now with defense counsel so we won't have to

20    re-approach the Court in that aspect.

21            THE COURT:  There's no -- at this point --

22    correct.  At this point, he is not authorized to work.

23            THE PRETRIAL SERVICES OFFICER:  Okay.

24            THE COURT:  As I've mentioned, if, at some point

25    in the future, the parties want to approach me about that,

1    they may, but at this point he is not authorized -- work is

2    not one of the authorized reasons for him to leave or else I

3    wouldn't have made it home incarceration.

4           THE PRETRIAL SERVICES OFFICER:  Okay.  And I'm

5    just going to put that on the order so it's perfectly clear,

6    Your Honor, not authorized to work at this time.

7           THE COURT:  All right.  Very well.

8           All right.  And is there anything -- Mr. -- as I

9    recall, Mr. Davis, you had made the point that you wanted --

10   I don't know if I need to reflect this on the order one way

11   or the other at all, but you had mentioned Ms. Jensen would

12   come and actually pick him up from D.C.  Is that correct?

13          MR. DAVIS:  That's correct, Your Honor.  And, you

14   know, actually, I could resubmit an order, but I think

15   that's probably a good idea.  I'm -- as far as I can

16   determine, Mr. Jensen is on a no-fly list.  I haven't been

17   able to confirm that other than by trying to book him a

18   ticket and it doesn't work.  So I assume he's on a no-fly

19   list.  So his wife is going to have to drive from Iowa.

20   She'll leave today and pick him up tomorrow morning.  I --

21   what I would suggest we do is put in the order that he be

22   released from CTF on July 14th to his wife's custody and

23   identify her by name and she'll present identification when

24   she goes to pick him up, and I'll make certain this goes

25   smoothly.

```
1              THE COURT:  All right.  We'll work with Pretrial
2     Services to try to come up with language that is specific in
3     that regard and that only releases him to her custody, as
4     you -- as you've indicated.
5              MR. DAVIS:  Thank you.
6              THE PRETRIAL SERVICES OFFICER:  Your Honor, I
7     don't know if that needs to be on the release order.  It
8     needs to be on the paperwork that the Court will submit to
9     the marshals that we'll send to the D.C. Jail.
10             THE COURT:  All right.  We will work this out.
11             Ms. Mirell, I saw you --
12             I -- so I -- what -- wherever that language goes,
13    I think we can work on that without taking up any more time
14    in today's hearing.
15             Ms. Mirell, did -- were -- I saw your arm moving,
16    maybe, toward unmuting yourself.  Did you want to be heard
17    on something?
18             MS. MIRELL:  Yes, Your Honor.  You addressed one
19    of my concerns about having the defendant released directly
20    into the custody of his wife --
21             THE COURT:  Yes.
22             MS. MIRELL:  -- however, is there a reporting date
23    by which he must be outfitted with a location-monitoring
24    bracelet in Iowa?
25             THE COURT:  We can -- and actually, the -- well,
```

1    you raise a sub-issue that I did -- since we do have Mr.

2    Brown -- Officer Brown here, Officer Brown, can I just ask

3    this one question.  Do you know the answer?  I had assumed

4    it would be a -- for lack of a better way to put it, a GPS

5    monitoring system.  We -- I can do it as, sort of,

6    technology as directed by you.  But if I did that, do you

7    know what technology you would -- Iowa would be using at

8    this point for this?

9           THE PROBATION OFFICER:  Unfortunately, Your Honor,

10   I'd have to staff that with our location monitoring team.

11   Typically, what I've seen with the home incarceration cases,

12   since they're primarily at home, we typically put those

13   people on RS units.

14          THE COURT:  What -- and RS is the, like -- the

15   radio frequency?

16          THE PROBATION OFFICER:  Correct.

17          THE COURT:  All right.  And that -- remind me.

18   That would -- tells you if they leave the home.  But if they

19   left the home, it would not necessarily tell you where they

20   would be once they leave a certain perimeter from the home;

21   is that true?

22          THE PROBATION OFFICER:  That's correct.

23          THE COURT:  Yeah.  I mean, I may -- this may be

24   one where, I think -- and, maybe, Ms. Mirell, if this -- I'm

25   not sure if this is what you're requesting, but I see you

1   nodding.  My thought is, actually, I'm going to -- rather

2   than leave it up to Iowa, I will probably require GPS in

3   this particular case.  It's, sort of, a belt-and-suspenders

4   thing, but I think knowing -- there will be, maybe, in more

5   cases than usual -- at least for the kind of medical visits

6   that the order will reflect, Mr. Jensen may well be leaving

7   his house a little more -- a little bit more than the

8   average person who's subject to home incarceration.  So I

9   think probably GPS technology is appropriate here just so we

10  know exactly where he is.  And so I'll probably check that

11  box.

12          And then, Officer Brown, how quickly do you think

13  he can be fitted with that if he is released to Ms. Jensen

14  on the -- let's say, tomorrow on the 14th?

15          THE PROBATION OFFICER:  If he's released tomorrow,

16  I imagine he probably wouldn't be back in -- what -- until

17  the 15th.  So we would put it on that day.

