UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 21-cr-6 (TJK) |
| v. | : | |
| | : | |
| DOUGLAS AUSTIN JENSEN, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE

Defendant Douglas Austin Jensen, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to the Southern District of Iowa. Jensen fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.

### BACKGROUND

On January 6, 2021, Jensen, having traveled halfway across the country to participate in the rally in support of then-President Trump, decided to join a mob to storm the U.S. Capitol building in an effort to stop the certification of the Electoral College votes. He scaled the walls to reach the doors to the building. He was among the first rioters to enter the Capitol building itself, climbing through a recently broken window to do so. Once inside, he chased a U.S. Capitol Police officer up a flight of stairs in a menacing fashion, refusing to obey orders to stop and leave. During the attack, as Jensen later admitted, he carried a knife. He later told law enforcement that he wanted to stop then-Vice President Mike Pence, adding that "I was trying to fire up this nation," and "I'm all about a revolution."

Jensen was charged by superseding Indictment on November 10, 2021, with civil disorder, in violation of 18 U.S.C. § 231(a)(3); obstruction of an official proceeding, in violation of 18

1

U.S.C. §§ 1512(c)(2), 2; assaulting, resisting, or impeding federal law enforcement officers, in violation of 18 U.S.C. § 111(a)(1); unlawfully entering and remaining in a restricted building while carrying a deadly and dangerous weapon, that is, a knife, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); disorderly and disruptive conduct in a restricted building while carrying a deadly and dangerous weapon, that is, a knife, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, and picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). Dock. No. 50. Trial is scheduled to begin on September 19, 2022.

Jensen now moves for a change of venue to the district of his residence, the Southern District of Iowa. Dock. No. 64 ("Def. Mtn"). Although he presents no evidence supporting his theory, he contends that prejudice should be presumed in this district for three primary reasons: (1) the physical proximity of D.C. residents to the U.S. Capitol where the events occurred; (2) pretrial publicity surrounding the events of January 6; and (3) the decrease in size of the jury pool following the trial of other January 6 defendants. Each of the defendant's arguments is without merit, and the motion should be denied, just as several other judges in this district have denied similar requests by fellow January 6 defendants. *See United States v. Reffitt*, No. 21-cr-32 (DLF) (D.D.C. Oct. 15, 2021) (Minute Order); *United States v. Caldwell*, No. 21-cr-28 (APM) (D.D.C. Sept. 14, 2021) ECF No. 415 at 10-11; *United States v. Fitzsimons*, No. 21-cr-158 (RC) (D.D.C. Dec. 14, 2021) (Minute Order); *United States v. Bochene*, No. 21-cr-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022).

## ARGUMENT

I. **Legal Principles**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where

the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). As a result, it is the "well established procedure" in this circuit to "refus[e] [defendants'] pre-*voir dire* requests for ... a change of venue." *Id.* at 64; *see also United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where *voir dire* reveals that an impartial jury cannot be impaneled would a change of venue be justified."). After voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

This is in part because exposure to media coverage about a case does not indicate that a juror is unqualified to serve. As the Supreme Court long ago noted, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155–56 (1878). More recently, the Court reiterated, "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381. A juror need not be sheltered from all pre-trial exposure to a given case; he or she only must be capable of setting aside any prejudgment and basing a decision based solely on the evidence. The "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* In fact, the Supreme Court has found no presumption of prejudice even when nearly all the prospective jurors had heard of the case and 77% indicated in voir dire that "they would carry an opinion into the jury box." *Patton v. Yount*, 467 U.S. 1025, 1029 (1984).

Nor does an event's impact on the community necessitate a transfer of venue, even where a large number of residents directly experienced effects of the charged crime. Courts routinely conclude that a defendant can receive a fair trial in the location where the crime was committed, even where many members of the community were victimized or deeply affected by the events. *See*, *e.g.*, *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (Boston Marathon bombing); *Yousef*, 327 F.3d at 155 (1993 World Trade Center bombing); *see also United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks,

4

including on the Pentagon).

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

*Rideau*'s holding was not based simply on the existence of significant pretrial publicity but on the unfairly prejudicial nature of the "dramatically staged" confession by the defendant himself, disseminated to a huge proportion of the jury pool very shortly before trial. *See Skilling*, 561 U.S. at 382 (describing *Rideau*). Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard*, 384 U.S. 333 (same).

Establishing prejudice is, therefore, a high burden, and it is a burden the defendant carries.

The defense must do more than speculate about the possible biases and prejudices of a population that is as large and diverse as a major metropolitan city. *See Bochene*, 2022 WL 123893, at *2 (rejecting January 6 defendant's assertion of prejudice in the D.C. jury pool as based on "conjecture" rather than actual evidence of bias against this particular defendant). Demonstrable prejudice is difficult to come by at this stage, before voir dire, because the jury pool itself has not been identified or questioned.

