**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-6 (TJK)** |
| **v.** | : | |
| | : | |
| **DOUGLAS AUSTIN JENSEN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS EVIDENCE**

Defendant Douglas Austin Jensen, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to suppress statements he made to law enforcement on January 8, 2021, and evidence seized from the phone he provided the same day. ECF No. 65 ("Def. Mtn."). Because his statements were made voluntarily in a non-custodial meeting that the defendant initiated, and because the search of his phone was based on his voluntary consent, this this Court should deny the defendant's motion.

**STATEMENT OF FACTS**

On January 6, 2021, Jensen, having traveled halfway across the country to participate in the rally in support of then-President Trump, joined a mob to storm the U.S. Capitol building in an effort to stop the certification of the Electoral College votes. He scaled the walls to reach the doors to the building. He was among the first rioters to enter the Capitol building itself, climbing through a recently broken window to do so. Once inside, he chased a U.S. Capitol Police officer up a flight of stairs in a menacing fashion, refusing to obey orders to stop and leave.

Jensen's chase of the officer was captured on video by a reporter and widely publicized in national news media. By January 7, 2021, Jensen had learned that he was all over the national news. *See* Exhibit 1, excerpts of Jensen's text messages ("Seen ya on CBS in tha capital"; "You

know you're everywhere right?"; "Just saw you on the news. Just wanted to tell you I love you and stay safe please!!!!"). Tips began coming into the FBI and the media identifying individuals seen in the news footage, including Jensen. By mid-day on January 7, 2021, the FBI learned his identity and KCCI Des Moines, a CBS-affiliated television station, publicly identified Jensen by name and place of work, along with the photo shown below.

## Iowa man seen inside U.S. Capitol during Wednesday violence

602
Shares         Updated: 1:43 PM CST Jan 7, 2021

Infinite Scroll Enabled 



Agents found Jensen's publicly-available Facebook page, and learned that he had posted about his experience at the Capitol on January 6. By the afternoon of January 7, 2021, the FBI determined it would "likely be initiating" a full investigation into Jensen, but had not yet opened the case. *See* Exhibit 2, email between FBI and DOJ staff.

In the meantime, Jensen was on his way home from D.C. back to Des Moines, a full day's drive. He left the D.C. area around 7:30 am on January 7. *See* Exh. 1 ("Leaving dc," sent by Jensen at 7:38 am). Throughout the drive, his phone was "blowing up" with messages and people warning him about the news coverage. He received so many messages that he deleted all the apps from his phone and shut the phone off. Transcript of Jan. 8 Interview, at p.15, line 22 – p. 16, line 5 (hereinafter cited as "Tr. page:line"). As soon as he arrived back in Des Moines, he went to see his wife. She was scared because of all the news coverage Jensen was receiving, and she told him to go take care of the problem. Tr. 103:9-18.

Following his wife's advice, on the morning of January 8, Jensen walked the six miles from his neighborhood to the Des Moines Police Department, located in downtown Des Moines, Iowa. (He later explained that his car was broken down. Tr. 126:8.) He arrived there, unannounced and without warning, at around 8:38 am. *See* Exh. 2 (reporting that Jensen "just walked into DMPD [Des Moines Police Department,]" sent at 8:38 am). According to a second- or third-hand account reported later that day, Jensen "walked into the [police department] this morning and said 'I think I'm probably wanted[]'" based on his participation in the effort to "'overtake the Capitol' after the president spoke." Exhibit 3, email from DOJ staff. There was no arrest warrant, no plan to make an arrest, and not even a formal FBI investigation yet opened.

Des Moines police officers notified the FBI of Jensen's drop-in, and FBI staff quickly made plans to get to the police department, about 15-20 minutes away. Jensen checked his 3-inch blade pocket knife before entering the secure space of the police office. An officer escorted Jensen to an interview room, outfitted with a video camera, where he could sit and wait comfortably for the FBI agents to arrive. The door to the room did not lock automatically, and there is no indication it was ever locked (in fact, the video indicates that the door remained unlocked throughout the

morning, as the door was opened freely from inside the room on multiple occasions). At around 8:40 am, the officer returned with bottled water and a status update; he told Jensen it would be a few minutes until the investigators arrived. Jensen was never handcuffed or placed in restraints. He waited quietly for the next few minutes, as shown below.[1]



At around 9:00 am, FBI Special Agents Tyler Johnson and Scott James arrived and introduced themselves. They shook hands with Jensen and thanked him for coming in. Jensen, Agent Johnson, and Agent James sat in a semi-circle around the table. Agent Johnson said they had a couple of questions they wanted to run by Jensen, but first started off with this:

---

[1] A copy of the video of this interview will be submitted electronically to chambers. The video file includes the date and time of the events referenced here.

> Definitely, you know, first and foremost, we want you to understand, this is a voluntary interview. Okay? We just, again, we appreciate you coming in. It definitely seems to us that you want to come talk to somebody in law enforcement, so we're excited to hear what you have to say, okay?

