**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-6-TJK** |
| **DOUGLAS AUSTIN JENSEN,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Douglas Jensen to a mid-range sentence of 64 months' imprisonment, three years of supervised release, $2,000 in restitution, and a total mandatory special assessment of $520 for the five felony and two misdemeanor counts of conviction.

I.     **INTRODUCTION**

The defendant, Douglas Jensen, led the charge in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Jensen was a ringleader during the attack on the U.S. Capitol, working to rile up the crowd

_____

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

and encourage others to follow him into and through the building.   He scaled a twenty-plus-foot wall so that he could be one of the very first rioters to break into the building and disrupt the proceedings in Congress.   He watched as other rioters—using clubs, wood beams, stolen police shields, and their own bare fists—smashed windows before he jumped through a shattered window himself.   He was one of the first ten rioters to enter the Capitol on January 6, 2021.

Once inside, Jensen led a group of armed rioters down a hallway.   There, he found a lone U.S. Capitol Police (USCP) officer facing off against the angry mob.   That officer, Eugene Goodman, repeatedly ordered Jensen to back up.   Jensen did not comply with Officer Goodman's commands.   Instead, he led a mob of armed rioters in a menacing pursuit of Officer Goodman up a staircase that landed steps away from the Senate Chamber, where members of Congress were sheltering at that very moment.

Officer Goodman managed to divert Jensen away from the Senate Chamber and into the Ohio Clock Corridor, where Officer Goodman was fortuitously met with backup.   Inside the Ohio Clock Corridor, Jensen again acted as a ringleader and urged the mob to advance beyond the police line.   Jensen wanted the Capitol Police to arrest Vice President Mike Pence and he repeatedly ordered them to do so to stop the certification of the 2020 Presidential election.   Even after he was finally escorted out of the building, Jensen kept pursuing his goal, finding another entry point at the Rotunda doors where he breached the building for a second time and had to be physically escorted out of the building.   After the fact, as Jensen saw numerous photos and videos of himself circulating online, he posted to TikTok, "Don't believe the news."   Then he walked to the police station in his hometown of Des Moines, Iowa.   When the FBI agents there asked whether he regretted his actions, Jensen reported "it would have been worth it" if the outcome he wanted—to "stop the steal" and ensure then-President Trump stayed in power—came to pass.

The government recommends that the Court sentence Jensen to 64 months' incarceration, which is the mid-point of the advisory Guidelines' range of 57 to 71 months, which the government submits is the correct Guidelines range. A 64-month sentence reflects the gravity of Jensen's conduct and the need for his sentence to provide just punishment, deterrence to himself and others, and otherwise achieve the goals of sentencing.

## II.      FACTUAL BACKGROUND

### A.       The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Jensen among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, No. 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and as the evidence at trial showed, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice

President Pence was present and presiding, first in the joint session, and then in the Senate chamber. *See* Exhibit 650 (video montage of House and Senate proceedings and relevant statutes).[2]

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.   At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced toward the west front of the building.   Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.   Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended.   The proceedings resumed at approximately 8:00 p.m. after the building had been secured.   As U.S. Secret Service Special Agent Elizabeth Glavey testified at trial, Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

---

[2] Exhibit numbers used throughout this sentencing memorandum correspond to the exhibits presented at trial.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 1:21-cr-00107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 1:21-cr-00108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, No. 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than one hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety.   *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_ CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021 attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol building.   They caused extensive, and in some instances, incalculable, losses.   This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol building hallways.   *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).   The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8 million dollars.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

*Jensen's Conduct before January 6, 2021*

Douglas Jensen, a construction worker from Des Moines, Iowa, was disappointed in the results of the 2020 election and wanted to stop President-elect Biden from taking office.   He heard that Trump supporters were planning a big event in Washington, D.C., and he began making arrangements to attend.   He asked friends to join him for the long drive.   His text exchanges

indicate that he expected the event to turn violent.   For example, after telling a friend that he was going to D.C., Jensen sent that friend a picture of a letter from Mayor Muriel Bowser to the Commanding General of the District of Columbia National Guard ("DCNG") requesting that DCNG provide support for planned demonstrations on January 5 and 6, 2021.   According to the letter, Mayor Bowser was concerned that the planned demonstrations would "follow similar events on November 14, 2020 and December 12, 2020, which resulted in a large influx of participants, violence and criminal activity."   *See* Exhibit 321 (text message exchange).

As early as December 26, 2020, Jensen began discussing the possibility of bringing firearms to D.C. for the event.   In a Facebook message exchange, he told a friend that his group would be "locked and loaded" with "pistols."   *See* Exhibit 383 (Facebook messages, excerpted below).



Jensen's friend wanted heavier weaponry—including an assault rifle—and expressed interest in

caravanning to D.C. to avoid getting caught.    None of this dissuaded Jensen from eagerly making plans to get to D.C.

Jensen's text messages also made clear that his intent in going to the Capitol was to stop the certification of the Electoral College vote.    He wanted his preferred political party to remain in power.    The day before the event, for example, a friend texted Jensen to ask what he thought of the results of the runoff election in Georgia—which had just assured control of the Senate to the Democratic party.    Jensen thought that was "a turd burger just to enrage us.    To light everything up for the 6th."    *See* Exhibit 322 (text message exchange).

Jensen drove with a friend through the night on January 5 and arrived in D.C. just in time for Trump's rally at the Ellipse the morning of January 6.

### Jensen's Approach to the Capitol

At 11:47 a.m. on January 6, 2021, Jensen joined a large group of protesters gathered near the Washington Monument.    He took photos and selfies at the "Stop the Steal" rally.    *See* Exhibit 331A (selfie from Jensen's phone).    Then, he joined the crowd as they made their way to the U.S. Capitol building.    A little after 1:00 p.m., Jensen's friend texted him, "It's over, pence did nothing, passed the vote."    *See* Exhibit 322.    Jensen responded: "Lmao I'm here.    Who the f*ck told you that[.]    We are headed to the White House."    *Id.*    About a half hour later, Jensen's friend responded, "CNN pence banged the gavel[.]    Joint sessions [sic] certified all electoral votes as is."    Ten minutes later, Jensen responded: "That's all about to change 😉."    By that point, Jensen was already on a mission to arrest Vice President Pence and prevent Congress from certifying the results of the 2020 Presidential election.

By 2:01 p.m., Jensen had reached the Peace Circle, near the northwest corner of the restricted area of the Capitol grounds.    *See* Exhibit 332A (photo from Jensen's phone).    At 2:02

p.m., Jensen trampled past fallen bike rack barricades, which had been erected to keep rioters (including Jensen) out of the restricted Capitol grounds.   *See* Exhibit 333A (photo from Jensen's phone).   Jensen saw plumes of tear gas in the air and heard rioters accosting police, calling them "Traitors!" and demanding that they "Lock 'em up!"   *See* Exhibits 334, 335, 336 (live photos from Jensen's phone).



*Exhibit 335: Tear gas surrounding the mob of rioters who had breached bike rack barricades to enter the restricted grounds.*

Jensen moved quickly.   He made a beeline to a corner of the northwest lawn, next to a staircase leading from the lower west plaza to the upper west terrace of the building.   There, Jensen witnessed police officers, some in full riot gear, working to keep the crowd at bay.   *See* Exhibit 338 (photo from Jensen's phone).



*Exhibit 338: A USCP officer in riot gear attempting to block access to the northwest staircase.*

Jensen ignored the police presence there and headed straight for the wall closest to the U.S. Capitol building so that he could take a celebratory video of himself touching the retaining wall.   In this

video, Jensen proclaimed, "This is why we're here!"   *See* Exhibits 340, 341 (photo and video from

Jensen's phone).



*Exhibit 340: At 2:07, Jensen proclaimed, "This is me, touching the f\*cking White House."[3]*

---

[3] Jensen twice mistakenly referred to the Capitol building as the White House in his cell phone

Moments later, Jensen saw his chance to advance on the building.   He maneuvered himself past the police line and began to scale the retaining wall of the northwest staircase.   As Jensen climbed the twenty-plus-foot wall, the mob above him breached the police line and began surging up the staircase.



*Exhibit 201: Jensen scaling the wall just as rioters on the staircase forcibly breached the police line and charged toward the building.*

When Jensen reached the top of the balustrade, he threw up both hands in celebration and took another selfie video.   This time, he yelled, "Storm the White House! That's what we do!"   *See* Exhibits 342 (video from Jensen's phone); 201 (U.S. Capitol Police CCTV video); 220 (CCTV video); 500 (third-party video labelled "S.C.N.R."), 501 (third-party video labelled "Insurgence USA").   Jensen's highly visible cheering atop the balustrade riled up the mob, confirming to the crowd below that the police had lost control and that the rioters could overtake the building.

---

videos.   In later text conversations with his family, however, Jensen corrected himself and confirmed that he knew he was at the Capitol, not the White House.   *See* Exhibit 323 (text exchange with Jensen's wife).