18          THE COURT:  All right.  I'm going to just say no

19  later than the 16th and build in -- we'll put that that

20  should be -- that he should be fitted with that by at least

21  -- by the -- no later than the 16th just to build in a

22  potential administrative delay of a day.  Does that address

23  your concern, Ms. Mirell?

24          MS. MIRELL:  Yes, it does, Your Honor.

25          THE COURT:  Okay.  Anything further from you?

1          MS. MIRELL:  Well, obviously, the ship has sailed,

2     Your Honor, but just for purposes of the record, the

3     Government would also rely on the recently issued opinion by

4     the D.C. Circuit in Hale-Cusanelli of which this Court was

5     most certainly aware, but that's just for purposes of the

6     record.

7          But I also did want to inquire, as one more

8     thought came to me, if Ms. Jensen is driving alone -- and we

9     are now aware that it's a 16-hour drive straight -- if there

10    will be a stop along the way or whether she will be bringing

11    someone else to drive, just -- the Government still harbors

12    concerns about the danger to community and making any stops

13    longer than just a pickup in D.C.

14          THE COURT:  Ms. Jensen, what can you tell us about

15    your plans?

16          MS. JENSEN:  Either my son will be coming with us

17    or I have a -- one of my good friends will be riding with

18    me.

19          THE COURT:  All right.

20          MS. JENSEN:  So --

21          THE COURT:  So that means you plan on driving --

22    getting -- not stopping overnight, for example?

23          MS. JENSEN:  Probably not.

24          THE COURT:  All right.  Well, if you bring another

25    person, you won't have that ability.  And, again, he's --

1      I'm going to order that the GPS monitoring start no later

2      than the 16th.  So you know, if you don't hook up with

3      Officer Brown here and get that done by the 16th, then he

4      will be in violation and we will, you know, at that point --

5      the outcomes at that point won't be good for your husband.

6                   Mr. Davis, do you have anything else you want to

7      raise?

8                   MR. DAVIS:  I have nothing else to raise, Your

9      Honor.

10                  THE COURT:  All right.  I believe we're already

11     set in this case for a status.  Am I correct in that?

12                  MR. DAVIS:  I believe we are towards the latter --

13                  THE DEPUTY CLERK:  July 27th.

14                  THE COURT:  July 27th?  All right.  And I believe

15     we've even tolled speedy trial until that day; is that

16     correct?

17                  MR. DAVIS:  We have.

18                  THE COURT:  All right.

19                  THE PRETRIAL SERVICES OFFICER:  What's the time on

20     July 27th?  So I can place it on the order.

21                  MR. DAVIS:  That will be 3:00 p.m.

22                  THE PRETRIAL SERVICES OFFICER:  All right.  Thank

23     you.

24                  THE COURT:  3:00 p.m., although, obviously, by

25     video.

1           All right.  If there's nothing further from either

2   party --

3           THE DEPUTY CLERK:  Judge Kelly --

4           THE COURT:  Yes?

5           THE DEPUTY CLERK:  -- I need to swear Mr. Jensen

6   to his conditions of release --

7           THE COURT:  Oh, yes, you absolutely do.  Please go

8   ahead and do that.

9           THE DEPUTY CLERK:  Mr. Jensen, will you please

10  raise your right hand.

11          Do you solemnly swear or affirm that you will

12  abide by the conditions of release as imposed by the Court?

13          THE DEFENDANT:  I do.

14          THE DEPUTY CLERK:  Thank you.

15          THE DEFENDANT:  Thank you.

16          THE COURT:  I should have checked with you,

17  Ms. Harris.  Anything further from you, Ms. Harris?

18          THE DEPUTY CLERK:  That's all, Your Honor.  Thank

19  you.

20          THE COURT:  All right.  Very well.

21          THE PRETRIAL SERVICES OFFICER:  Your Honor, if I

22  could just speak to Mr. Brown once the proceeding is

23  concluded just for some administrative questions?

24          THE COURT:  We might be able to -- I don't

25  honestly know.

```
 1                  Ms. Harris, do you know whether someone else has
 2       this line for a proceeding?
 3                  THE DEPUTY CLERK:  I just need to take the public
 4       line off once we end.
 5                  THE COURT:  Okay.  All right.
 6                  THE PRETRIAL SERVICES OFFICER:  It will be --
 7                  THE COURT:  So --
 8                  THE PRETRIAL SERVICES OFFICER:  -- quick.  Two
 9       minutes, Your Honor.
10                  THE COURT:  All right.  Very well.
11                  With that, the parties are dismissed.
12                  MR. DAVIS:  Have a good day, Your Honor.
13                  (Proceedings concluded at 11:10 a.m.)
14                  * * * * * * * * * * * *
```

### CERTIFICATE OF OFFICIAL COURT REPORTER

**I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby
certify that the above and foregoing constitutes a true and
accurate transcript of my stenographic notes and is a full,
true and complete transcript of the proceedings to the best
of my ability, dated this 19th day of August 2021.**

**Please note:  This hearing occurred during the COVID-19
pandemic and is, therefore, subject to the technological
limitations of court reporting remotely.**

**/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
**Official Court Reporter**
**United States Courthouse**
**Room 6722**

1    **333 Constitution Avenue, NW**
     **Washington, DC 20001**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25