Some defendants claiming prejudice might point to public opinion polls or other attempts to survey the pre-trial opinions of likely jurors. But "courts have commonly rejected [] polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias."[1] *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005). Poll results cannot "decide the question of a presumption of prejudice" because they fail utterly to account for the important role of voir dire in addressing pretrial publicity. *See Tsarnaev*, 780 F.3d at 23; *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . .

---

[1] Courts are hesitant to find prejudice from polling data for several reasons. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722. Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723. But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

primary reliance on the judgment of the trial court makes good sense").

In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Haldeman*, 559 F.2d at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64. The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43.

Finally, a change of venue should only be considered where it might actually serve the purpose of the Sixth Amendment to ensure an unbiased jury. Where a defendant seeks to change venue due to pretrial publicity, he must show that the desired venue does not suffer from the same infection of publicity. A change of venue is of "doubtful value" where media coverage the defendant seeks to avoid is national in reach. *Haldeman*, 559 F.2d at 64 n.43 (noting that the Watergate scandal "is simply not a local crime of peculiar interest to the residents of the District of Columbia."); *see also Bochene*, 2022 WL 123893, at *3 (noting that publicity of the events of January 6 has been widespread, reaching the people of the defendant's desired district "just as much" as the people in D.C., and the influence of media coverage "would be present 'wherever trial is held'") (quoting *Tsarnaev*, 780 F.3d at 22); *Caldwell*, D.D.C. Case No. 21-cr-28-APM, ECF No. 415, at 11 (noting that January 6 defendant's claim of news media saturation cited to

national media outlets and said nothing about the D.C. jury pool).

## II. Jensen Has Not and Cannot Establish Prejudice

### A. January 6's Proximity to Washington D.C. Jurors Does Not Support a Presumption of Prejudice in this Case

The defendant contends that a D.C. jury could not be impartial because D.C. residents live geographically close to the U.S. Capitol. Def. Mtn. at 1-2, 7-8. This fact does not explain anything about the jury pool's inherent bias, nor does it provide any basis to conclude that D.C. residents could therefore not formulate evidence-based conclusions about one individual's participation in the January 6 riot. Jensen has not offered any explanation as to why proximity to the Capitol translates into an unconstitutionally biased jury pool. Indeed, D.C. residents live in close geographic proximity to every crime that occurs within the district's boundaries, and by this logic could not be empaneled as unbiased jurors in any high-profile case involving acts committed in D.C. That is certainly not required by the Sixth Amendment.

To be sure, some D.C. residents were directly impacted by the events of January 6, either because they adhered to the mayor's curfew order that evening, were diverted due to road closures or other physical impediments, or, perhaps, because they or their associates work in or around the Capitol building. Some of those residents may be selected for jury service and could appear in the venire in this case. During voir dire, the Court and the parties will have the opportunity to explore what impact these events had on those individuals, and whether, and to what extent, it colors their view of the charges against this defendant. *See Skilling*, 561 U.S. at 384 (finding that voir dire is "well suited to th[e] task" of identifying and inspecting prospective jurors' connections to the case and impact from the events). But to prospectively conclude that these potential jurors are biased— and that their numbers will be overwhelming among the jury venire—is pure conjecture. There is no reason to believe that the district's entire population of 700,000 people was so affected by these

events that the Court cannot seat an impartial jury here. Jensen offers no evidence to support this claim, nor does he cite any law to support his argument. If a jury can be empaneled in Manhattan, after the attack on the World Trade Center, or in Boston, after the bombing of the Boston Marathon, certainly one can be empaneled here.

### B. Media Coverage of January 6 Does Not Support a Presumption of Prejudice in this Case

The entire nation experienced the events of January 6 together, as those events unfolded, while images were broadcast in real time on television screens across the country. Jensen argues that images of the day are "likely imprinted indelibly in the mind of anyone who [viewed them][.]" Def. Mtn. at 7. This may be true, but it is also unhelpful to Jensen's argument. First, as he concedes, "[m]uch of this evidence has nothing to do with Mr. Jensen[.]" Def. Mtn. at 7. And the media coverage has been undeniably national in scope. Jurors in the Southern District of Iowa have been exposed to much of the same media coverage of the January 6 riot as jurors in any corner of the United States, including in D.C. The images Jensen describes of people scaling the Capitol walls, hoisting a hangman's gallows and noose, or waiving Confederate flags, have been "splashed across" newspapers and television all around the country. Def. Mtn. at 7. Like the Watergate scandal, the storming of the Capitol on January 6, 2021, was "not a local crime of peculiar interest to the residents of the District of Columbia" but one that is equally important to people all across the country. *Haldeman*, 559 F.2d at 64 n.43. Jensen does not argue—nor could he—that the impact of the media coverage of these events is limited to the district where he is charged and will stand trial.[2]

---

[2] Highlighting this point, the news articles Jensen cites come from *The Washington Post* and *USA Today*, both of which are national newspapers that circulate in Iowa as well as D.C. Def. Mtn. at 7, n.2.