Tr. 3:4-9. Jensen was informed that the interview was being recorded. *Id.*

Agent Johnson began by asking basic biographical questions. When they asked about his occupation, Jensen quickly volunteered that he had thrown away his job and his family for something that he believed in, and he began an unsolicited description of his adherence to "Q" (which he described as a group of people with close connections to Trump, who dropped intelligence to the public) and President Trump, and his participation in the riot at the Capitol. Tr. 4:21-5:21, approx. 9:04-:05 am. In purely volunteered statements that came in response to no specific solicitation by the FBI agents, Jensen said that he wanted to be at the front of the mob at the Capitol so that he could be the "poster boy" and give all the attention to "Q" (using his "Q" t-shirt). *Id*.

Jensen described his belief that January 6 would be "showtime," when prominent politicians and leaders would be arrested under the Insurrection Act. Tr. 13:13-19, approx. 9:20 am. In addition to providing information about his own activities, Jensen also used the interview as an opportunity to ask questions of the FBI agents, such as: was the FBI looking into "Q's" theories, Tr. 17:14-19; were arrests (of leaders like Mike Pence and Nancy Pelosi) imminent Tr. 136:14-16; had Antifa secretly agitated or infiltrated the mob, Tr. 131:6-7.

Jensen and the agents spoke for about an hour and a half, and at around 10:32 am Agent James and Agent Johnson took a phone call and left Jensen on his own in the room. Around 10:36 am, Task Force Officer (TFO) Matthew Towers came in and asked Jensen if he wanted to go outside and have a smoke. Tr. 72:14-25. Jensen said that would be great. He collected his things—a pack of cigarettes, a handkerchief or neck gaiter, and a bottle of water—and they left

the interview room together. They went outside of the police building, where Jensen was unrestrained and free to walk around as he pleased. Thirteen minutes later, they came back together. TFO Towers asked Jensen if he needed a restroom. Jensen said no, and sat alone to wait for the FBI agents to return. Tr. 73:3-12.

At around 10:57 am, the agents returned and the interview resumed. They first asked Jensen if he had said anything off-camera that he wanted to repeat for the recording. Jensen said he had not. Tr. 74:1-16. Then they asked some details about the logistics of his trip, how he got to and from the Capitol, and what happened while he was there. They spoke for another hour. At around noon, Jensen offered to show the agents his cell phone. Tr. 129:21. This preceded a second break, at around 12:02 pm, when the agents got up to leave and asked Jensen if he would like another smoke. Tr. 137:14.

At around 12:08 pm, a police officer arrived to escort Jensen outside for another cigarette. Tr. 139:15-17. Again Jensen went outdoors, where he was unrestrained and his departure unimpeded. At 12:23 pm, Jensen and the officer returned to the interview room.  The officer asked if Jensen needed anything else. Jensen said no. Tr. 139:22-24. The officer said he wasn't sure what the FBI agents had going, but Jensen seemed to know more than the police officer; he explained that he was going to sign some papers. The officer left Jensen to wait on his own for about five minutes for the FBI agents to come back. Tr. 140:6-9.

When the agents returned at around 12:28 pm, Agent James explained they were going to wrap things up. Agent Johnson filled out the paperwork relating to Jensen's offer to share his cell phone. Tr. 140:18-144:12. Jensen asked whether he could keep his phone. Agent Johnson answered, "what we would like to be able to do—" and Jensen finished the thought, "is hook up and take everything off of it and give it back to me?" Tr. 141:20-25. When Jensen asked if the data

would be removed, the agents explained that they could simply make a copy. Tr. 142:8-16. Jensen expressed no complaints with that process.  He gave them his home address (where he explained he had left his phone that morning) and phone password. Tr. 143:1-8. Jensen then signed a written form confirming his consent to search his cell phone. *See* Exhibit 4, consent to search, signed Jan. 8, 2021.

The interview concluded at around 12:32 pm. In total, Jensen spoke to the agents for about two and a half hours—from 9:00 am to 10:30 am, then again from about 11:00 am to noon. After the second break, at about 12:30 pm, they went through paperwork and finished up. Throughout the entire time Jensen was at the police department, the interviewing agents were respectful, calm, and polite. The interview was friendly and amicable throughout. The agents asked few questions, instead listening to Jensen's lengthy descriptions of his views and occasionally guiding him back to the topic at hand. Largely, Jensen offered up information and evidence before the agents even asked, including offering to show the agents his social media accounts and online commentators he followed.

Jensen presented as bright, alert, lucid, and engaged throughout the entire morning. Nevertheless, the agents took precautions by asking Jensen about his mental and physical state and his use of prescription and non-prescription drugs. Jensen acknowledged that some of his beliefs were a little "out there" and that some of his friends and family thought he was crazy, but he said he had not been diagnosed with any mental health problems. Tr. 18:18-19:3. He said that he suffered chronic pain as the result of an injury, for which he took muscle relaxers, anti-inflammatories, and two 7.5 hydrocodone per day, and he took blood pressure medication. Tr. 63:18-22. He also described a period of his life when he took antidepressants. Tr. 66:13-67:9. Relevant to the events of January 6, Jensen explained that he had gotten little sleep before the rally,

because he drove through the night on Tuesday to get to D.C. in time for Trump's speech on Wednesday morning. Tr. 4-23. But then after the riot, on the night of January 6, he went to bed at around 5:00 or 6:00 pm, slept for about 12 hours, then got up around 6:00 am on January 7 to drive home to Iowa. *See* Tr. 104:15-17, 106:8-9. The agents followed up to ensure Jensen was physically well during the interview. He assured them that the only aid he used to stay awake was Red Bull. Tr. 104:21-105:3. Jensen volunteered, "you can drug test me, I don't do meth, I promise you that." *Id.* Through his words, actions, and demeanor, Jensen never indicated any sign that he was tired or out of sorts during the interview, and he displayed a full understanding of what was happening throughout.