*Exhibit 201: Jensen celebrates as he mounts the balustrade of the northwest staircase.*



*Exhibit 501: Jensen reached the top of the staircase as the
crowd forcibly overran the police line.*

As the crowd surged up the stairs, Jensen marched up the balustrade, gaining ground on

the rest of the rioters.   *See* Exhibit 220 (CCTV montage, excerpted below).



*Exhibit 220 (excerpt): Jensen marches up the balustrade to advance on the building.*

This first wave of rioters swarmed past police who were attempting to hold the line at the top of the northwest staircase.   When they reached the Upper West Terrace, they toppled over the metal bike rack barricades and overwhelmed the outnumbered police, as seen below:



Jensen, who climbed the stairs at 2:10 p.m., was among this group.   He quickly advanced with the first wave of rioters to the Senate Wing Door of the Capitol.   Immediately, rioters began smashing the windows on either side of the door with their fists, steel clubs, stolen riot shields, and other makeshift weapons.   Jensen watched as the rioters shattered the windows, then he maneuvered himself to the front of the line to jump through the window frames.   *See* Exhibit 502 (third-party video labelled "BGOnTheScene").   Jensen was the tenth rioter to enter the Capitol building on January 6, 2021.   *See* Exhibit 203 (CCTV video).



*Exhibit 502: Jensen (circled) looks on as the first rioters clamber through a broken window.*



*Exhibit 203: Jensen (circled) emerges from the Senate Wing Door windows
as the tenth rioter in the building.*

### *Jensen's Pursuit of Officer Goodman and Standoff in the Ohio Clock Corridor*

Once inside, Jensen marched through the halls and found his way to the Senate side of the building.

At the same time, USCP Officer Eugene Goodman was responding to desperate calls over his radio alerting him that the Capitol had been breached and that rioters were inside the building. *See* Exhibit 150.1 (radio recordings from USCP). Officer Goodman ran toward the Senate and down the stairs toward the first floor, where he believed the rioters would have made entry. By that point, Officer Goodman had already spent nearly an hour on the West Front, battling violent rioters in hand-to-hand combat. Minutes before he encountered the rioters inside the building, he was vomiting into a bucket after being pepper sprayed directly in his eyes by a rioter on the northwest staircase.

Officer Goodman understood from his experience defending the West Front that the mob was prepared for violence and eager to attack. As he ran toward the breach point, he passed

Senators and their staff, and instructed them to shelter inside the Senate Chamber.   Then he ran to the bottom of the East Grand Staircase, where the rioters had begun to congregate.

The very first thing Officer Goodman saw when he got down the stairs was a rioter standing in the archway, holding a Confederate flag.   *See* Trial Transcript, Sept. 21, 2022, at 197, 201-02. At that point, Officer Goodman was alone, with no reinforcements in sight.   He was out of pepper spray.   His baton had fallen out of his belt as he ran down the stairs.   *Id.* at 202.   And though he had his service weapon on his belt, he did not want to use it.   *Id.* at 208.

The man with the Confederate flag, Kevin Seefried,[4] ignored Officer Goodman's commands to leave.   Instead, Seefried used his Confederate flag to jab at Officer Goodman.   *Id.* at 202.   As the crowd behind Seefried began to grow, Officer Goodman could see other rioters holding weapons, including one rioter wearing a horned fur hat and holding a sharpened metal spear.   *Id.* at 203.   The mob ignored Officer Goodman's repeated commands to leave and back up.   Instead, they began to threaten and taunt Officer Goodman, shouting: "[W]hat are you going to do, you are by yourself."   *Id.*   The crowd did not back down, even as Officer Goodman placed his hand on his service weapon.   *Id.* at 208.

Jensen then pushed his way to the front of the crowd to square off face-to-face with Officer Goodman.   Officer Goodman, with his right hand still on his service weapon, commanded Jensen and the rest of the mob to back up.   *Id.* at 209; *see also* Exhibit 504 (third-party video from Parler) and 505 (third-party video by Igor Bobic).   But Jensen did not stop advancing, even after Officer Goodman warned him that he was "going to shoot."   Trial Transcript, Sept. 21, 2022, at 210. Instead, Jensen, undeterred by the threat of being shot, told Officer Goodman: "[D]o what you got to do."   *Id.*   Jensen continued to creep forward toward Officer Goodman, making clear that he

---

[4] *See United States v. Kevin Seefried*, No. 1:21-cr-00287 (TNM).

had no intention of retreating or backing down.   *Id.*



*Exhibit 504: Jensen positions himself at the front of the mob confronting Officer Goodman.*



*Exhibit 505: Jensen continues accosting Officer Goodman even as Officer Goodman, with his right hand on his service weapon, orders Jensen to back up.*

At trial, Officer Goodman described how Jensen "kept coming closer" and "kept accosting me." *Id.* at 211.   Indeed, Officer Goodman "felt like [the mob was] going to rush at any time," due in large part to rioters like Jensen, who ignored his commands to move back. *Id.*   Officer Goodman also described the futility of trying to physically distance himself from Jensen, explaining how Jensen just "kept coming." *Id.* at 212.

Eventually, Officer Goodman was forced to retreat.   According to Officer Goodman, had he not backed up and retreated up the stairs at that time, the mob "would have just engulfed me and did whatever they chose. They would have just had their way." *Id.*

Cornered and alone, Officer Goodman had nowhere to go other than up the stairs toward the Senate Chamber.   As Officer Goodman ran up the stairs, Jensen chased him—two steps at a

time—leading the mob along the way.   Open-source video of this pursuit shows Officer Goodman reaching for his radio and calling out for backup.   *Id.* at 213; *see also* Exhibits 505, 504.   Jensen knew at the time of his pursuit that he was menacing Officer Goodman.   Indeed, as Jensen later recalled in an interview with FBI, Officer Goodman "showed a lot of fear" as Jensen chased him up the stairs.   *See* Exhibit 301.18 (FBI Interview with Jensen, Jan. 8, 2021).   But Officer Goodman's commands did not slow Jensen.   Instead, Jensen continued his vigorous pursuit as the rioters behind him shouted, "Keep running, motherf*cker," and "He's one person, we're thousands."   *See* Exhibit 504.





*Exhibits 505, 504: Jensen pursues Officer Goodman up the stairs as members of the mob behind yell, "Keep running, motherf\*cker," and "He's one person, we're thousands."*

When Officer Goodman reached the second floor of the building, he could see that the Senators and staff whom he earlier saw gathered outside the Senate Chamber were now seemingly locked inside. Officer Goodman then diverted the mob away from the Republican Doors—the most commonly used entrance to the Senate Chamber—to the Ohio Clock Corridor, which is the hallway through which Senators must pass in order to convene in a Joint Session with the House. There, inside the Ohio Clock Corridor, Officer Goodman was relieved to find backup USCP officers. Trial Transcript, Sept. 21, 2022, at 216.

Inspector Thomas Loyd and Officer Brian Morgan were among the USCP officers who came to Officer Goodman's aid and who helped establish a makeshift police line inside the Ohio Clock Corridor. *Id.* at 217. Jensen, however, still was not deterred by these additional police. According to Officer Goodman, even after the arrival of a half dozen armed police officers, Jensen remained "forceful, trying to get us to back up our police line" and "yelling." *Id.* at 218; *see also* Exhibit 508 (third-party video from New York Times).



*Exhibit 508: Jensen waves the mob forward as he crowds the police line and orders the officers to back up. Kevin Seefried was nearby, holding the Confederate flag (far left, wearing tan-colored vest).*

Inspector Loyd[5] was the first officer to come to Officer Goodman's aid inside the Ohio Clock Corridor.   Inspector Loyd immediately ordered Jensen to "leave, now," but Jensen just shook his head no.   *See* Exhibit 505 (Bobic video).   Instead of heeding the Inspector's commands, Jensen waved the mob forward and shouted at the officers to "back up."   Jensen then ordered Inspector Loyd "to surrender the building to the mob so they could get Pence," and to "go lock up the Vice President."   *See* Trial Transcript, Sept. 21, 2022, at 80-81, 82; *see also* Exhibit 507 (Jensen can be heard telling Inspector Loyd to "Go arrest the Vice President.").   But Inspector Loyd stood firm, so much so that when Jensen asked, "What's the point in stopping us," the Inspector replied, "That's as far as you are going to go."   Trial Transcript, Sept. 21, 2022, at 90; *see also* Exhibit 507 (third-party video labelled "RMG News").

---

[5] Inspector Loyd has over 32 years of experience with the USCP and commands over 350 officers.



*Exhibit 507: Jensen confronts Inspector Loyd at the front of the mob in the Ohio Clock Corridor*

According to Inspector Loyd, Jensen acted "pretty arrogant and cocky" inside the Ohio Clock Corridor because "he knew he had a lot more muscle behind him than I did."   Trial Transcript, Sept. 21, 2022, at 83.   Indeed, Jensen repeatedly tried to mobilize the mob behind him, gesturing them forward every time that he advanced on the police line.   Inspector Loyd worried for his officers' safety inside the Ohio Clock Corridor, describing the standoff between the armed and "very angry" mob and his officers as "dire."   *Id.* at 84, 96.