9

In fact, there is good reason to suspect the opposite. National coverage of the riots has focused on the mob, the crowds, and the most memorable individuals like those wearing costumes and battle regalia or putting their feet on the desks of prominent lawmakers. Jensen received attention along with other "faces" of the insurrection, but not more so than some of his even more infamous co-defendants. The people of D.C., like the rest of the country, have been exposed to an array of media images focusing on dozens, hundreds, or even thousands of rioters and protestors who contributed to the events as they unfolded. News of Jensen's role in the riot is diffused by the many other people who have received equal or greater attention on the national stage. Jensen has not even claimed that the pool of potential jurors in D.C. is likely to have learned his name, recognize his face, or have any information about his specific case as distinguished from any of the hundreds of other January 6 rioters and co-defendants.

On the other hand, media in Jensen's home district have focused heavily on his case. The *Des Moines Register* publishes updates about Jensen's case to its readership nearly every time a new pleading is filed. An online search for "Doug Jensen" results in links first to the *Des Moines Register*; second to KCCI Des Moines, a CBS-affiliated Des Moines television station, third to Iowa Public Radio, and only fourth to *The Washington Post*. According to Google and newspaper records, the *Des Moines Register* has published more than a dozen articles about Jensen specifically—more coverage than a similar search shows he has received in *The Washington Post*. But even in Iowa, the coverage of Jensen is certainly less significant than of the defendant in *Skilling*, where the Houston Chronicle "mentioned Enron in more than 4,000 articles during the 3-year period following the company's December 2001 bankruptcy" with "[h]undreds of these articles discussing Skilling by name." *Skilling*, 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part).

Moreover, the coverage of January 6 in general and of Jensen in particular is not unfairly prejudicial or inflammatory, and Jensen has presented no basis to conclude that the jury pool in D.C. is biased as a result of seeing it. Any images showing Jensen would be relevant and admissible at trial, and they are a far cry from the prejudicial impact of a widely-broadcast, "dramatically staged" extrajudicial confession such as occurred in *Rideau*. *Skilling*, 561 U.S. at 382 (describing *Rideau*). Even "pervasive, adverse publicity [] does not inevitably lead to an unfair trial[,]" where the news stories are not "particularly likely to produce prejudice[.]" *Id.* at 384 (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976)). As in *Caldwell*, Jensen "has not put forth a scrap of evidence to support his claims of jury bias," and his attempt to equate media coverage with actual bias are "based entirely on his own speculation." *Caldwell*, D.D.C. Case No. 21-cr-28-APM, ECF No. 415, at 11.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on Jensen's conjecture. As in *Haldeman*, there is "no reason for concluding that the population of Washington, D.C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. 559 F.2d at 62. Even a great deal of pretrial publicity does not disqualify a potential juror or an entire venire. As *Skilling* noted, "juror *impartiality* . . . does not require *ignorance*." 561 U.S. at 381; *see also Patton*, 467 U.S. at 1029 (finding no presumption of prejudice even when 77% indicated on voir dire that "they would carry an opinion into the jury box").

### C. The Size of the Jury Pool Does Not Support a Presumption of Prejudice in this Case

Jensen's final argument is that by the time of his trial in September 2022, the pool of

eligible jurors will be that much smaller, as other January 6 defendants take their cases to trial before his. Def. Mtn. at 9. He cannot show an impact on the jury pool sufficient to justify a change of venue.

To date, only one January 6 defendant has been tried before a jury. *Reffitt*, No. 21-cr-32 (DLF). In that case, the Court individually questioned approximately 60 prospective jurors over two days of voir dire and seated a 12-member jury with four alternates. In a district of approximately 700,000 residents, that leaves hundreds of thousands of additional potential jurors who have not yet been called to serve. Even if other defendants' trials cause "spikes" in publicity, Def. Mtn. at 9, there is no reason to surmise that publicity would mention Jensen's case in particular. Moreover, any additional publicity involving Jensen himself will likely be offset by the additional passage of time since the events of January 6. *See Skilling*, 561 U.S. at 383 (observing that "the decibel level of media attention diminished somewhat" in the four years between Enron's collapse and trial); *Patton*, 467 U.S. at 1029 (observing that "prejudicial publicity [had] greatly diminished and community sentiment had softened" in four years). If, as Jensen supposes, the jury pool is irredeemably prejudiced by the time of his trial, the Court's voir dire will reveal the issue and a solution can be tailored at that time. But Jensen's conjecture that this *might* come to pass in the future is wholly insufficient to support a transfer of venue now.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

                              Respectfully submitted,

                              MATTHEW M. GRAVES
                              United States Attorney
                              D.C. Bar No. 481052

By:    */s/ Emily W. Allen*
           EMILY W. ALLEN, Cal. Bar No. 234961
           Assistant United States Attorney
           555 Fourth Street, N.W.
           Washington, DC 20530
           emily.allen@usdoj.gov
           (907) 271-4724