All the circumstances surrounding the interview indicate that it was voluntary and that Jensen was free to leave at any time—and that Jensen understood this. As noted, he showed up of his own accord, unbidden, and at his wife's suggestion. The agents expressly stated that the interview was voluntary on at least four separate occasions: (1) at the very outset of the interview at 9:01 am (Tr. 3:5); (2) just before the break at 10:32 am (Tr. 71:25); (3) before resuming again at 10:57 am (Tr. 74:1); and (4) at the conclusion of the interview, at 12:34 pm (although it is unclear whether Jensen was near enough to hear this final statement, made for the record toward the camera) (Tr. 147:9). Agent James made additionally clear that Jensen was free to leave when, toward the end of the interview, he predicted that "when you walk out of here and you get home, and you get back on your phone," Jensen might see negative information about himself online or on social media, and he should try to keep perspective. Tr. 127:16-25. In addition, Agent James twice used the phrase "non-custodial": (1) after the first break before resuming the interview at 10:58 am (Tr. 74:1); and (2) at the conclusion of the meeting at 12:34 pm (Tr. 147:9-10).

On one occasion, Agent James misspoke; while directing his comments to the recorder, just before the first break at 10:32 am, he said, "we're taking a break from the voluntary, custodial interview that we're conducting." Tr. 71:25-72:1. But it was clear that this was a mistake—just after Agent James said this, Jensen left the police department building and went outside for thirteen minutes, when he was unrestrained and free to move about as he pleased, clearly not in custody. Moreover, Jensen made no further statements until the interview resumed at 10:58 am—before which, Agent James again addressed the recording, and clearly stated the correct term, "This is the resumption of the voluntary, non-custodial interview." Tr. 73:25-74:1. Jensen was listening and gently nodding along as Agent James said this, and indicated no disagreement or surprise that the interview was, as stated, "non-custodial." Jensen made no statements between the time Agent James inadvertently said the interview was "custodial" (before the break at 10:32 am) and the time when he correctly noted it was "non-custodial" (after the break at 10:58 am).

Jensen himself stated his belief that he was free to stop the interview and that he would be going home when they were finished talking. When the agents asked where Jensen would be staying, he answered, "I'd like to go home… That's where I'd like to go. And as long as its safe." Tr. 109:19-25. In other words, his concern about going home was not the belief that he was in police custody but just the opposite—he worried for his safety because he saw himself as a target due to his notoriety. *Id.* Then, at around 11:54 am, Jensen assured the agents, "I'm not gonna go anywhere. You guys – you know what I mean?…If you want to talk to me again, I will come back." Tr. 129:16-19. He offered to show them his phone and all his research into "Q's" theories. Then he asked their advice about his continued internet research: "[S]o, do I go home and look at that stuff, or should I quit and take a break?" Tr. 130:2-14. Agent James told Jensen he was a grown man and free to make his own decisions, but suggested that more of this reading might lead

to more stress and anxiety. *Id*. Jensen agreed, saying, "I think I'm just going to let it go for a while… And I'm just gonna pray." *Id*. These exchanges clearly indicated Jensen's expectation that he would be returning home when the conversation ended. Even reflecting back on the interview several months later, Jensen described it, through counsel, as a voluntary meeting, stating that "he voluntarily met with the[ FBI] and described what occurred – on video." ECF No. 21, p.6.

Not only was it Jensen's stated expectation that he would return home after the interview, that is exactly what happened. At the conclusion of the interview, the agents—recalling that he had walked six miles to get to the police station due to his broken-down car—offered to give Jensen a ride home. Tr. 144:14-17. They said they could use that opportunity to pick up Jensen's phone from his home. Jensen wanted to ensure that they could access his social media, and volunteered his passwords. Tr. 145:7-11. The three got up together and left the room. Before they left the police department, the agents collected Jensen's knife so they could return it to him. Tr. 147:17-18.

On the brief ride home, Jensen gave the agents directions to his house. When they arrived, he invited the agents inside and gave them his cell phone. The agents explained that they would make a copy of his phone and offered to deliver it back to Jensen when they were finished. They did not specify when that would happen. The agents never asked Jensen to stay home or remain in any particular place. They gave him no instructions or requests about what he should do next. The agents never told Jensen to go or not to go anywhere. Jensen was not placed under surveillance or monitored once the agents left. In fact, they returned Jensen's pocket knife before they left.  They were in Jensen's home for just a few minutes.

After the agents left Jensen at his home, they returned to work. For the first time—only after Jensen had returned home from the interview—they discussed the possibility and logistics of

making an arrest and taking Jensen into custody. Around 6:36 pm Central time, a federal magistrate judge in D.C. signed a warrant for Jensen's arrest, based on an affidavit sworn by an FBI agent in D.C. who had consulted with the Des Moines team. *See* ECF. No. 1-1.