Inspector Loyd ultimately left the standoff to go check on the House chamber, at which point Jensen tried again to breach the police line.   But he was blocked by USCP Officer Brian Morgan, who quickly assumed Inspector Loyd's position on the front line.   Officer Morgan first responded to the Ohio Clock Corridor after hearing his longtime colleague Officer Goodman's "frantic" calls over the radio.   *Id.* at 241.   At that point, Officer Morgan assumed the situation was dire, because Officer Goodman "was in the service . . . overseas" and "doesn't get frantic very often."   *Id.*   As Officer Morgan explained, "[n]ot much rattles" Officer Goodman.   *Id.*

Officer Morgan described the situation inside the Ohio Clock Corridor as "mass chaos": "You hear[d] a lot of screaming and yelling, four letter words, being called traitors." *Id.* at 244. Officer Morgan "felt threatened" by the mob inside the Ohio Clock Corridor, especially because he "knew these people had weapons." *Id.* at 249.   There were three rioters in particular who caught Officer Morgan's attention inside the Ohio Clock Corridor: Seefried, who was carrying the Confederate flag, a male carrying a six-foot long spear and holding a bullhorn,[6] and Jensen, who was "one of the closest [rioters] to the police line," and who was angrily "flailing his arms" and ordering him to arrest Mike Pence.   *Id.* at 245, 247.

Given the perilous circumstances inside the Ohio Clock Corridor, Officer Morgan deployed his collapsible baton.   In Officer Morgan's words, he wanted his baton "in case [he] had to go hands on with somebody." *Id.* at 249.   As soon as Officer Morgan deployed his baton, Jensen said that he would "one up" Officer Morgan if he kept his baton deployed.   *Id.* at 251-52. Fearing that Jensen might be carrying a weapon more lethal than his baton,[7] Officer Morgan took a step back, knelt to the ground, and collapsed his baton directly in front of Jensen, "almost as a peace offering, like I'm putting mine away, so you don't have to take your[s] out, you don't have to step anything up, and we can just try to settle this situation." *Id.* at 253.   Jensen clearly believed that he was in control at that point, and he even told Officer Morgan that he "didn't have to bow to him."   *Id.* at 255; *see also* Exhibit 532 (third-party video).

---

[6] *See United States v. Jacob Anthony Chansley*, No. 1:21-cr-00003 (RCL).

[7] In fact, unbeknownst to Officer Morgan, Jensen was carrying a knife with a three-inch blade inside his pocket.



*Exhibit 532: Officer Morgan beginning to kneel to collapse his baton as Jensen, left, watches.*

A few seconds later, another rioter deployed a fire extinguisher inside the Ohio Clock Corridor.   The officers immediately began coughing and fell back as they tried to determine what type of chemical irritant had just been deployed.   Trial Transcript, Sept. 21, 2022, at 259.   Again, Jensen used this as an opportunity to gain ground.   Unphased by the chaos surrounding him, Jensen continued to move forward.   Officer Morgan described this scene as something from an episode of The Walking Dead: Jensen "walked right through the cloud like it was nothing," even though the police and rioters around him were all "gagging," "coughing," and "struggling."   *Id.*

at 260; *see also* Exhibit 511 (photo in Ohio Clock Corridor).



*Exhibit 511: Jensen, undeterred by a chemical cloud caused by a fire extinguisher,
continued to advance on the police line.*

As the chaos in the Ohio Clock Corridor unfolded, Senators, who were huddled inside their

Chamber just behind the wall, could hear the rioters' shouting.   Nearby, Secret Service agents

began evacuating Vice President Pence and his family members.   *See* Exhibit 222 (CCTV video);

528 (compilation video from House Select Committee, including footage of Jensen).



*Exhibit 222: Secret Service agents evacuate Vice President Pence at 2:26 p.m.*

Jensen chased Officer Goodman into the Ohio Clock Corridor at 2:16 p.m. and stayed there for approximately thirty minutes. He spent nearly twenty minutes in a standoff with USCP officers. Then, as rioters began breaching a perpendicular hallway, Jensen moved past the police line and closer to the action. In surveillance footage, he can be seen cheering and applauding as rioters in the perpendicular hallway clashed with officers outside Senator Mitch McConnell's office. Officer Morgan, who was still present inside the Ohio Clock Corridor, was "extremely concerned" that the "very aggressive, very volatile, [and] very violent" rioters outside Senator McConnell's office would break through the police line and join forces with Jensen and the others because at that point, the police "wouldn't have [had] the numbers" to stop the rioters. *See* Trial Transcript, Sept. 22, 2022, at 19, 22.

Jensen once again took advantage of the chaos. Recognizing that officers were distracted by the scuffle outside Senator McConnell's office, Jensen slipped past the police line and walked toward the far end of the Ohio Clock Corridor. There, he encountered several Metropolitan Police

Department (MPD) officers stationed outside one of the entrances to Senator Chuck Schumer's office.   The MPD officers were trying to establish a police line to block rioters from further encroaching upon the Senate evacuation route.   During this standoff with MPD, Jensen repeatedly threatened the officers with force, saying to his fellow rioters "I think they'll have to force 'em." *See* Exhibit 103 (body-worn camera (BWC) footage of Jensen during the standoff with MPD officers outside Senator Schumer's office).   Jensen also said to the officers, "What happens if we push?   Do you back up?   We're not going to push hard."   *Id.*   Officer Morgan, who was standing guard with the MPD officers, testified that he was gravely concerned that this "volatile" and "heated" standoff would escalate into violence.   *Id.* at 30.



*Exhibit 103: Jensen encouraged rioters to forcibly breach the police line that Morgan (far right) and MPD officers had secured outside of Senator Schumer's offices.*

Jensen eventually abandoned his effort to forcibly breach the MPD police line and instead returned to the Ohio Clock Corridor.   He reluctantly made his way back down the hallway, whereupon he continued to ignore officers' repeated commands to leave the building.   As Jensen

sauntered past the main entrance to the Senate Chamber, he spotted a police cap on a chair just outside the chamber doors.   Jensen picked up the cap and hurriedly took a selfie before Officer Goodman confiscated the cap from him.   *See* Exhibit 349A (blurry live photo from Jensen's phone).



*Exhibit 349A: Jensen poses for a selfie as the Capitol is under siege.*

Jensen was eventually escorted out of the Capitol building at 2:56 p.m.

### Jensen's Second Breach of the Capitol Building

Less than fifteen minutes after being escorted out of the Capitol building, Jensen re-entered the building through the East Rotunda door.   To get there, he had to force his way through the densely packed crowd gathered on the East stairs.   When he arrived at the East Rotunda door, he

peered through the broken windows and watched as beleaguered police officers tried to clear the defiant rioters from the Rotunda.   When the police opened the East Rotunda doors to let one of the rioters out, Jensen slipped through the door, past the police line, and inside the building.   A large group of rioters followed Jensen inside, and a mob began to congregate inside the foyer between the East Rotunda doors and the Rotunda.   Jensen snaked his way through this crowd and eventually pressed his way past a second police line and inside the Rotunda.



*Exhibit 215: Jensen (circled) slips past the police at the East Rotunda door and into the foyer*

MPD Officer Paul Weiss, who was dispatched to assist USCP officers in clearing rioters from the Rotunda, described the scene as a "bar fight": "It was just people fighting and screaming and arguing and yelling and . . .  people fighting the police, and there was no control."   Trial Transcript, Sept. 22, 2022, at 195.   When Jensen entered the Rotunda, the officers stationed there had already been battling with rioters for what felt like hours.   All the officers were fatigued, and some of them were injured, including Officer Weiss, who suffered a leg injury after being crushed against the corner of a statue.   *Id.* at 197.

Jensen did not leave the Rotunda willingly.   As Officer Weiss tried to escort Jensen out, Jensen jerked back and shoved Officer Weiss.   *Id.* at 222; *see also* Exhibit 107 (BWC from Officer Weiss inside the Rotunda).   Jensen continued to resist as other officers attempted to physically escort him out of the Rotunda.   Indignant and increasingly agitated, Jensen yelled, "He doesn't have the right to touch me.   You can't push people.   You can't do that. The Constitution! . . . You guys aren't doing your jobs properly!"   *See* Exhibits 104, 106, 107 (BWC of MPD officers inside the Rotunda).



*Exhibit 107: Jensen yells at MPD officers after elbowing Officer Weiss as they escort him out*

Jensen was finally escorted out of the Capitol, again, at 3:29 p.m.

### *Jensen's Post-Riot Statements*

Jensen spent the night of January 6 at a hotel in Washington D.C. and drove home to Des Moines the following day.   On his drive back to Iowa, he began hearing from family and friends who had seen news footage of him inside the Capitol.   Jensen was proud of his newfound notoriety.   He sent screenshots of himself on the cover of several news articles to his family

members and friends.   He described himself as a "hero to the military and capital [*sic*] police."
*See* Exhibit 324 (text message exchange).   He falsely claimed that the "cops let us in and directed
me," and he eagerly sought recognition from his friends.