That afternoon and evening, the FBI put together a plan for Jensen's arrest based on the D.C. warrant and arranged for an arrest team to approach Jensen at his home. At around 8:00 pm, the agents approached Jensen at his home and informed him he was under arrest.  They placed him in handcuffs and transported him to the Polk County Jail. Once he was arrested, Jensen was not asked any questions and did not make statements.

Jensen now moves to suppress his January 8, 2021 statements and the evidence obtained from the search of his phone. Def. Mtn at 2-3, 4. He claims the interview was custodial, and that therefore the absence of *Miranda* warnings requires the statements be suppressed. *Id.* at 4-5. Citing *Wong Sun v. United States,* 371 U.S. 471, 488 (1963), but not *United States v. Patane*, 542 U.S. 630, 637, 642 (2004), Jensen further claims that evidence obtained from the consent search of his cell phone must be suppressed. *Id.* at 4. These arguments are without merit. Jensen's interview was voluntary and non-custodial, and the statements he made, as well as the evidence obtained from the consent search of his phone, are admissible.

## ARGUMENT

Jensen's self-initiated interview with the FBI, which occurred at the time and location of his own choosing and which was preceded by the agent's express advisement that it was voluntary, was not custodial, and therefore no *Miranda* warnings were required. Furthermore, Jensen's statements were the product of a free and unconstrained choice by Jensen himself, not of any police conduct that even arguably approaches coercion. Jensen's consent to search his cell phone was the result of an equally voluntary choice, and, in any case, the exclusionary rule does not apply to

evidence obtained in violation of *Miranda*'s mandates. Jensen's interview statements, and the evidence seized from the consent search of his cell phone the same day, are admissible as direct evidence at trial.

## I. Jensen's Statements to Law Enforcement Were Non-Custodial and No *Miranda* Warnings Were Required

### a. Legal Principles

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. To safeguard that right, the police must warn a suspect who is going to be questioned while in custody that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). But this prophylactic applies only to custodial interrogation—which the Supreme Court defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. In other words, *Miranda*'s rule does not come into play unless the court determines that the defendant was in "custody" for this purpose.

In this context, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *United States v. Burden*, 934 F.3d 675, 161 (D.C. Cir. 2019) (citing *Howes v. Fields*, 565 U.S. 499, 508 (2012)) (quotation marks omitted). There are two components to the *Miranda* custody analysis. *Howes*, 565 U.S. at 508–09. "[T]he initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (internal citations omitted). "[C]ourts must examine 'all of the circumstances

surrounding the interrogation'" to determine if the subject's "freedom of movement was curtailed." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*per curiam*) (finding an officer's intent to restrict the liberty of a suspect is only relevant on the custody issue if it is "conveyed, by word or deed, to the individual being questioned")). Factors relevant to this analysis include: (1) the location of the interview; (2) its duration; (3) statements made during the interview; (4) any use of physical restraints during the interview; and (5) whether the person was released at the end of the interview. *Howes*, 565 U.S. at 509 (collecting cases). If the individual would have felt free to leave, the inquiry ends; a restraint on freedom of movement is a prerequisite for *Miranda* custody. *See Maryland v. Shatzer*, 559 U.S. 98, 112 (2010).

But "[b]ecause not all restraints on freedom of movement amount to custody for purposes of *Miranda*, a finding that a person in the suspect's shoes would not have felt free to leave does not end the inquiry." *United States v. Cooper*, 949 F.3d 744, 748 (D.C. Cir. 2020) (citing *Howes*, 565 U.S. at 509) (quotation marks omitted). The second step is to ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509; *see also Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (explaining that "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody"). Coercive pressures include "the shock" of being arrested and questioned after being "yanked from familiar surroundings in the outside world" and "'cut off from his normal life and companions'"; "the hope" that speaking will allow the interviewee "to leave and go home"; and a reason to think that the interrogating officers have "authority to affect the duration" of the interviewee's confinement. *Howes*, 565 U.S. at 511–12 (quoting *Shatzer*, 559 U.S. at 106).

13

The location of an interview does not determine its custodial nature. "Indeed, *Miranda* did not even establish that police questioning of a suspect at the station house is always custodial." *Howes*, 565 U.S. at 507-08 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). In *Mathiason*, the defendant, who was suspected of burglary, was asked to call the police officer investigating the crime. 429 U.S. at 495. The defendant did call, and agreed to come to the state patrol office to "discuss something" with the officer. *Id*. During that meeting, the two sat in an office at the station house where the door was closed. At the end of the interview, the defendant left the police station "without hindrance." *Id*. Although the interview occurred at the police station and the defendant was in fact suspected of the crime that was the subject of the interrogation—indeed he was later charged for that crime—the Supreme Court found that the situation was "noncustodial." *Id*. *Miranda* warnings were thus not required. *Id*. The Court made this conclusion even while acknowledging that some aspects of the interview were "coercive"—noting that all police interviews will have some degree of coercion to them. *Id*.