*Exhibit 384: Facebook Messenger conversation between Jensen and a friend.*

Notwithstanding his personal participation in the violent breach of the Capitol building,
Jensen falsely claimed to his friends and followers that the media had fabricated its coverage of
his role in the riot on January 6.   In fact, on his drive home to Des Moines, he posted a TikTok
video stating: "So they want to make me the poster boy for all this bullshit.   F*ck that.   Don't
believe the news."

By the time he returned to Des Moines the morning of January 8, Jensen knew he was
wanted by the FBI.   After parking his car at home and checking in on his wife, he walked to the
Des Moines Police Department to turn himself in.   During a voluntary interview with FBI agents
at the police station, Jensen admitted that he "basically intended on being the poster boy" on

January 6, and that he was "trying to give all the attention to Q" and "fire up this nation."   ECF 69-1, at 5-6.   He also admitted to most of his criminal conduct both inside and outside the Capitol building on January 6.   First, he acknowledged that he was never instructed by President Trump to go "storm the building."   *Id.* at 14.   Then, he admitted to scaling a wall to get on top of the northwest staircase.   *Id.*   He told agents that he witnessed the crowd "just shove[] all the cops up the stairs," and explained that he "jumped down and went with that crowd" because he "wanted to be up there in front."   *Id.* at 85.   Jensen further admitted to witnessing a rioter pull a steel club out of his backpack and start "bashing the window in" next to the Senate Wing door.   *Id.* at 15, 81.   As for his encounter with Officer Goodman, Jensen acknowledged that Officer Goodman was alone and "showed a lot of fear and started running" up the stairs.   *Id.* at 85.   Jensen informed FBI agents that while inside the Capitol building, he was carrying a pocket knife, which he explained was for "protection from if there was going to be some kind of showdown."   *Id.* at 56-57.   Finally, Jensen admitted that he re-entered the Capitol building a second time, after being escorted out the first time by Capitol police, and that he witnessed officers trying to arrest rioters as he re-entered the building for a second time.   *Id.* at 90-91.

When asked whether he had any regrets about his actions that day, Jensen replied, "I don't know.   It depends on if the outcome I wanted happens, then it would have been worth it."   *Id.* at 121.

### III.   THE CHARGES AND JURY VERDICTS

On November 10, 2021, a federal grand jury returned a seven-count Third Superseding Indictment, charging Jensen with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Two); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1)

(Count Three); Entering and Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) (Count Four); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) (Count Five); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Six); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Seven).   *See* ECF 50.

This Court presided over a jury trial on those charges between September 19 and 23, 2022. At the conclusion of the trial, the jury unanimously returned guilty verdicts on all counts.

## IV.    STATUTORY PENALTIES

Jensen now faces sentencing on all seven counts in the Third Superseding Indictment.   The statutory maximum penalties are as follows:

Count One, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3): up to five years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

Count Two, Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2: up to twenty years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

Count Three, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1): up to eight years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

Count Four, Entering and Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A): up to ten years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

Count Five, Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A): up to ten years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

Count Six, Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D): up to six months of imprisonment, a fine up to $5,000, and no supervised release.

Count Seven, Parading Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G): up to six months of imprisonment, a fine up to $5,000, and no supervised release.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

### A.     Guidelines Sentencing Range

The PSR correctly calculates Jensen's Guidelines range. While the government respectfully submits that the offense level computations for each count should be performed prior to the grouping analysis, as discussed further below and in its response to the draft PSR (ECF 106), the government agrees that Counts One through Five group pursuant to U.S.S.G. § 3D1.2(c), and that the offense level applicable to the group is the offense level for the most serious of the counts

comprising the group—in this case, Count Two.   *See* U.S.S.G. § 3D1.3(a); PSR ¶¶ 55-58.

The Guidelines for each count of the Superseding Indictment are calculated as follows:

      1.      **Count One: 18 U.S.C. § 231(a)(3)**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."   *See* U.S.S.G. § 2X5.1.   Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a), cross-referenced to § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

*Base Offense Level*

Pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)."   Section 2A2.2, in turn, defines "aggravated assault" as a "felonious assault that involved . . . (D) an intent to commit another felony."   U.S.S.G. § 2A2.2 cmt. n.1.   The cross-reference in § 2A2.4(c)(1) applies here because Jensen's assault of Officer Goodman constituted aggravated assault under U.S.S.G. § 2A2.2 commentary note 1; it was a felonious assault with the intent to commit another felony.   The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes.   *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another.   *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted);

*Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (individual assaulted police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979).

Here, Jensen committed an aggravated assault for two independent reasons. First, he menacingly chased Officer Goodman up a flight of stairs.   In so doing, he threatened to inflict injury upon Officer Goodman and had the ability to do so.   Jensen knew he had the numbers; he knew he had the force of the armed mob behind him, and he used the strength of this mob when he led them in pursuit of Officer Goodman up the East Grand Staircase and into the Ohio Clock Corridor.   That amounted to "a threat to inflict injury upon the person of another [with the] apparent present ability [to do so]," which cause[d] [Officer Goodman to experience] a reasonable apprehension of immediate bodily harm."

Second, when Jensen was impeding Officer Goodman during a civil disorder, his intent was to "commit another felony," that is to obstruct an official proceeding before Congress, in violation of 18 U.S.C. § 1512(c)(2).   Jensen's communications before and after the riot provided additional, overwhelming proof of that criminal intent.   For that reason as well, Jensen's § 231 offense should be treated as an aggravated assault, subject to U.S.S.G. § 2A2.2.   *See* PSR ¶ 50 n.6.

### 2.   Count Two: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat of Physical Injury to Person or Property Damage | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference with the Administration of Justice | +3 |
| | **Total** | **25** |

***Threat of Physical Injury to Person or Property***

Section 2J1.2(b)(1)(B) of the Guidelines applies because Jensen's offense involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice." For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding," as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress," *see* 18 U.S.C. § 1515(a)(1)(B), specifically, Congress' Joint Session to certify the Electoral College vote.

Under U.S.S.G. § 1B1.3, relevant conduct for sentencing encompasses both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. It also includes "all harm that resulted" from the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant. U.S.S.G. § 1B1.3(a)(3).

The evidence at trial established that Jensen's intent in leading a mob of armed rioters in a menacing pursuit of Officer Goodman was to arrest the Vice President—the individual who, by law, must preside over the Certification—and thereby obstruct the administration of justice. *See* Section II, *infra*. Additionally, by convicting Jensen of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with Officer Goodman with the intent to commit another felony, as set forth in Count Three, the jury necessarily found that Jensen threatened to use force against Officer Goodman. *See* Jury Instructions, ECF 97, at 29 (requiring the jury find that Jensen acted "forcibly" in his assault of Officer Goodman). This finding is supported by Officer Goodman's testimony, who described in detail his harrowing experience when he encountered the mob at the bottom of the East Grand Staircase. Officer Goodman testified that he felt like the mob was "going to rush me at any time," and that they could have "engulfed" him and done

"whatever they chose."   Trial Transcript, Sept. 21, 2022, at 210, 212.   Officer Goodman further testified that he feared the mob "would just have their way" with him.   *Id.* at 212.   With respect to Jensen in particular, Officer Goodman testified that Jensen was "forceful, trying to get us to back up."   *Id.* at 218.   *See generally* PSR ¶ 60.

### *Substantial Interference with the Administration of Justice*

According to the commentary to U.S.S.G. § 2J1.2(b)(2), the term "substantial interference with the administration of justice" include "the unnecessary expenditure of substantial governmental or court resources."   *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1.   For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding," as defined in 18 U.S.C. § 1515(a)(1).   In the Capitol Riot cases, the term "official proceeding" refers to a "proceeding before the Congress, § 1515(a)(1)(B).

The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety.   As the jury found, Jensen corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count.   The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses.   As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

This adjustment is particularly appropriate for Jensen, who was responsible for leading a mob of rioters into the hallway directly outside the main entrance to the Senate Chamber.   USCP Officer Mark Gazelle, who was stationed on the Senate floor on January 6, 2021, testified that at the precise time that Jensen led a mob of rioters into the Ohio Clock Corridor (2:16 p.m.), nearly all of the Senators were still on the floor of the Senate Chamber and huddling for safety as USCP

locked down the Chamber and tried to figure out an evacuation route.   *See generally* PSR ¶ 61.

### Guidelines Definition of "Administration of Justice"

The Court should apply both the three-point enhancement for substantially interfering with the administration of justice, under U.S.S.G. § 2J1.2(b)(2), and the eight-point enhancement for causing or threatening to cause injury or property damage in order to obstruct the administration of justice, under U.S.S.G. § 2J1.2(b)(1)(B), over defendant's objection.   *See* ECF 105 (Jensen's objections to the PSR).   Jensen's conduct obstructed the "administration of justice," as that term is used in the Guidelines, because it obstructed the certification of the Electoral College vote.