Other courts have found station-house interviews non-custodial for Miranda purposes, following on *Mathiason*. In *United States v. Patterson*, for example, a suspect was interrogated at the FBI's office after armed agents approached him near his home and brought him to the interview location in an FBI vehicle. 826 F.3d 450, 453 (7th Cir. 2016). During the two-hour interview that followed, the defendant indicated that he believed he would be arrested, and asked the agents when they thought that would happen. *Id.* at 453-54. But he was never restrained while in the interview room, and the door remained unlocked; furthermore, he left after the interrogation. The court found this setting non-custodial for *Miranda* purposes. *Id.* at 459.

Likewise, in *United States v. Galceran*, police left the defendant a business card and asked him to call; when he did, the officer asked him to come to the police station to discuss a series of

robberies and told him he would not be arrested. 301 F.3d 927, 929 (8th Cir. 2002). The defendant

drove himself to the police station after telling his family "that he was going to turn himself in"

with the hope that he would receive leniency from the judge. *Id.* at 930. Although the questioning

took place at the police station, the court found that the "setting was not police dominated," in part

because the defendant voluntarily appeared for the interview. *Id.* at 931. Moreover, the defendant

left at the end of the interview—a factor the court noted was "very important" in its determination.

*Id.* (citation omitted). The court found the defendant was not in custody or otherwise deprived of

his freedom of action in any significant way, and *Miranda* warnings were not required. *Id.*

### b.   A Reasonable Person in Jensen's Position Would Feel Free to Leave

Jensen chose to visit the police station that morning and asked to speak with investigators.

He was in the location of his own choosing. He was not summoned there. He offered up

information without even being asked. He was never restrained or handcuffed. He was never told

he was under arrest. He took two separate breaks to go outdoors. He made statements indicating

his belief that he would go home at the end of the interview. The agents talked about what would

happen when he went home. In light of the objective circumstances of this interview, any

reasonable person in Jensen's position would have felt free to terminate the interview and leave.

*See Howes*, 565 U.S. at 509 (noting the importance of factors including whether the person was

released at the end of the interview, the absence of physical restraints, and statements made during

the interview).

Jensen's interview was less akin to a custodial setting than the circumstances in *Patterson*

and *Galceran*, both of which were found non-custodial.  Jensen was not summoned to the police

station—he chose the location and appeared there unannounced. *Cf. Patterson*, 826 F.3d at 453

(interview was non-custodial even when armed agents checked the defendant for weapons before

bringing him to the FBI office in an FBI car); *Galceran*, 301 F.3d at 931 (a defendant's intention to "turn himself in" at the police station does not make an interview there custodial, particularly because the defendant did in fact leave freely at the end of a two-hour interview). Jensen's interview occurred on his own terms, at the time and place he elected, without any restraint on his movements.  And it ended with him leaving freely just as he expected.

Jensen was subject to routine, universal security measures at the police station, including being escorted while he was in the secure office space and being asked to leave his weapon at the door. This does not mean his freedom of movement was restrained as *Miranda* envisioned, nor does it convert his interview into a custodial setting.  Evaluating similar circumstances, the Seventh Circuit noted that universal security requirements at an FBI building that defendant relinquish weapons, keys, and cell phones, and that he be escorted throughout the building, was not indicative of *Miranda* custody.  *United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012).  This was true even though these security measures had the effect of impeding the defendant's ability to communicate with the outside world. *Id*. Similarly, Jensen was quite reasonably asked to leave his weapon when he entered the police station, and he was escorted around the office by police department staff, just like any visitor would be. These measures did not meaningfully restrain his freedom of movement; he remained free to walk out any time he wanted.

Neither did Agent James' single misstatement referring to the meeting as a "voluntary, custodial interview" change the objective circumstances or indicate that any reasonable person would not have felt free to terminate the interview and leave.  Jensen was told repeatedly that it was a voluntary interview, and the agents twice noted explicitly that it was "non-custodial."  Agent James corrected his single misstatement in Jensen's presence and, significantly, *before Jensen made any further statements*. Thus even if this comment somehow changed Jensen's understanding

of the circumstances—a conclusion that is not warranted by any of the evidence here—the agent's correction cured the issue. Jensen simply did not make any statements or respond to any questions in the time between when the agent mistakenly referred to the meeting as "custodial" and when he clearly and correctly noted that it was "non-custodial." The agents never intended to change the nature of the meeting and take Jensen into custody, and they certainly never conveyed any such non-existent plans to Jensen. To the contrary, they discussed his "walk[ing] out of here" and "get[ting] home." Tr. 127:17; *cf. Stansbury*, 511 U.S. at 322 (1994) (officer's intent regarding custody may be relevant if it is "conveyed, by word or deed, to the individual being questioned").

### c.  The Environment of the Questioning Was Not Coercive

Even if the Court disagrees and finds that a reasonable person in Jensen's position would not have felt free to terminate the interview or leave the Des Moines police office, the analysis is not over; a person is only in *Miranda* custody if *both* prongs of the *Howes* test are met. Here, there was nothing coercive about the meeting. Jensen walked into the police station of his own accord, without any "shock" of being arrested or "yank[ing]" from his familiar surroundings. *See Howes*, 565 U.S. at 511-12. He walked out when the interview was over, and he knew throughout the interview that he would be "leav[ing] and go[ing] home." *Id.* He volunteered all the information he provided. He offered a lengthy narrative, hardly needing the agents to ask any questions at all. The tone was polite and respectful. The agents even began the conversation by telling Jensen that they were excited to hear from him. The setting here was, in sum, nothing like the inherently coercive pressures discussed in *Miranda. Howes*, 565 U.S. at 509. No prophylactic warnings were required to protect Jensen's rights, because he was not in custody.