### i.   The certification of the Electoral College vote involved the administration of justice as defined broadly in the Guidelines.

Section 2J1.2, entitled "Obstruction of Justice," applies to a variety of obstruction offenses, including all offenses under § 1512 and under eleven other statutes found in Chapter 73 of Title 18.   *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A.   It provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice."   U.S.S.G. § 2J1.2(b)(1)(B).   It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2).

Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the Electoral College vote interferes with the "administration of justice" for purposes of the guideline.   Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government.   Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969)

(defining justice to include "exact conformity to some obligatory law"). When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added). And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is more commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *United States v. Aguilar*, 515 U.S. 593 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings"). But there are compelling reasons for concluding that "administration of justice" bears its broader (albeit less common) meaning in U.S.S.G. § 2J1.2.

First, § 2J1.2's context and purpose support the broader reading of "administration of justice" in both (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings). *See* U.S.S.G. § 2J1.2 cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index). Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. § 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c);

obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212.   Yet under a narrow interpretation of the guideline, the enhancements under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to those statutes.   That is good reason to reject such a reading.   *Cf. United States v. Castleman*, 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of violent and dangerous conduct at issue in this case.   The background notes that § 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence."   U.S.S.G. § 2J1.2 cmt. Background.   Within that range, the enhancements "reflect the more serious forms of obstruction."   *Id.*   The Commission thus crafted the enhancements in § 2J1.2 to cover the most egregious *conduct* in the full knowledge that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting subsection (b)(1)(B)'s and (b)(2)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines.   "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct."   *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018).   The

Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). The Sentencing Commission quite reasonably determined, for example, that "causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice" is more serious than obstruction not involving such injury or threats and should be punished more severely. U.S.S.G. § 2J1.2(b)(1)(B). And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive. There is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding. *See United States v. Rubenacker,* No. 1:21-cr-00193 (BAH), May 26, 2022 Sentencing Hearing Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense.").

This is especially true considering that subsections (b)(1)(B) and (b)(2) are not simply two factors among many but are the key sentencing factors in most obstruction cases. The three other enhancements in § 2J1.2 have limited application. Subsections (b)(1)(A) and (b)(1)(C) apply only to violations of § 1001 and § 1505 relating to sex or terrorism offenses. And subsection (b)(3), a comparatively minor two-level increase, applies only where a document was destroyed or altered or the offense was "extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3). Reading the enhancements in subsection (b)(1)(B) and (b)(2) as applying only to judicial or quasi-judicial proceedings would fail to distinguish between the seriousness of offenders' conduct in a

wide variety of obstruction offenses covered by § 2J1.2.   On the other hand, reading the term "administration of justice" more broadly eliminates this gap in the guideline.

Second, Section 2J1.2's commentary provides a broad definition of "administration of justice."   It defines "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*."   U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added).   This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources.   The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."   *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative.

To be sure, the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-point enhancement in U.S.S.G. § 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of justice," which serves as the basis for the eight-point enhancement in U.S.S.G. § 2J1.2(b)(1)(B). But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements.   The operative verbs "interfere[]" and "obstruct" carry the same meaning in this context.   And the adjective "substantial" in § 2J1.2(b) does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources."   U.S.S.G.

§ 2J1.2 cmt. n.1 (emphasis added).   Thus, the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities.   A different conclusion would lead to the incongruous result of giving two different meanings to the term "administration of justice" within the same guideline. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Obstruction of the Electoral College certification vote on January 6, 2021 falls comfortably within the meaning of "administration of justice" as used in § 2J1.2 because it involved Congress's performance of duties required by law.   Specifically, Congress's certification of the Electoral College vote was an official proceeding required by both the Constitution and federal statutes.[8] *See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18.   Application of both subsections (b)(1)(B) and (b)(2) is therefore appropriate here.

> **ii.    Courts, including judges on this Court in January 6 cases, have correctly held that non-judicial proceedings can involve the administration of justice.**

Other courts have appropriately applied the "administration of justice" enhancements in U.S.S.G. § 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings that were not limited to

---

[8] Chief Judge Howell has articulated a different basis on which to apply the enhancement to obstruction of the Electoral College certification.   *United States v. Rubenacker*, No. 1:21-cr-00193 (BAH), Sentencing Hearing Tr. at 69.   She pointed out that Black's Law Dictionary defines "administration of justice" to include the "maintenance of right within a political community by means of the physical force of the state," Black's Law Dictionary (11th ed. 2019), and observed that the joint session of Congress used "'the physical force of the state' in the form of law enforcement officers located in and around the Capitol to secure the proceedings."   *Rubenacker,* Sentencing Tr. at 75.   This understanding of the guideline is arguably broader than the interpretation advanced by the government because it could apply to any proceeding (or event) at which there was a police presence, rather than being limited to proceedings involving the administration of the law.

judicial or grand jury proceedings.  *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial resources to recover the defendant's children he kidnapped and transported internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying § 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2) after a defendant withheld subpoenaed documents from a congressional subcommittee).

Several judges on this Court have applied § 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6, both in cases where the parties agreed to their application and where the application was contested.  *See, e.g.*, *United States v. Wilson*, No. 1:21-cr-00345 (Lamberth, J.); *United States v. Hodgkins*, No. 1:21-cr-00188 (Moss, J.); *United States v. Fairlamb*, No. 1:21-cr-00120 (Lamberth, J.); *United States v. Chansley*, No. 1:21-cr-00003, (Lamberth, J.); *United States v. Matthew Miller*, No. 1:21-cr-00075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 1:21-cr-00193 (BAH) (contested); *United States v. Guy Reffitt*, No. 1:21-cr-00032 (Friedrich, J.) (contested); *United States v. Pruitt,* No. 1:21-cr-00023 (Kelly, J.); *United States v. Robertson,* 1:21-cr-00034 (Cooper, J.) (contested).

**iii.     Judge McFadden's contrary conclusion in *Seefried* and *Secor* is unpersuasive.**

One judge on this Court, Judge McFadden, has reached a contrary conclusion, holding that "administration of justice" in § 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations."  *United States v. Seefried*, No. 1:21-cr-000287, ECF 123 at 1 (D.D.C. Oct. 29, 2022) (TNM); *see United States v. Rodean*, No. 1:21-cr-00057, ECF 76 (D.D.C. Oct. 26, 2022) (restricted statement of reasons); *United States v. Secor,* No. 1:21-cr-00157, ECF 56 at 17-20 (Oct.

24, 2022) (TNM); *United States v. Hale-Cusanelli*, No. 1:21-cr-00037, ECF 120 at 50-55 (D.D.C. Sept. 27, 2022) (TNM).   Judge McFadden's reasons for reaching that conclusion, however, are not persuasive.

Judge McFadden first discussed Black's Law Dictionary's definitions of "administration of justice" and "due administration of justice," which, he concluded, "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights."  *Seefried*, ECF 123 at 4.  He also considered that dictionary's definition of "obstructing" and "interfering with" the administration of justice, a definition that he determined "further corroborates that the 'administration of justice' involves something like a legal proceeding, such as a trial or grand jury hearing."  *Id.* at 5.  But Judge McFadden did not consider the broader definitions of "justice" and "obstruction of justice" cited above, which relate to the orderly administration of the law more generally.   Indeed, Black's Law Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . interferes with the administration of justice."   Black's Law Dictionary (11th ed. 2019) (emphasis added).

Nor does Judge McFadden's corpus linguistics analysis support a different result. Surveying a representative sampling of 375 uses of the term "administration of justice" in legal usage between 1977 and 1987, Judge McFadden found that about 65% of the hits referred to "a judicial proceeding deciding legal rights," about 4% involved "law enforcement activities," and only three entries "referr[ed] to government function generally."  *Seefried*, ECF 123 at 11-13. But the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the guideline's context, purpose, and commentary point in a different direction.   Like all words, legal terms often bear multiple meanings.   For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the

prosecution's withholding of favorable evidence from the defense.   Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus.   And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and corresponds with the commentary's definition.

Judge McFadden was also incorrect in his analysis of § 2J1.2's commentary.   *Seefried*, ECF 123 at 14-17.   As an initial matter, he questioned whether the commentary was even "authoritative," pointing out that the D.C. Circuit "has suggested that courts should eschew deference to the Commission when the commentary expands the meaning of the text of the Guidelines themselves."   *Id.* at 14 (citing *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018)).   But *Winstead* involved a very different situation, in which the guideline's text included a specific list of crimes defined as "controlled substance offenses" and the commentary added an additional *attempt* crime that was "not included in the guideline."   *Winstead*, 890 F.3d at 403.   The D.C. Circuit held that "[b]y purporting to add attempted offenses to the clear textual definition," rather than "interpret[ing] or explain[ing] the ones already there," the commentary conflicted with the guideline and was not authoritative under *Stinson*.   *Id.* at 404.   Here, by contrast, the commentary does not attempt to add to a finite list of offenses, but rather "explain[s]" that the term "administration of justice" bears a broad meaning that includes non-judicial proceedings.