II.     **Jensen's Statements to Law Enforcement were Voluntary**

Jensen next claims that his interview was not voluntary by Constitutional standards; that is, that his will was overborne such that he made the statements only because of police coercion. Def. Mtn. at 5-6. This argument is baseless. Jensen sought out law enforcement officers in order to self-disclose his activities without any prompting, and he never showed any inkling of a desire to stop the interview. In fact, before this very Court he has previously referenced this interview to suggest his cooperativeness in a bid for pretrial release, describing that Jensen "voluntarily met with the[ FBI] and described what occurred[.]"  ECF No. 21, at 6.

For a defendant's statements to be admitted at trial, the government must show that they were made voluntarily. As the D.C. Circuit has summarized, "[v]oluntariness turns on whether the 'defendant's will was overborne' when he gave his statement, and the test for this is whether the statement was a 'product of an essentially free and unconstrained choice by its maker.'" *United States v. Murdock*, 667 F.3d 1302, 1307 (D.C. Cir. 2012) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), and *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).   Unlike the determination of *Miranda* custody, this inquiry is subjective, focusing on the defendant's understanding of the proceedings and events. The absence of *Miranda* warnings—even when they were required—does not indicate that a statement was not voluntary. To the contrary, the D.C. Circuit has reversed the suppression of a statement where the defendant initially invoked his right to remain silent and was questioned anyway, in violation of *Miranda*. *Murdock*, 667 F.3d at 1307.

To determine whether a defendant was coerced such that his will was "'overborne and his capacity for self-determination critically impaired,'" a court must consider "the characteristics of the accused and the details of the interrogation." *Bustamonte,* 412 U.S. at 225-26 (quoting *Culombe,* 367 U.S. at 602). But "a defendant's mental condition, by itself and apart from its

relation to official coercion," cannot "dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 479 U.S. 157, 164, (1986). Therefore, a law enforcement officer's "nonthreatening behavior" militates "towards a noncoercive encounter," even where a defendant has provided evidence of "low intelligence, poor schooling, history of psychological problems, and the absence of any warning of her right to withhold consent[.]" *United States v. Hall*, 969 F.2d 1102, 1107, 1108 (D.C. Cir. 1992) (evaluating voluntariness in the related context of a Fourth Amendment waiver).

In *United States v. Hallford*, the D.C. Circuit reversed the trial court's assessment that police conduct was coercive. 816 F.3d 850, 858 (D.C. Cir. 2016). There, the defendant—who was diagnosed with "'schizoaffective disorder'…, paranoid delusions, and self-destructive behavior" —was being involuntarily held at a hospital based on threats he made when he was receiving medical care. *Id.* at 853, 855. Without providing *Miranda* warnings, agents interviewed him at the hospital. *Id.* at 853. The agents asked straightforward questions in conversational tones, and he was deprived of no essentials. Although the defendant had psychiatric problems, nothing the agents did contributed to an atmosphere of coercion, which is necessary to a finding that statements were involuntary. *Id.* at 859. Similarly, in *United States v. Cooper*, the D.C. Circuit found statements were given freely and voluntarily when no weapons were brandished and no handcuffs were used, the defendant was "cooperative," the agents employed a "professional and cordial tone," and at no point did the defendant ask to end the questioning. 949 F.3d 744, 749 (D.C. Cir. 2020).

Jensen claims that his interview was not voluntary because he was sleep-deprived, he was enclosed in an "interrogation room," and "[t]he interview lasted four hours." Def. Mtn. at 6. But these reasons are both factually unsupported and legally insufficient. There is no evidence that Jensen was too sleep deprived to make a free choice to engage in the interview. To the contrary,

he chose the timing of the meeting (without consulting with the agents) and walked there on his own (which he noted gave him "a lot of time to think[,]" Tr. 103:25). He reported that he had slept at least 12 hours on Wednesday night. When the agents had reason to inquire further about Jensen's mental state including any substance use, they did so, and relied on Jensen's articulate assurance that he was alright. The "interrogation room," an interview room at the police department where Jensen chose to go, was a comfortable room where Jensen was offered water and anything else he might want numerous times, and from which he was invited to—and did—leave to go outdoors two times. The length of the interview was largely of Jensen's own making, as he provided a great deal of background information, context, and thoughts about his own beliefs, unprompted by the agents. Moreover, he began discussing his participation in the riot nearly immediately, so it is not as though the interview was stretched long by agents attempting to draw out a reluctant witness.

In short, much like in *Hallford*, the agents were professional and cordial, "treat[ed] him nicely," appropriately inquired about Jensen's mental condition, and began the discussion by highlighting its voluntary nature. 816 F.3d at 858. And, just as in *Connolly*, the interview was completely absent of any form of police coercion. 479 U.S. at 167 ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary,'" so a defendant's self-initiated confession to police was admissible even though he was suffering psychosis according to his medical examiner). None of the reasons Jensen cites in support of his claim of involuntariness are supported in the evidence, nor do they provide any legal basis for a finding of involuntariness. This claim should be rejected.