Nor was Judge McFadden correct that—even if it is binding—§ 2J1.2's commentary supports only "a narrower interpretation of the 'administration of justice.'"   *Seefried*, ECF 123 at 15.   Although the other definitions in the commentary undoubtedly relate to "investigations, verdicts, and judicial determinations," that fact does not support a definition that excludes

congressional proceedings.   The commentary's use of the word "includes" indicates that the definition is not an exhaustive list.   *See* Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012).   And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Reading the commentary's use of the word "governmental . . . resources" to include congressional resources would not, as Judge McFadden concluded, "render[ ] the phrase 'or court' superfluous."   *Seefried*, ECF 123 at 17.   Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is hardly an obvious superfluity.   The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts.   And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial).   The superfluity canon provides no basis to limit the term to "*prosecutorial* resources."   *Id.*   Moreover, Judge McFadden's interpretation of the commentary runs into its own superfluity problem.   If, as he concluded, the term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at 1, then the word "governmental" is itself superfluous.   This reading should be rejected.

Judge McFadden's concern that a broader reading of "administration of justice" would allow the government to "trigger the enhancements at will" is also misplaced.   *Seefried*, ECF 123 at 16.   The enhancements in § 2J1.2 do not apply whenever the offense "caused unnecessary expenditures of its resources" in some attenuated way, such as by causing the government to later bring a prosecution.   *Id.* ("While the events of January 6 caused the Government to commit

significant resources—evidenced in part by the number of cases charged in this district—this argument proves too much.").  Instead, the enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources.  *See United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996) (observing that the case resulted in the expenditure of "substantial resources . . . over and above the routine costs of prosecuting the obstruction offense").  If the enhancement could truly be triggered simply by "charg[ing]" a case, *Seefried*, ECF 123 at 16, then even under Judge McFadden's reading the enhancement would apply every time the government brought a felony prosecution, which results in the expenditure of substantial "court" and "prosecutorial" resources, *id.* at 16-17.  Judge McFadden's conclusion that "governmental" should be read to exclude Congress simply does not follow from his concerns about excessive application of the enhancements.

Judge McFadden was also incorrect in perceiving a conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice." *See Seefried*, ECF 123 at 5-6 (observing that the government had not charged any January 6 defendants under § 1503), 20-21 (saying it would be "incongruous" to conclude that "official proceeding" means something different in the Sentencing Guidelines than in the statutory context). The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute.  *DePierre v. United States*, 564 U.S. 70, 87 (2011).  And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently.   First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental *or* court" resources.   Second, § 1503

50

appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice."   And, third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

Judge McFadden's reading of § 2J1.2 also creates difficult line-drawing problems.   Under his reasoning, the enhancements in subsection (b)(1)(B) and (b)(2) apply only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature.   *Seefried*, ECF 123 at 4. But those terms themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations."   *Id.* at 1.   For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of punishment by the state," *id.* at 4.   The government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2.   Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

Moreover, even under a narrower reading of administration of justice, the certification fits within the definition because it has quasi-judicial features.   The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election.   3 U.S.C. § 15.   As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their

respective chambers so each House can render "its decision" on the objection. *Id.* Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared." 3 U.S.C. § 16. Indeed, for these reasons, several judges on this Court have concluded that Congress's certification of the Electoral College is a "quasi-adjudicative or quasi-judicial" proceeding. *United States v. Nordean*, 579 F. Supp. 3d 28, 43 (D.D.C. 2021); *see United States v. Robertson*, 588 F. Supp. 3d 114, 121-22 (D.D.C. 2022) (holding that "the certification of the Electoral College vote is quasi-adjudicatory"); *United States v. Caldwell*, 581 F. Supp. 3d 1, 14-15 (D.D.C. 2021) (holding that the certification was "an 'adjudicatory' proceeding").

### 3.   Count Three: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

*Base Offense Level*

For the same reasons described above regarding Count One, the base offense level is 14, under § 2A2.2(a), because Jensen committed an aggravated assault. *See* PSR ¶ 50 n.6.

*Official Victim*

The named victim in Count Three is United States Capitol Police Officer Eugene Goodman, who is a government officer. Jensen's assault of Officer Goodman was motivated by the fact that Officer Goodman was doing his job of protecting members of Congress and keeping the rioters away from the Senate chamber. Jensen pursued Officer Goodman because he wanted the rioters, including himself, to conduct some sort of "citizen's arrest" of members of Congress and the Vice President in order to stop the certification vote. Jensen also demanded that Officer Goodman and the other USCP officers abdicate their official duties and surrender the Capitol

building to the rioters.

### 4. Count Four: 18 U.S.C. §§ 1752(a)(1), (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Trespass occurred "at any restricted building or grounds." | +2 |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous weapon possessed | +2 |
| U.S.S.G. § 2X1.1(a) | Cross-reference to Count Two | <u>25</u> |
| | **Total** | **25** |

Pursuant to U.S.S.G. § 2B2.3(c)(1), if the offense was committed with the intent to commit a felony offense, § 2X1.1 is applied in respect to that felony offense, if the resulting offense level is greater than that determined otherwise using § 2B2.3. Here, Jensen entered and remained in the restricted area of the Capitol complex for the purpose of committing a felony offense— specifically, obstructing an official proceeding by stopping Congress from certifying the results of the 2020 Presidential election. Accordingly, the substantive offense is Count Two. *See* PSR ¶ 53 n.8.

### 5. Count Five: 18 U.S.C. §§ 1752(a)(2), (b)(1)(A)

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." *See* U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) cross-referenced to §2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | <u>+6</u> |
| | **Total** | **20** |

### 6. Counts Six and Seven: 40 U.S.C. § 5104

Counts Six and Seven are Class B misdemeanors to which the Sentencing Guidelines do not apply. *See* 18 U.S.C. §§ 19 and 3583(b)(2).

### 7.   Grouping Analysis

The Guidelines set out the specific "order" of the analysis: first, for each count of conviction, determine the offense guidelines; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3.   U.S.S.G. § 1B1.3(a)(1)-(3).   *Then*, repeat each step for each additional count of conviction.   U.S.S.G. § 1B1.1(a)(4).   *Finally*, perform the grouping analysis in Part D of Chapter 3.   *Id.*   Probation did not follow this procedure in preparing the PSR.   Rather, Probation started with the grouping analysis in Part D of Chapter 3, PSR ¶¶ 55-58, then did the Guidelines analysis in U.S.S.G. § 1B1.1(a)(1)-(3), but only for Count Two.   PSR ¶¶ 59-68.   Instead, the grouping analysis should be "[a]ppl[ied]" only *after* the Guidelines analysis is performed for each separate count.   U.S.S.G. § 1B1.1(a)(4); *see also* Government's Objections to Draft PSR, ECF 106.

The government submits that the appropriate offense level computations for Counts One, Three, Four, and Five, prior to any grouping analysis under Part D of Chapter 3, are those set forth in Section V.A, *supra*.

Under U.S.S.G. § 3D1.2, "closely related counts" group.   Counts One, Three, and Five comprise a single group ("Group 1") under U.S.S.G. §3D1.2(a) because they involve the same victim—Officer Goodman—and the same threatening pursuit of Officer Goodman.   Counts Two and Four group under § 3D1.2(b) ("Group 2") because they involve the same victim—Congress— and are also connected by the same common criminal objective: to stop the certification of the Electoral college vote.   Group 1 and Group 2 ultimately group under §3D1.2(c) because the counts in Group 1 embody conduct (specifically, the threat to cause physical injury to Officer Goodman) that is treated as a specific offense characteristic for a count in Group 2 (Count Two).

*See* U.S.S.G. §2J1.2(b)(1)(B) (the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice).

Pursuant to § 3D1.3(a), the total offense level is 25.[9]

### 8.    <u>Acceptance of Responsibility</u>

Jensen has not clearly demonstrated acceptance of responsibility for his offenses.   He is therefore ineligible for a reduction in his guidelines offense level under § 3E1.1(a).