## III.     Evidence from Jensen's Cell Phone is Admissible

Jensen lastly moves to suppress evidence seized from the consent search of his cell phone, relying on his arguments that the interview should be suppressed and that the phone evidence is

akin to fruit of the poisonous tree. *See* Def. Mtn. at 4. This doctrine is inapplicable, and Jensen is mistaken.

### a.  Jensen's Consent to Search Was Validly Obtained

During the interview, Jensen offered to show the agents the social media he followed on his phone so they could better understand his views. Tr. 98:4-7 ("Like give me my phone and I can start showing you guys everything, you know what I mean?…There's a lot out there."). He agreed to provide access to his accounts by logging in from another device, since he had left his phone at home. Tr. 115:24-116:25 (regarding social media accounts, "I don't even have to have my phone and we can look at all that stuff right now… If you had an access, I could sign into all of it. I'll give you all of that."). The agents said they would prepare a form to document that Jensen was providing his consent for them to look at his accounts. *Id.* With Jensen's input, they prepared a written consent to search Jensen's phone. Tr. 140:18-144:13. Jensen documented his consent and provided his password to access the phone. *Id.*; *see also* Exh. 4. The agents said they would try to return the phone as quickly as they could. *Id.* They made arrangements to give him a ride back to his house where he could give them the phone. Tr. 144:13-17.

Law enforcement officers may validly execute a search without a warrant if the owner of the property to be search gives consent. *See Schneckloth*, 412 U.S. 218, 219 (1973). The government must show by a preponderance of the evidence that consent was given "voluntarily." *Hall*, 969 F.2d at 1106. As with interview statements, this is a fact-intensive inquiry into the totality of all the circumstances, taking into account both "the nature of the police activity towards the defendant 'as well as the possibly vulnerable subjective state of the person who consents.'" *Hall*, 969 F.2d at 1106 (quoting *Schneckloth*, 412 U.S. at 229). That standard is easily met here. For all the reasons set forth above, just as Jensen freely volunteered to be interviewed,

his consent to search was freely and voluntarily given. Crucially, Jensen does not claim otherwise.

### b.  The Exclusionary Rule Does Not Apply

Rather than challenge the voluntariness of his consent to search, Jensen instead asserts that his consent was the result of an un-*Mirandized* interview, and therefore it should be excluded as fruit of that unlawful "detention and interrogation." Def. Mtn. at 4. But the exclusionary rule articulated in *Wong Sun* does not apply to the fruits of a statement given without *Miranda* warnings. *United States v. Patane*, 542 U.S. 630, 637, 642 (2004); *see also Hallford*, 816 F.3d at 856 ("The Supreme Court, adopting a position Judge Friendly advocated long ago, has determined that the fruit-of-the-poisonous-tree doctrine [of *Wong Sun*] does not apply to statements taken in violation of the *Miranda* rules."). *Miranda* is a fundamental *trial* right, meaning it protects against the admission at trial of unwarned statements—and the "complete and sufficient" remedy is to exclude those statements from the government's case-in-chief only. *Patane*, 542 U.S. at 641 (quoting *Chavez v. Martinez*, 538 U.S. 760, 790 (2003) (Kennedy, J., concurring in part and dissenting in part). *Miranda* does not provide a barrier against the use of voluntary statements— even unwarned, custodial ones—to collect physical evidence. *Id.* at 639 ("the *Miranda* rule does not require that the statements taken without complying with the rule and their fruits be discarded as inherently tainted") (quotation marks omitted).

Jensen's consent to search his cell phone, which he spontaneously initiated and freely volunteered, provided the agents with sufficient authority to image the contents of the phone and seize the evidence they found there. Although *Miranda* warnings were not required in the non-custodial setting of his interview, the consent search of Jensen's phone was lawful even if those warnings had been required. In short, suppression of the phone evidence is not a remedy available to Jensen.

### c.  The Phone Evidence Would Inevitably Have Been Discovered

Evidence that might otherwise be suppressed is nevertheless admissible if the government can show that it would inevitably have discovered the evidence through independent means. *Nix v. Williams*, 467 U.S. 431, 448, (1984). The inevitable-discovery exception "applies when… evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first." *United States v. Keszthelyi*, 308 F.3d 557 (6th Cir. 2002). In *United States v. Cunningham*, police conducted a consent search of the defendant's home, but the defendant later challenged that consent, claiming it was the result of coercion. 413 F.3d 1199, 1202 (10th Cir. 2005). The Tenth Circuit held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred. *Id*. at 1205; *see also United States v. Christy*, 739 F.3d 534, 543 (10th Cir. 2014); *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir.1995) (inevitable discovery requires "probable cause plus a chain of events that would have led to a warrant").

If Jensen's consent to search his phone was not lawfully given, therefore, the evidence is nevertheless admissible if it would have been discovered in a later search. That is the case here. Before Jensen walked into the Des Moines Police Department on January 8, the FBI had identified Jensen as the man in the videos inside the Capitol and had reviewed his publicly-available Facebook posts describing his participation in the riot on January 6. Ample evidence pointed toward Jensen, and agents "would have inevitably wanted to examine" the very cell phone he used while he was inside and around the Capitol to document his criminal activity. *See United States v. Chapman-Sexton*, 758 F. App'x 437, 441 (6th Cir. 2018) (applying the inevitable-discovery doctrine to the search of a flash drive because "routine procedures that police would have used

regardless of the illegal search would have resulted in the discovery of the disputed evidence")
(quoting *Keszthelyi*, 308 F.3d at 574).