According to note two of the commentary to § 3E1.1, the adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."   U.S.S.G. § 3E1.1 cmt. n.2. *Cf. United States v. Jones,* 997 F.2d 1475, 1478 (D.C. Cir. 1993) (en banc) ("The guidelines explicitly tell judges that they normally should deny the two-point reduction to a defendant who does not plead guilty.").   Although "conviction by trial . . . does not automatically preclude a defendant from consideration for such a reduction," a defendant who exercises his right to trial is eligible for a reduction for acceptance of responsibility only in "rare situations."   U.S.S.G. § 3E1.1 cmt. n.2.   As an example, the commentary offers the case of a defendant who "goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)."   *Id.*

In *In re Sealed Case*, 350 F.3d 113, 117 (D.C. Cir. 2003), a defendant who testified before a grand jury about his own involvement in a drug distribution conspiracy but then decided not to

---

[9]  Based on the facts and circumstances of Jensen's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 because a sentence within the Guidelines range is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

enter a guilty plea was found ineligible for a guidelines reduction under § 3E1.1.   The D.C. Circuit held that this did not present such a "rare situation" where the exception should apply.   The court cited several decisions from other Circuits to support its conclusion.   *Id.* at 118 n.3 (citing *United States v. Luciano-Mosquera*, 63 F.3d 1142, 1157 (1st Cir. 1995) (no acceptance of responsibility adjustment under rare situation exception where defendant offered to plead guilty but went to trial); *United States v. Portillo-Valenzuela*, 20 F.3d 393, 394-95 (10th Cir. 1994) (no adjustment under rare situation exception where defendant cooperated and confessed but went to trial); *United States v. Garcia*, 987 F.2d 1459, 1461-62 (10th Cir.1993) (no adjustment under rare situation exception where defendant gave statement and went to trial to contest only one charge); *United States v. Davila*, 964 F.2d 778, 784 (8th Cir. 1992) (no adjustment where defendant admitted involvement in offense and offered to cooperate but went to trial); *United States v. Garcia*, 917 F.2d 1370, 1377-78 (5th Cir.1990) (no adjustment where defendant cooperated with authorities and offered to plead guilty but went to trial)).

In determining whether a defendant has clearly demonstrated acceptance of responsibility under § 3E1.1, the D.C. Circuit has also found relevant a defendant's refusal to cooperate with Probation.   *United States v. Saani*, 650 F.3d 761, 768 (D.C. Cir. 2011) (finding a defendant's agreement to speak candidly with Probation is part of the "candid and full unraveling" required under § 3E1.1 and discussed in *In re Sealed Case*).   Thus, a refusal to provide information to Probation about crimes the defendant has been convicted of committing suggests that the defendant has not, in fact, accepted responsibility for his actions.

Here, Jensen turned himself in only after learning that he was wanted by the FBI.   He agreed to a voluntary interview, and discussed some of his actions on January 6, but he did not explain his state of mind or other details critical to the offenses he committed that day.   For

example, he disclosed nothing about his preparations for the January 6 riot or his knowledge that people he knew planned to bring assault rifles to D.C. that day.   Later, he challenged the voluntariness of his interview.   He declined the government's offer to admit all the elements of the offenses and plead guilty under a favorable plea agreement.   He declined to speak with the Probation Officer in preparation of the PSR.   He has never acknowledged the impact his actions had on the law enforcement officers he confronted or the lawmakers he tried to confront.   He has expressed no remorse for his role in the events that shook the country that day.   In short, he has done nothing to clearly demonstrate acceptance of responsibility for his crimes.   The two-level reduction under § 3E1.1(a) is not applicable here, and Jensen's offense level should remain at 25.

### 9.    Criminal History

The U.S. Probation Office correctly calculated that Jensen has one criminal history point, which places him in Criminal History Category I.   PSR ¶ 75.

### 10.    Guidelines Imprisonment Range

Based on the government's and the Probation officer's calculation of Jensen's total adjusted offense level at 25, Jensen's Guidelines imprisonment range is 57 to 71 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,

§ 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. While each defendant should be sentenced based on his individual conduct, each person who entered the Capitol and interfered with or assaulted police officers on January 6 did so under the most extreme of circumstances.

Any rioter who entered the Capitol would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Jensen's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just

punishment.

To be clear, had Jensen personally engaged in destruction or further violence, he would be facing additional charges and additional penalties associated with that conduct. The absence of destructive acts or more direct violence on Jensen's part is therefore not a mitigating factor in this case.

The nature and circumstances of Jensen's conduct on January 6 weigh heavily towards a significant term of incarceration. He came to Washington D.C. prepared for violence, and when the day approached, he played a significant role leading the violent crowd past the police line, into the building, and through the halls of the Capitol. Even beforehand, he believed that at least some rioters would be armed with firearms, and he knew the D.C. National Guard had been enlisted in case the scheduled protests brought violence. Jensen's intention in marching toward the Capitol and entering the building was to stop the peaceful transfer of power, and he would not be stopped until he accomplished that goal.

Jensen was undeterred by the violence being committed against police on January 6. To the contrary, he celebrated this violence, as evidenced by his triumphant celebration atop the balustrade of the northwest staircase after watching his fellow rioters assault and trample past the police line. His reaction to this violence was not to stop or turn around; it was to shout encouragement to the crowd and into his video camera. He yelled, "Storm the White House. That's what we do!" Jensen was also unphased by the property damage that the rioters caused. For example, when Jensen witnessed rioters smashing in windows with steel clubs, he didn't back away; instead, he positioned himself at the front of the mob so that he could be one of the first rioters to climb through the broken window frame and enter the building.

Jensen repeatedly disobeyed the commands of police on January 6. In particular, he

ignored Officer Goodman who, with his hand on his service weapon, threatened to shoot Jensen if he did not step back.   He refused to leave or back down when Inspector Loyd gave him a direct order to do so.   Jensen also ignored the commands of the police officers inside the Rotunda, who repeatedly instructed him to leave.

Jensen was unafraid to use force against the police inside the Capitol building.   After all, Jensen had the numbers, and he knew it.   Inside the Ohio Clock Corridor, for example, Jensen repeatedly motioned to the men behind him to move forward.   *See* Exhibit 508.   He knew he could rely on the force of the armed mob behind him when he commanded the officers inside the corridor to back up.   Jensen also repeatedly wielded and threatened the force of the mob, including during his standoff with MPD officers near the Senate evacuation route, where he told officers, "What happens if we push?   Do you back up?"   By the time Jensen re-entered the building a second time, he had grown more defiant and began physically shoving police officers, excoriating them for doing their jobs.

Jensen was not only determined to arrest Vice President Pence on January 6, but he also wanted the Capitol Police to "surrender the building" to the rioters.   In other words, his goal was not just to disrupt the certification of the electoral college vote, but to actually occupy the building. He was not there to protest; he was there to wrest control.

To this day, Jensen has not expressed remorse or contrition for his conduct on January 6. In the hours and days after January 6, Jensen called himself a "hero" to the military and Capitol Police, and repeatedly expressed pride for having achieved his goal of becoming the "poster boy" for January 6.   He also propagated lies about January 6, including by telling his friends and social media followers that the police had waved him in that day and that the news was lying.   Finally, Jensen has refused to abandon, much less reevaluate, the beliefs that led him to assault a police

officer on his mission to arrest the Vice President of the United States.   For example, during his bid for pretrial bond in July 2021, Jensen insisted, through counsel, that he was reformed, and that he no longer subscribed to QAnon's conspiracy theories.   But less than thirty days after his release, Jensen was caught using an unauthorized cell phone to stream media channels that continue to propagate lies about the results of the 2020 Presidential election.

Overall, the nature and circumstances of Jensen's offense—most importantly, his leadership of the violent mob that assaulted Officer Goodman and then chased him up the Capitol stairs toward the Senate Chamber—all warrant a significant sentence in this case.

### B.    Jensen's History and Characteristics

Jensen's assault of Officer Goodman was not his first.   In 2015, he was convicted of domestic assault and disorderly conduct after physically attacking his foster stepfather.   PSR ¶ 74. Jensen's wife was present for the assault and had visible injuries to her face, but she did not cooperate with police and Jensen reported that he had a lot to drink and could not recall whether he had hit his wife.   *Id.*   Based on underlying police reports from Jensen's criminal history records, Jensen has engaged in a pattern of threatening behavior, beginning with the 2015 assault, and continuing with an uncharged physical assault in 2018, uncharged cyber harassment in 2019, and most recently, an August 2022 fight with an inmate at the United States Penitentiary, Lewisburg, for which he was sanctioned.   *Id.* ¶¶ 17, 74, 80-81.

In addition to this pattern of violence, harassment, and threatening behavior, Jensen has previously breached this Court's trust by swiftly violating the terms of his bond.   *Id.* ¶ 16. Specifically, thirty days after his release from pretrial detention, Jensen was caught using an unauthorized Wi-Fi connected iPhone to stream news from the online platform Rumble.   Jensen also admitted to his pretrial services officer that he had previously used the Wi-Fi connected

iPhone to watch Mike Lindell's "Cyber Symposium" regarding the recount of the presidential election.   The bond condition restricting Jensen's access to the Internet had been imposed at Jensen's own suggestion, after he claimed in his bond motion that he had fallen "victim" to a "barrage of internet sourced info" and conspiracy theories.   ECF 21 at 4, 6-7.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law.   "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[10]   As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Jensen's criminal conduct—leading an angry mob to assault a lone United States Capitol Police officer in order to obstruct an official proceeding and stop the peaceful transfer of power—epitomizes disrespect for the law.   When Jensen entered the Capitol grounds, and the Capitol itself, it was abundantly clear that lawmakers, and the police officers who were there to protect them, were under siege.   Police officers were overwhelmed, outnumbered, and in many cases, in serious danger.   The rule of law was not only disrespected; it was under attack that day.   A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct Congress and overthrow our system of democracy are not taken seriously.   This is particularly true in Jensen's case, since he portrayed himself to his friends as a "hero" to the Capitol Police, he riled up and emboldened the crowds around him, and he wanted to be (and succeeded in becoming) the "poster boy" for the violence and destruction

---

[10]   Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), *available at* https://oversight.house.gov/sites/ democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

of that day.   In this way, a lesser sentence could encourage further abuses.   *See Gall*, 552 U.S. at

54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote

disrespect for the law").