Jensen's use of his cell phone to commit and document his crimes makes it inevitable that such a search warrant would have been obtained here. In the event the Court determines that Jensen's consent to search was not lawfully given—a claim Jensen has not made—the evidence from his cell phone would inevitably have been discovered by means of a lawful search warrant.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion to suppress evidence should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, DC 20530
emily.allen@usdoj.gov
(907) 271-4724

Exhibit 1

Excerpts of Jensen's Text Messages

| | | | |
|---|---|---|---|
| Wyatt Woods* | Participants:<br>Wyatt Woods,<br>Doug Jensen (owner) | Timestamp:<br>1/6/2021 2:32:43 PM(UTC-6)<br><br>Read: 1/7/2021 7:07:37 AM(UTC-6) | Direction:<br>Incoming<br>Body:<br>Seen ya on CBS in tha capital<br><br>Status: Read<br>Message Type:<br>SMS<br>Folder:<br>Inbox |

| | | | |
|---|---|---|---|
| Austin Jensen* | Doug Jensen* (owner) | Timestamp:<br>1/7/2021 7:27:28 AM(UTC-6)<br><br>Read: 1/7/2021 7:27:55 AM(UTC-6) | Direction:<br>Incoming<br>Body:<br>You know you're everywhere right?<br><br>Participants: |

| | | | |
|---|---|---|---|
| Amanda | Doug Jensen* (owner) | Timestamp:<br>1/7/2021 1:43:28 PM(UTC-6)<br><br>Read: 1/7/2021 2:11:15 PM(UTC-6) | Direction:<br>Incoming<br>Body:<br>Hey uncle! Just saw you on the news. Just wanted to tell you I love you and stay safe please!!!!<br><br>Participants: |

| | | | |
|---|---|---|---|
| Doug Jensen* (owner) | Greg Brookhart* | Timestamp:<br>1/7/2021 7:38:02 AM(UTC-6)<br><br>Delivered: 1/7/2021 7:38:03 AM(UTC-6) | Direction:<br>Outgoing<br>Body:<br>Leaving dc.<br><br>Participants: |

Exhibit 2

Email between FBI and DOJ Staff

From: ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛fbi.gov>
Sent: Friday, January 8, 2021 8:38 AM
To: ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛usa.doj.gov>

Subject: [EXTERNAL EMAIL] - Re: KCCI Lead

This individual just walked into DMPD. Were going to assist with the interview now.

SSRA ⬛⬛⬛⬛⬛⬛⬛⬛
FBI - Des Moines / Sioux City

On Jan 7, 2021 6:12 PM, ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ @usdoj.gov> wrote:
Thank you for the heads up! Someone can call me once you open it so I can open a case over here.

Sent from my iPhone

On Jan 7, 2021, at 2:43 PM, ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ @fbi.gov> wrote:

USAO Colleagues,

The FBI received a lead from KCCI today about an individual involved in the DC incidents yesterday.  Here's the KCCI website today:

https://www.kcci.com/article/des-moines-iowa-man-seen-inside-capitol-during-violence/35153695

OM reportedly observed another video where the individual is observed chasing a Capital Police officer up a staircase in the US Capital.

The JTTF will likely be initiating a Full Investigation and may be asking for some legal process soon.

SSRA ⬛⬛⬛⬛⬛⬛⬛
FBI – Des Moines / Sioux City

Exhibit 3

Email from DOJ Staff

On Jan 8, 2021, at 11:57 AM,                                                    @usdoj.gov> wrote:


Just spoke with                head of De Moines RA/JTTF
They are currently interviewing Doug Jensen and believe him to be one of the firsts few individuals to
storm into the capitol. He was in a grey sweatshirt over the top of a black shirt in a beanie and was
leading the charge into the Capitol building. He walked into the  PD this morning and said " I think I'm
probably wanted." He said he was following Q anon and then went to the capital to "overtake the
Capitol" after the president spoke.

JTTF would like to know how quickly do we want to move on this guy. His employer said that this guy is
him and they know it is him from social media posts. Still talking to him now. They are sending the video.

Thanks,

Exhibit 4

FD-941 (2-26-01)

# CONSENT TO SEARCH COMPUTER(S)

I, Douglas Jensen _____, have been asked by Special Agents of the

Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers,

any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals,

described below:

I phone - X _____

CPU Make, Model & Serial Number (if available)

_____

Storage or Retrieval Media, Computer Peripherals

and located at _____ Des Moines, IA _____, which I own, possess,

control, and/or have access to, for any evidence of a crime or other violation of the law. The required passwords, logins,

and/or specific directions for computer entry are as follows: _____.

I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely

and voluntarily, and not as the result of threats or promises of any kind.

I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which

it is stored, and any associated data, hardware, software and computer peripherals.

1/8/21
Date

1/6/21
Date

_____
Signature

_____
Signature of Witness

SA Tyler Johnson
Printed Full Name of Witness

Des Moines Police Department
Location