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant.   18 U.S.C. § 3553(a)(2)(B-C).   *See also United States v. Russell*, 600 F.3d 631, 637

(D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by

others.   18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong because January

6 involved acts of violence that were intended to influence the government through intimidation

or coercion—acts that have been defined, by statute, as domestic terrorism.   *See* 18 U.S.C.

§ 2331(5).

The demands of general deterrence weigh strongly in favor of incarceration, as they will

for nearly every case arising out of the violent riot at the Capitol.   The violence at the Capitol on

January 6 was cultivated to interfere, and did interfere, with one of the most important democratic

processes we have: the transfer of power.   As noted by Judge Moss during sentencing, in *United

States v. Paul Hodgkins*, No. 1:21-cr-00188 (RDM):

> [D]emocracy requires the cooperation of the governed.   When a mob is prepared
> to attack the Capitol to prevent our elected officials from both parties from
> performing their constitutional and statutory duty, democracy is in trouble.   The
> damage that [the defendant] and others caused that day goes way beyond the
> several-hour delay in the certification.   It is a damage that will persist in this
> country for decades.

Tr. at 69-70.   Indeed, the attack on the Capitol means "that it will be harder today than it was

seven months ago for the United States and our diplomats to convince other nations to pursue democracy.   It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."   *Id.* at 70.

The gravity of these offenses demands deterrence.   This was not a protest.   *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").   And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.   There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs in favor of a lengthy term of incarceration.   Jensen's behavior on January 6 displayed a total lack of respect and acknowledgment for the difficulty he created and encouraged for the police officers under attack.   Not only did he threaten and menace the officers, he also made light of their situation.   He posed for selfies at the same moment the police officers were under attack and felt the situation was nearing collapse.   He lightheartedly posed with an officer's hat that he took from its hiding place, insulting the officers who saw that symbol as sacrosanct.   And in his interview with the FBI, he made light of the seriousness of what he had done and its impact on the entire country.   His conduct during his brief time on pretrial release further demonstrates his unwillingness to acknowledge the seriousness of his offense conduct, and highlights his lack of respect for the law—and the risk that he would re-offend.

### E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data.   U.S.S.G. § 1A1.1, intro, comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.   See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.   Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one."   *Rita*, 551 U.S. at 347, 355 (emphasis in original).   In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"   *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.   As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.   This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis.   In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.   Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Jensen and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases.   To try to mechanically compare other § 1512 defendants prior to January 6, 2021 would be a disservice to the magnitude of what the riot entailed and signified.

Section 3553(a)(6) directs a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall*, 552 U.S. at 54.   In short, "the Sentencing Guidelines are themselves an anti-disparity formula."   *United States v.*

66

*Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See United States v. Smocks*, 1:21-cr-00198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).   *But see United States v. De La Cruz*, 397 F. App'x 676, 678 (2d Cir. 2010) ("[A] Guidelines sentence can create an unwarranted disparity") (citing *Kimbrough*, 552 U.S. at 91).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012) (internal quotation marks and citation omitted).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id.* at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v.*

*Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

*United States v. Jacob Chansley*, No. 1:21-cr-00003 (RCL), provides one useful point of comparison to this case. Chansley, following Jensen up the stairs, participated in the chase of Officer Goodman, but did not assault the officer as Jensen had. Chansley later made his way to the Senate floor and stood at the dais. Chansley, the "QAnon Shaman," made himself the face of the January 6 attack. Chansley used a bullhorn, said former Vice President Pence was a traitor, left a note on the Senate dais, and gave TV interviews. Because he qualified for acceptance of responsibility, Chansley's sentencing guidelines offense level was 22, with a corresponding range of 41-51 months imprisonment. The government recommended a sentence of 51 months' imprisonment, and Judge Lamberth imposed a sentence of 41 months' imprisonment.

Similarly, the defendant in *United States v. Rubenacker*, 1:21-cr-00193 (BAH), also followed Jensen in the chase of Officer Goodman. Like Jensen, Rubenacker entered the Capitol for a second time and found himself in the Rotunda. There, he smoked marijuana and had to be forced out with pepper spray before he would leave; he even resisted police efforts to clear him from the Rotunda by swinging a water bottle at one officer's head and throwing liquid at other

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, No. 1:22-cr-0031 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

officers who were engaging with a rioter.   Rubenacker pleaded guilty, without a plea agreement, to an indictment charging him with violations of 18 U.S.C. §§ 111(a), 231, 1512(c)(2), 1752(a)(1) and 1752(a)(2).   Because he qualified for a three-level reduction for acceptance of responsibility, his Guidelines offense level was 22, yielding a Guidelines range of 41 to 51 months.   Chief Judge Howell sentenced Rubenacker to 41 months' incarceration, the bottom of the Guidelines range.

In *United States v. Joshua Hughes*, No. 1:21-cr-00087 (TJK), the defendant followed Jensen up the stairs as part of the mob chasing Officer Goodman.   Unlike Jensen, Hughes committed no assault, and accepted responsibility by pleading guilty.   This Court relied on his extraordinary community support, lack of any criminal history, and other personal characteristics to depart three months below the low end of the guidelines and imposed a sentence of 38 months in custody.   In four other Capitol Siege cases in which defendants pled guilty to obstruction charges, but not assaults, *United States v. Duke Wilson*, No. 1:21-cr-00345 (RCL), *United States v. Scott Fairlamb*, No. 1:21-cr-0012 (RCL), and *United States v. Marshall Neefe and Charles Bradford Smith*, No. 1:21-cr-00562 (RCL), each defendant faced advisory Guidelines ranges of 41-51 months.   Judge Lamberth, who sentenced all four of these defendants in addition to Chansley, imposed incarceration sentences of 41 months for all except Wilson, who received 51 months.

Lastly, another comparable case is *United States v. Thomas Robertson*, No. 1:21-cr-00034 (CRC).   Robertson was an off-duty police officer who recruited his mentee/subordinate officer to go to D.C. with him.   Robertson traveled to D.C. with police badges, his police department gun, and a wooden stick.   Like Jensen, Robertson entered the U.S. Capitol through the Senate Wing Door in a sea of rioters that was engaging in destructive and violent behavior.   Robertson took

photos and videos of his participation.   At sentencing following a jury trial, the government sought the eight-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B) and the three-point enhancement under U.S.S.G. § 2J1.2(b)(2).   The Court agreed that both should apply.   In addition, unlike Jensen, Robertson's conduct led to an additional two-point enhancement for obstructing the investigation and prosecution of his own offense (§ 3C1.1) and a two-point enhancement for his aggravating role with respect to his co-defendant (§ 3B1.1).   The Court sentenced Robertson to 87 months' incarceration, the bottom of the applicable Guidelines range of 87 to 108 months.   Jensen engaged in a more visible and active role in inciting other rioters while inside the Capitol, leading the charge against Officer Goodman and encouraging the mob of rioters to push against the police line in the Ohio Clock Corridor.   However, unlike Robertson, Jensen did not obstruct the investigation or prosecution if his own offense, leading to a guidelines range four levels lower than Robertson's.   A sentence of 64 months' imprisonment here would be consistent with the sentence imposed in Robertson.

Because of Jensen's aggravated conduct before and during the riot, a sentence in the middle of the applicable Guidelines range would be sufficient but no greater than necessary to satisfy the requirements of 18 U.S.C. § 3553(a).

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 (VWPA), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[12]   *United States v. Papagno*, 639 F.3d 1093,

---

[12] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here.   *See* 18

1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused

by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a

specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b).

Those principles have straightforward application here.   The identified assault victim in

this case, Officer Goodman, did not suffer bodily injury as a result of Jensen's assault.   But the

riot did inflict substantial damage on the Capitol building and grounds, as described above.

Restitution of $2,000 would reflect in part the role Jensen played in the riot on January 6.   If so

ordered, Jensen's restitution payment should be made to the Clerk of the Court, who will forward

the payment to the Architect of the Capitol,[13] who is responsible for the care and upkeep of the

Capitol building and grounds.

---

U.S.C. § 3663A(c)(1).

[13] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 64 months, which is a mid-range sentence as calculated by the government and the Probation Office, restitution of $2,000, and the mandatory special assessment of $520 ($100 for each felony count of conviction and $10 for each misdemeanor).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:  _____/s/_____
     Emily W. Allen, CA Bar No. 234961
     Havi Mirell, CA Bar No. 311098
     Assistant United States Attorneys
     U.S. Attorney's Office
     601 D. Street NW
     Washington, D.C. 20530
     emily.allen@usdoj.gov
     hava.mirell@usdoj.gov

72